# EXHIBIT 1

## 2nd original

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon 'A' and "Barecon 'B'". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO). Copenhagen. Issued November 2001

| 1. Shipbroker<br>**Arrow Tankers A/S**<br>**Bredgade 31 B, 4.**<br>**DK-1260 Copenhagen K**<br>**Denmark** | **BIMCO STANDARD BAREBOAT CHARTER**<br>**CODE NAME: "BARECON 2001"**    PART I |
|---|---|
| | 2. Place and date<br>**Copenhagen, 23rd February 2010** |
| 3. Owners/Place of business (Cl. 1)<br>**Psara Energy Limited**<br>**Ajeltake Road, Ajeltake Island**<br>**Majuro, MH 96960**<br>**Marshall Island** | 4. Bareboat Charterers/Place of business (Cl. 1)<br>**Geden Holdings Limited, Malta or nominee always guaranteed by Geden Line. Performance Guarantee to the satisfaction of Owners and their financiers be mutually agreed.** |
| 5. Vessel's name, call sign and flag (Cl. 1 and 3)<br>**Name: m.t. CV STEALTH**<br>**Flag: Malta** | |
| 6. Type of Vessel<br>**Crude oil carrier** | 7. GT/NT<br>**58,418 / 31,117** |
| 8. When/Where built<br>**2005 / Shanghai Wangaoqiao Shipbuilding Co. Ltd.** | 9. Total DWT (abt.) in metric tons on summer freeboard<br>**104,499** |
| 10. Classification Society (Cl. 3)<br>**ABS** | 11. Date of last special survey by the Vessel's classification society<br>**N/A** |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)<br>**Attached Vessel's Q88. Vessel to be redeliverd with SS passed** | |
| 13. Port or Place of delivery (Cl. 3)<br>**WW DLOSP at one safe port / safe anchorage ATDNSHINC**<br>**Vessel to be delivered with SS passed** | 14. Time for delivery (Cl. 4)<br>**15th April 2010, 00:01 hrs lt**    15. Cancelling date (Cl. 5)<br>**30th August 2010, 23:59 hrs lt** |
| 16. Port or Place of redelivery (Cl. 15)<br>**DLOSP at one safe port, berth or anchorage WW in CHOPT always within trading limits ATDNSHINC** | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15)<br>**SS/DD passed without extensions** |
| 18. Running days' notice if other than stated in Cl. 4<br>**See Rider Clause 15.** | 19. Frequency of dry-docking (Cl. 10(g))<br>**As required by class without extensions** |
| 20. Trading limits (Cl. 6)<br>**Worldwide, excluding Israel, Cambodia, Cuba, Lebanon, Gulf of Aqaba, Namibia, North Korea, Chinese River Ports, Haiti, all war risk and war like zones and other areas/countries prohibited by the flag of the vessel and the United Nations without Owners' prior consent which shall not be unreasonably withheld.**<br><br>**The vessel not to trade in ice, break ice nor follow ice breakers in ice.** | |
| 21. Charter period (Cl. 2)<br>**5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period** | 22. Charter hire (Cl. 11)<br>**USD 9,750 gross pdpr the first 365 days after delivery**<br>**USD 10,750 gross pdpr for the 2nd charter year**<br>**USD 11,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year**<br>**USD 10,750 gross pdpr for 4th charter year**<br>**USD 10,750 gross pdpr for 5th charter year**<br>**USD 13,250 for the optional period** |
| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))<br>**10%** | |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

## "BARECON 2001" STANDARD BAREBOAT CHARTER

PART I

| | |
|---|---|
| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to <u>PART IV</u><br><br>**As per Clause 10 F** | 25. Currency and method of payment (<u>Cl. 11</u>)<br><br>**US Dollars / Telegraphic Transfer** |
| 26. Place of payment; also state beneficiary and bank account (<u>Cl. 11</u>)<br><br>**TBA** | 27. Bank guarantee/bond (sum and place) (<u>Cl. 24</u>) (optional)<br><br>**Corporate Guarantee to be attached to the BBCHP as attached to the C/P** |
| 28. Mortgage(s), if any (state whether <u>12(a)</u> or <u>(b)</u> applies; if <u>12(b)</u> applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (<u>Cl. 12</u>) | 29. Insurance (hull and machinery and war risks) (state value acc. to <u>Cl. 13(f)</u> or, if applicable, acc. to <u>Cl. 14(k)</u>) (also state if <u>Cl. 14</u> applies)<br><br>**USD 77,000,000** |
| 30. Additional insurance cover, if any, for Owners' account limited to (<u>Cl. 13(b)</u> or, if applicable, <u>Cl. 14(g)</u>)<br><br>**At Owner's discretion** | 31. Additional insurance cover, if any, for Charterers' account limited to (<u>Cl. 13(b)</u> or, if applicable, <u>Cl. 14(g)</u>)<br><br>**At Charterer's discretion** |
| 32. Latent defects (only to be filled in if period other than stated in <u>Cl. 3</u>)<br><br>**N/A** | 33. Brokerage commission and to whom payable (<u>Cl. 27</u>)<br><br>**1% to Arrow Tankers A/S payable by the Owners** |
| 34. Grace period (state number of clear banking days) (<u>Cl. 28</u>)<br><br>**Seven (7) working days** | 35. Dispute Resolution (state <u>30(a)</u>, <u>30(b)</u> or <u>30(c)</u>; if <u>30(c)</u> agreed Place of Arbitration <u>must</u> be stated (<u>Cl. 30</u>)<br><br>**30a** |
| 36. War cancellation (indicate countries agreed) (<u>Cl. 26(f)</u>)<br><br>**UK, USA, Russia, China** | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether <u>PART III</u> applies) (optional)<br><br>**N/A** | 38. Name and place of Builders (only to be filled in if <u>PART III</u> applies)<br><br>**N/A** |
| 39. Vessel's Yard Building No. (only to be filled in if <u>PART III</u> applies)<br><br>**N/A** | 40. Date of Building Contract (only to be filled in if <u>PART III</u> applies)<br><br>**N/A** |
| 41. Liquidated damages and costs shall accrue to (state party acc. to <u>Cl. 1</u>)<br><br>  a) **N/A**<br>  b) **N/A**<br>  c) **N/A** | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether <u>PART IV</u> applies) (optional)<br><br>**As per Rider Clause 13** | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether <u>PART V</u> applies) (optional)<br><br>**No** |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if <u>PART V</u> applies)<br><br>**N/A** | 45. Country of the Underlying Registry (only to be filled in if <u>PART V</u> applies)<br><br>**N/A** |
| 46. Number of additional clauses covering special provisions, if agreed<br><br>**Rider Clauses 1-20** | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include <u>PART I</u> and <u>PART II</u>. In the event of a conflict of conditions, the provisions of <u>PART I</u> shall prevail over those of <u>PART II</u> to the extent of such conflict but no further. It is further mutually agreed that <u>PART III</u> and/or <u>PART IV</u> and/or <u>PART V</u> shall only apply and only form part of this Charter if expressly agreed and stated in <u>Boxes 37</u>, <u>42</u> and <u>43</u>. If <u>PART III</u> and/or <u>PART IV</u> and/or <u>PART V</u> apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of <u>PART III</u> and/or <u>PART IV</u> and/or <u>PART V</u> to the extent of such conflict but no further.

| | |
|---|---|
| Signature (Owners) | Signature (Charterers) |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

**"BARECON 2001" STANDARD BAREBOAT CHARTER**

This document is a computer generated BARECON 2001 form printed by authority of BIMCO.  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "BARECON 2001" Standard Bareboat Charter

**1. Definitions** — 1
In this Charter, the following terms shall have the — 2
meanings hereby assigned to them: — 3
*"The Owners"* shall mean the party identified in Box 3; — 4
*"The Charterers"* shall mean the party identified in Box 4; — 5
*"The Vessel"* shall mean the vessel named in Box 5 and — 6
with particulars as stated in Boxes 6 to 12; — 7
*"Financial Instrument"* means the mortgage, deed of — 8
covenant or other such financial security instrument as — 9
annexed to this Charter and stated in Box 28. — 10

**2. Charter Period** — 11
In consideration of the hire detailed in Box 22, — 12
the Owners have agreed to let and the Charterers have — 13
agreed to hire the Vessel for the period stated in Box 21 — 14
("The Charter Period"). — 15

**3. Delivery** — 16
*(not applicable when Part III applies, as indicated in Box 37)* — 17
**(a)** The Owners shall before and at the time of delivery — 18
exercise due diligence to make the Vessel seaworthy — 19
And in every respect ready in hull, machinery and — 20
equipment for service under this Charter. — 21
The Vessel shall be delivered by the Owners and taken — 22
over by the Charterers at the port or place indicated in — 23
Box 13 in such ready safe berth as the Charterers may — 24
direct. — 25
**(b)** The Vessel shall be properly documented on — 26
delivery in accordance with the laws of the flag State — 27
indicated in Box 5 and the requirements of the — 28
classification society stated in Box 10. The Vessel upon — 29
delivery shall have her survey cycles up to date and — 30
trading and class certificates valid for at least the number — 31
of months agreed in Box 12. — 32
**(c)** The delivery of the Vessel by the Owners and the — 33
taking over of the Vessel by the Charterers shall — 34
constitute a full performance by the Owners of all the — 35
Owners' obligations under this Clause 3, and thereafter — 36
the Charterers shall not be entitled to make or assert — 37
any claim against the Owners on account of any — 38
conditions, representations or warranties expressed or — 39
implied with respect to the Vessel but the Owners shall — 40
be liable for the cost of but not the time for repairs or — 41
renewals occasioned by latent defects in the Vessel, — 42
her machinery or appurtenances, existing at the time of — 43
delivery under this Charter, provided such defects have — 44
manifested themselves within twelve (12) months after — 45
delivery unless otherwise provided in Box 32. — 46

**4. Time for Delivery** — 47
*(not applicable when Part III applies, as indicated in Box 37)* — 48
The Vessel shall not be delivered before the date — 49
indicated in Box 14 without the Charterers' consent and — 50
the Owners shall exercise due diligence to deliver the — 51
Vessel not later than the date indicated in Box 15 as per — 52
Box 18. — 53
~~Unless otherwise agreed in Box 18, the Owners shall~~ — 53
~~give the Charterers not less than thirty (30) running days'~~ — 54
~~preliminary and not less than fourteen (14) running days'~~ — 55
~~definite notice of the date on which the Vessel is~~ — 56
~~expected to be ready for delivery.~~ — 57
The Owners shall keep the Charterers closely advised — 58
of possible changes in the Vessel's position. — 59

**5. Cancelling** — 60
*(not applicable when Part III applies, as indicated in Box 37)* — 61
**(a)** Should the Vessel not be delivered by the — 62
cancelling date indicated in Box 15, the Charterers shall — 63
have the option of cancelling this Charter by giving the — 64
Owners notice of cancellation within thirty-six (36) — 65
running hours after the cancelling date stated in Box — 66
15, failing which this Charter shall remain in full force — 67
and effect. — 68
**(b)** If it appears that the Vessel will be delayed beyond — 69
the cancelling date, the Owners may, as soon as they — 70
are in a position to state with reasonable certainty the — 71

day on which the Vessel should be ready, give notice — 72
thereof to the Charterers asking whether they will — 73
exercise their option of cancelling, and the option must — 74
then be declared within one hundred and sixty-eight — 75
(168) running hours of the receipt by the Charterers of — 76
such notice or within thirty-six (36) running hours after — 77
the cancelling date, whichever is the earlier. If the — 78
Charterers do not then exercise their option of cancelling, — 79
the seventh day after the readiness date stated in the — 80
Owners' notice shall be substituted for the cancelling — 81
date indicated in Box 15 for the purpose of this Clause 5. — 82
**(c)** Cancellation under this Clause 5 shall be without — 83
prejudice to any claim the Charterers may otherwise — 84
have on the Owners under this Charter. — 85

**6. Trading Restrictions** — 86
The Vessel shall be employed in lawful trades for the — 87
carriage of suitable lawful merchandise within the trading — 88
limits indicated in Box 20. — 89
The Charterers undertake not to employ the Vessel or — 90
suffer the Vessel to be employed otherwise than in — 91
conformity with the terms of the contracts of insurance — 92
(including any warranties expressed or implied therein) — 93
without first obtaining the consent of the insurers to such — 94
employment and complying with such requirements as — 95
to extra premium or otherwise as the insurers may — 96
prescribe. **When required by Owner, the Charterers** — 97
**shall keep the Owners and Mortgages advised on** — 
**intended employment of Vessel.** — 
The Charterers also undertake not to employ the Vessel — 98
or suffer her employment in any trade or business which — 99
is forbidden by the law of any country to which the Vessel — 100
may sail or is otherwise illicit or in carrying illicit or — 101
prohibited goods or in any manner whatsoever which — 102
may render her liable to condemnation, destruction, — 103
seizure or confiscation. — 104
Notwithstanding any other provisions contained in this — 105
Charter it is agreed that nuclear fuels or radioactive — 106
products or waste are specifically excluded from the — 107
cargo permitted to be loaded or carried under this — 108
Charter. This exclusion does not apply to radio-isotopes — 109
used or intended to be used for any industrial, — 110
commercial, agricultural, medical or scientific purposes — 111
provided the Owners' prior approval has been obtained — 112
to loading thereof. — 113

**7. Surveys on Delivery and Redelivery** — 114
*(not applicable when Part III applies, as indicated in Box 37)* — 115
The Owners and Charterers shall each appoint — 116
surveyors for the purpose of determining and agreeing — 117
in writing the condition of the Vessel at the time of — 118
delivery and redelivery hereunder. The Owners shall — 119
bear all expenses of the On-hire Survey including loss — 120
of time, if any, and the Charterers shall bear all expenses — 121
of the Off-hire Survey including loss of time, if any, at — 122
the daily equivalent to the rate of hire or pro rata thereof. — 123

**8. Inspection** — 124
The Owners shall have the right at any time after giving — 125
reasonable notice to the Charterers to inspect or survey — 126
the Vessel or instruct a duly authorised surveyor to carry — 127
out such survey on their behalf:- **provided it does not** — 128
**interfere with the operation of the Vessel a/o crew,** — 
**but not to be unreasonably withheld.** — 
**(a)** to ascertain the condition of the Vessel and satisfy — 129
themselves that the Vessel is being properly repaired — 130
and maintained. The costs and fees for such inspection — 131
or survey shall be paid by the Owners unless the Vessel — 132
is found to require repairs or maintenance in order to — 133
achieve the condition so provided; — 134
**(b)** in dry-dock if the Charterers have not dry-docked — 135
Her in accordance with Clause 10(g). The costs and fees — 136
for such inspection or survey shall be paid by the — 137
Charterers; and — 138
**(c)** for any other commercial reason they consider — 139
necessary (provided it does not unduly interfere with — 140

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BiMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

the commercial operation of the Vessel). The costs and 141
fees for such inspection and survey shall be paid by the 142
Owners. 143
All time used in respect of inspection, survey or repairs 144
shall be for the Charterers' account and form part of the 145
Charter Period. 146
The Charterers shall also permit the Owners to inspect 147
the Vessel's log books whenever requested and shall 148
whenever required by the Owners furnish them with full 149
information regarding any casualties or other accidents 150
or damage to the Vessel. 151

**9.    Inventories, Oil and Stores** 152
A complete inventory of the Vessel's entire equipment, 153
outfit including spare parts, appliances and of all 154
consumable stores on board the Vessel shall be made 155
by the Charterers in conjunction with the Owners on 156
delivery and again on redelivery of the Vessel. The 157
Charterers and the Owners, respectively, shall at the 158
time of delivery and redelivery take over and pay for all 159
bunkers, lubricating oil, unbroached provisions, paints, 160
ropes and other consumable stores (excluding spare 161
parts) in the said Vessel at the then current market prices 162
at the ports of delivery and redelivery, respectively. The 163
Charterers shall ensure that all spare parts listed in the 164
inventory and used during the Charter Period are 165
replaced at their expense prior to redelivery of the 166
Vessel. 167

**10.    Maintenance and Operation** 168
(a)(i) Maintenance and Repairs – During the Charter 169
Period the Vessel shall be in the full possession 170
and at the absolute disposal for all purposes of the 171
Charterers and under their complete control in 172
every respect. The Charterers shall maintain the 173
Vessel, her machinery, boilers, appurtenances and 174
spare parts in a good state of repair, in efficient 175
operating condition and in accordance with good 176
commercial maintenance practice and, except as 177
provided for in Clause 14(l), if applicable, at their 178
own expense they shall at all times keep the 179
Vessel's Class fully up to date with the Classification 180
Society indicated in Box 10 and maintain all other 181
necessary certificates in force at all times. If 182
necessary as deemed by class, the Charterers to
take immediate steps to have the necessary
repairs done within a reasonable time (prior to or
upon SS-drydocking) failing which the Owners
shall have the right of withdrawing the Vessel
from the service of the Charterers and without
prejudice to any claim the Owners may
otherwise have against the Charterers under this
Charter.
(ii) New Class and Other Safety Requirements - In the 183
event of any improvement, structural changes or 184
new equipment becoming necessary for the 185
continued operation of the Vessel by reason of new 186
class requirements or by compulsory legislation 187
costing (excluding the Charterers' loss of time) 188
more than the percentage stated in Box 23, or if 189
Box 23 is left blank, 5 per cent. of the Vessel's 190
insurance value as stated in Box 29, then the 191
extent, if any, to which the rate of hire shall be varied 192
and the ratio in which the cost of compliance shall 193
be shared between the parties concerned in order 194
to achieve a reasonable distribution thereof as 195
between the Owners and the Charterers having 196
regard, inter alia, to the length of the period 197
remaining under this Charter shall, in the absence 198
of agreement, be referred to the dispute resolution 199
method agreed in Clause 30. 200
(iii) Financial Security - The Charterers shall maintain 201
financial security or responsibility in respect of third 202
party liabilities as required by any government, 203
including federal, state or municipal or other division 204

or authority thereof, to enable the Vessel, without 205
penalty or charge, lawfully to enter, remain at, or 206
leave any port, place, territorial or contiguous 207
waters of any country, state or municipality in 208
performance of this Charter without any delay. This 209
obligation shall apply whether or not such 210
requirements have been lawfully imposed by such 211
government or division or authority thereof. 212
The Charterers shall make and maintain all arrange- 213
ments by bond or otherwise as may be necessary to 214
satisfy such requirements at the Charterers' sole 215
expense and the Charterers shall indemnify the Owners 216
against all consequences whatsoever (including loss of 217
time) for any failure or inability to do so. 218
(b)    Operation of the Vessel - The Charterers shall at 219
their own expense and by their own procurement man, 220
victual, navigate, operate, supply, fuel and, whenever 221
required, repair the Vessel during the Charter Period 222
and they shall pay all charges and expenses of every 223
kind and nature whatsoever incidental to their use and 224
operation of the Vessel under this Charter, including 225
annual flag State fees and any foreign general 226
municipality and/or state taxes. The Master, officers 227
and crew of the Vessel shall be the servants of the Charterers 228
for all purposes whatsoever, even if for any reason 229
appointed by the Owners. 230
Charterers shall comply with the regulations regarding 231
officers and crew in force in the country of the Vessel's 232
flag or any other applicable law. 233
(c)    The Charterers shall keep the Owners and the 234
mortgagee(s) advised of the intended employment, 235
planned dry-docking and major repairs of the Vessel, 236
as reasonably required. 237
(d)    Flag and Name of Vessel – Charterers have the 238
right to reflag the ship and install and display their
funnel insignia and fly their own house flag, but name
cannot be changed. During the Charter
Period, the Charterers shall have the liberty to paint the 239
Vessel in their own colours, install and display their 240
funnel insignia and fly their own house flag. The 241
Charterers shall also have the liberty, with the Owners' 242
consent, which shall not be unreasonably withheld, to 243
change the flag and/or the name of the Vessel during 244
the Charter Period. Painting and re-painting, instalment 245
and re-instalment, registration and re-registration, if 246
required by the Owners, shall be at the Charterers' 247
expense and time. 248
(e)    Changes to the Vessel – Subject to Clause 10(a)(ii), 249
the Charterers shall make no structural changes in the 250
Vessel or changes in the machinery, boilers, appurten- 251
ances or spare parts thereof without in each instance 252
first securing the Owners' approval thereof. If the Owners 253
so agree, the Charterers shall, if the Owners so require, 254
restore the Vessel to its former condition before the 255
termination of this Charter. 256
(f)    Use of the Vessel's Outfit, Equipment and 257
Appliances - The Charterers shall have the use of all 258
outfit, equipment, and appliances on board the Vessel 259
at the time of delivery, provided the same or their 260
substantial equivalent shall be returned to the Owners 261
on redelivery in the same good order and condition as 262
when received, ordinary wear and tear excepted. The 263
Charterers shall from time to time during the Charter 264
Period replace such items of equipment as shall be so 265
damaged or worn as to be unfit for use. The Charterers 266
are to procure that all repairs to or replacement of any 267
damaged, worn or lost parts or equipment be effected 268
in such manner (both as regards workmanship and 269
quality of materials) as not to diminish the value of the 270
Vessel. The Charterers have the right to fit additional 271
equipment at their expense and risk but the Charterers 272
shall remove such equipment at the end of the period if 273
requested by the Owners. Any equipment including radio 274
equipment on hire on the Vessel at time of delivery shall 275
be kept and maintained by the Charterers and the 276

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BiMCO approved document and this computer generated document.

**2nd original**

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

Charterers shall assume the obligations and liabilities 277
of the Owners under any lease contracts in connection 278
therewith and shall reimburse the Owners for all 279
expenses incurred in connection therewith, also for any 280
new equipment required in order to comply with radio 281
regulations. 282
**(g)** Periodical Dry-Docking - The Charterers shall dry- 283
dock the Vessel and clean and paint her underwater 284
parts whenever the same may be necessary, but not 285
less than once during the period stated in Box 19 or, if 286
Box 19 has been left blank, every sixty (60) calendar 287
months after delivery or such other period as may be 288
required by the Classification Society or flag State. 289

**11.   Hire** 290
**(a)**   The Charterers shall pay  hire due to the Owners 291
punctually in accordance with the terms of this Charter 292
in respect of which time shall be of the essence. 293
**(b)**   Payment of hire shall be made as per daily hire 294
**in Box 22 basis per calender month in advance. First**
**hire payable prorata upto end of the month starting**
**from vessel's actual delivery date/time.** The Charterers
shall pay to the Owners for the hire
of the Vessel a lump sum in the amount indicated in 295
Box 22 which shall be payable not later than every thirty 296
(30) running days in advance, the first lump sum being 297
payable on the date and hour of the Vessel's delivery to 298
the Charterers. Hire shall be paid continuously 299
throughout the Charter Period. 300
**(c)**   Payment of hire shall be made in cash without 301
discount in the currency and in the manner indicated in 302
Box 25 and at the place mentioned in Box 26. 303
**(d)**   Final payment of hire, if for a period of less than 304
thirty (30) running days **a month**, shall be calculated 305
proportionally
according to the number of days and hours remaining 306
before redelivery and advance payment to be effected 307
accordingly. 308
**(e)**   Should the Vessel be lost or missing, hire shall 309
cease from the date and time when she was lost or last 310
heard of. The date upon which the Vessel is to be treated 311
as lost or missing shall be ten (10) days after the Vessel 312
was last reported or when the Vessel is posted as 313
missing by Lloyd's, whichever occurs first.  Any hire paid 314
in advance to be adjusted accordingly. 315
**(f)**   Any delay in payment of hire shall entitle the 316
Owners to interest at the rate per annum as agreed 317
in Box 24. If Box 24 has not been filled in, the three months 318
Interbank offered rate in London (LIBOR or its successor) 319
for the currency stated in Box 25, as quoted by the British 320
Bankers' Association (BBA) on the date when the hire 321
fell due, increased by 2 per cent., shall apply. 322
**(g)**   Payment of interest due under sub-clause 11(f) 323
shall be made within seven (7) running days of the date 324
of the Owners' invoice specifying the amount payable 325
or, in the absence of an invoice, at the time of the next 326
hire payment date. 327

**12.   Mortgage** 328
(only to apply if Box 28 has been appropriately filled in) 329
*)   (a)   The Owners warrant that they have not effected 330
any mortgage(s) of the Vessel and that they shall not 331
effect any mortgage(s) without the prior consent of the 332
Charterers, which shall not be unreasonably withheld. 333
*)   **(b)**   The Vessel chartered under this Charter is financed 334
by a mortgage according to the Financial Instrument. 335
The Charterers undertake to comply, and provide such 336
information and documents to enable the Owners to 337
comply, with all such instructions or directions in regard 338
to the employment, insurances, operation, repairs and 339
maintenance of the Vessel as laid down in the Financial 340
Instrument or as may be directed from time to time during 341
the currency of the Charter by the mortgagee(s) in 342
conformity with the Financial Instrument. The Charterers 343
confirm that, for this purpose, they have acquainted 344

themselves with all relevant terms, conditions and 345
provisions of the Financial Instrument and agree to 346
acknowledge this in writing in any form that may be 347
required by the mortgagee(s). The Owners warrant that 348
they have not effected any mortgage(s) other than stated 349
in Box 28 and that they shall not agree to any 350
amendment of the mortgage(s) referred to in Box 28 or 351
effect any other mortgage(s) without the prior consent 352
of the Charterers, which shall not be unreasonably 353
withheld. 354
*)   (Optional, Clauses 12(a) and 12(b) are alternatives; 355
indicate alternative agreed in Box 28). 356

**13.   Insurance and Repairs** 357
**(a)**   During the Charter Period the Vessel shall be kept 358
insured by the Charterers at their expense against hull 359
and machinery, war and Protection and Indemnity risks 360
(and any risks against which it is compulsory to insure 361
for the operation of the Vessel, including maintaining 362
financial security in accordance with sub-clause 363
10(a)(iii)) in such form as the Owners shall in writing 364
approve, which approval shall not be un-reasonably 365
withheld. Such insurances shall be arranged by the 366
Charterers to protect the interests of both the Owners 367
and the Charterers and the mortgagee(s) (if any), and 368
The Charterers shall be at liberty to protect under such 369
insurances the interests of any managers they may 370
appoint. Insurance policies shall cover the Owners and 371
the Charterers according to their respective interests. 372
Subject to the provisions of the Financial Instrument, if 373
any, and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clause 13(a) and for repairs of latent defects according 388
to Clause 3(c) above, including any deviation, shall be 389
for the Charterers' account. 390
**(b)**   If the conditions of the above insurances permit 391
additional insurance to be placed by the parties, such 392
cover shall be limited to the amount for each party set 393
out in Box 30 and Box 31, respectively. The Owners or 394
the Charterers as the case may be shall immediately 395
furnish the other party with particulars of any additional 396
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400
**(c)**   The Charterers shall upon the request of the 401
Owners, provide information and promptly execute such 402
documents as may be required to enable the Owners to 403
comply with the insurance provisions of the Financial 404
Instrument. 405
**(d)**   Subject to the provisions of the Financial Instru- 406
ment, if any, should the Vessel become an actual, 407
constructive, compromised or agreed total loss under 408
the insurances required under sub-clause 13(a), all 409
insurance payments for such loss shall be paid to the 410
Owners who shall distribute the moneys between the 411
Owners and the Charterers according to their respective 412
interests. The Charterers undertake to notify the Owners 413
and the mortgagee(s), if any, of any occurrences in 414
consequence of which the Vessel is likely to become a 415
total loss as defined in this Clause. 416
**(e)**   The Owners shall upon the request of the 417
Charterers, promptly execute such documents as may 418

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

be required to enable the Charterers to abandon the 419
Vessel to insurers and claim a constructive total loss. 420
**(f)**    For the purpose of insurance coverage against hull 421
and machinery and war risks under the provisions of 422
sub-clause 13(a), the value of the Vessel is the sum 423
indicated in Box 29. 424

~~**14.**    **Insurance, Repairs and Classification**~~ 425
~~(Optional, only to apply if expressly agreed and stated~~ 426
~~in Box 29, in which event Clause 13 shall be considered~~ 427
~~deleted).~~ 428
~~**(a)**    During the Charter Period the Vessel shall be kept~~ 429
~~insured by the Owners at their expense against hull and~~ 430
~~machinery and war risks under the form of policy or~~ 431
~~policies attached hereto. The Owners and/or insurers~~ 432
~~shall not have any right of recovery or subrogation~~ 433
~~against the Charterers on account of loss of or any~~ 434
~~damage to the Vessel or her machinery or appurt-~~ 435
~~enances covered by such insurance, or on account of~~ 436
~~payments made to discharge claims against or liabilities~~ 437
~~of the Vessel or the Owners covered by such insurance.~~ 438
~~Insurance policies shall cover the Owners and the~~ 439
~~Charterers according to their respective interests.~~ 440
~~**(b)**    During the Charter Period the Vessel shall be kept~~ 441
~~insured by the Charterers at their expense against~~ 442
~~Protection and Indemnity risks (and any risks against~~ 443
~~which it is compulsory to insure for the operation of the~~ 444
~~Vessel, including maintaining financial security in~~ 445
~~accordance with sub-clause 10(a)(iii)) in such form as~~ 446
~~the Owners shall in writing approve which approval shall~~ 447
~~not be unreasonably withheld.~~ 448
~~**(c)**    In the event that any act or negligence of the~~ 449
~~Charterers shall vitiate any of the insurance herein~~ 450
~~provided, the Charterers shall pay to the Owners all~~ 451
~~losses and indemnify the Owners against all claims and~~ 452
~~demands which would otherwise have been covered by~~ 453
~~such insurance.~~ 454
~~**(d)**    The Charterers shall, subject to the approval of the~~ 455
~~Owners or Owners' Underwriters, effect all insured~~ 456
~~repairs, and the Charterers shall undertake settlement~~ 457
~~of all miscellaneous expenses in connection with such~~ 458
~~repairs as well as all insured charges, expenses and~~ 459
~~liabilities, to the extent of coverage under the insurances~~ 460
~~provided for under the provisions of sub-clause 14(a).~~ 461
~~The Charterers to be secured reimbursement through~~ 462
~~the Owners' Underwriters for such expenditures upon~~ 463
~~presentation of accounts.~~ 464
~~**(e)**    The Charterers to remain responsible for and to~~ 465
~~effect repairs and settlement of costs and expenses~~ 466
~~incurred thereby in respect of all other repairs not~~ 467
~~covered by the insurances and/or not exceeding any~~ 468
~~possible franchise(s) or deductibles provided for in the~~ 469
~~insurances.~~ 470
~~**(f)**    All time used for repairs under the provisions of~~ 471
~~sub-clauses 14(d) and 14(e) and for repairs of latent~~ 472
~~defects according to Clause 3 above, including any~~ 473
~~deviation, shall be for the Charterers' account and shall~~ 474
~~form part of the Charter Period.~~ 475
~~The Owners shall not be responsible for any expenses~~ 476
~~as are incident to the use and operation of the Vessel~~ 477
~~for such time as may be required to make such repairs.~~ 478
~~**(g)**    If the conditions of the above insurances permit~~ 479
~~additional insurance to be placed by the parties such~~ 480
~~cover shall be limited to the amount for each party set~~ 481
~~out in Box 30 and Box 31, respectively. The Owners or~~ 482
~~the Charterers as the case may be shall immediately~~ 483
~~furnish the other party with particulars of any additional~~ 484
~~insurance effected, including copies of any cover notes~~ 485
~~or policies and the written consent of the insurers of~~ 486
~~any such required insurance in any case where the~~ 487
~~consent of such insurers is necessary.~~ 488
~~**(h)**    Should the Vessel become an actual, constructive,~~ 489
~~compromised or agreed total loss under the insurances~~ 490
~~required under sub-clause 14(a), all insurance payments~~ 491
~~for such loss shall be paid to the Owners, who shall~~ 492

~~distribute the moneys between themselves and the~~ 493
~~Charterers according to their respective interests.~~ 494
~~**(i)**    If the Vessel becomes an actual, constructive,~~ 495
~~compromised or agreed total loss under the insurances~~ 496
~~arranged by the Owners in accordance with sub-clause~~ 497
~~14(a), this Charter shall terminate as of the date of such~~ 498
~~loss.~~ 499
~~**(j)**    The Charterers shall upon the request of the~~ 500
~~Owners, promptly execute such documents as may be~~ 501
~~required to enable the Owners to abandon the Vessel~~ 502
~~to the insurers and claim a constructive total loss.~~ 503
~~**(k)**    For the purpose of insurance coverage against hull~~ 504
~~and machinery and war risks under the provisions of~~ 505
~~sub-clause 14(a), the value of the Vessel is the sum~~ 506
~~indicated in Box 29.~~ 507
~~**(l)**    Notwithstanding anything contained in sub-clause~~ 508
~~10(a), it is agreed that under the provisions of Clause~~ 509
~~14, if applicable, the Owners shall keep the Vessel's~~ 510
~~Class fully up to date with the Classification Society~~ 511
~~indicated in Box 10 and maintain all other necessary~~ 512
~~certificates in force at all times.~~ 513

**15.    Redelivery** 514
At the expiration of the Charter Period the Vessel shall 515
be redelivered by the Charterers to the Owners at a 516
safe and ice-free port or place as indicated in Box 16, in 517
such ready safe berth as the Charterers ~~Owners~~ may 518
direct. The 519
Charterers shall give the Owners not less than thirty 519
(30) running days' preliminary notice of expected date, 520
range of ports of redelivery or port or place of redelivery 521
and not less than **5/3/2/1** ~~fourteen (14)~~ running days' 522
definite 523
notice of expected date and port or place of redelivery. 523
Any changes thereafter in the Vessel's position shall be 524
notified immediately to the Owners. 525
The Charterers warrant that they will not permit the 526
Vessel to commence a voyage (including any preceding 527
ballast voyage) which cannot reasonably be expected 528
to be completed in time to allow redelivery of the Vessel 529
within the Charter Period.  Notwithstanding the above, 530
should the Charterers fail to redeliver the Vessel within 531
The Charter Period, the Charterers shall pay the daily 532
equivalent to the rate of hire stated in Box 22 plus 10 533
per cent. or to the market rate, whichever is the higher, 534
for the number of days by which the Charter Period is 535
exceeded.  All other terms, conditions and provisions of 536
this Charter shall continue to apply. 537
Subject to the provisions of Clause 10, the Vessel shall 538
be redelivered to the Owners in the same or as good 539
structure, state, condition and class as that in which she 540
was delivered, fair wear and tear not affecting class 541
excepted. 542
The Vessel upon redelivery shall have her survey cycles 543
up to date and trading and class certificates valid for at 544
least the number of months agreed in Box 17. 545

**16.    Non-Lien** 546
The Charterers will not suffer, nor permit to be continued, 547
any lien or encumbrance incurred by them or their 548
agents, which might have priority over the title and 549
interest of the Owners in the Vessel. The Charterers 550
further agree to fasten to the Vessel in a conspicuous 551
place and to keep so fastened during the Charter Period 552
a notice reading as follows: 553
"This Vessel is the property of (name of Owners). It is 554
under charter to (name of Charterers) and by the terms 555
of the Charter Party neither the Charterers nor the 556
Master have any right, power or authority to create, incur 557
or permit to be imposed on the Vessel any lien 558
whatsoever." 559

**17.    Indemnity** 560
**(a)**    The Charterers shall indemnify the Owners against 561
any loss, damage or expense incurred by the Owners 562
arising out of or in relation to the operation of the Vessel 563

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "BARECON 2001" Standard Bareboat Charter

by the Charterers, and against any lien of whatsoever 564
nature arising out of an event occurring during the 565
Charter Period. If the Vessel be arrested or otherwise 566
detained by reason of claims or liens arising out of her 567
operation hereunder by the Charterers, the Charterers 568
shall at their own expense take all reasonable steps to 569
secure that within a reasonable time the Vessel is 570
released, including the provision of bail. 571
Without prejudice to the generality of the foregoing, the 572
Charterers agree to indemnify the Owners against all 573
consequences or liabilities arising from the Master, 574
officers or agents signing Bills of Lading or other 575
documents. 576
**(b)** If the Vessel be arrested or otherwise detained by 577
reason of a claim or claims against the Owners, **by the** 578
**mortgage holder the**
Owners shall at their own expense take all reasonable 579
steps to secure that within a reasonable time the Vessel 580
is released, including the provision of bail. 581
In such circumstances the Owners shall indemnify the 582
Charterers against any loss, damage or expense 583
incurred by the Charterers (including hire paid under 584
this Charter) as a direct consequence of such arrest or 585
detention. 586

**18.  Lien** 587
The Owners to have a lien upon all cargoes, sub-hires 588
and sub-freights belonging or due to the Charterers or 589
any sub-charterers and any Bill of Lading freight for all 590
claims under this Charter, and the Charterers to have a 591
lien on the Vessel for all moneys paid in advance and 592
not earned. 593

**19.  Salvage** 594
All salvage and towage performed by the Vessel shall 595
be for the Charterers' benefit and the cost of repairing 596
damage occasioned thereby shall be borne by the 597
Charterers. 598

**20.  Wreck Removal** 599
In the event of the Vessel becoming a wreck or 600
obstruction to navigation the Charterers shall indemnify 601
the Owners against any sums whatsoever which the 602
Owners shall become liable to pay and shall pay in 603
consequence of the Vessel becoming a wreck or 604
obstruction to navigation. 605

**21.  General Average** 606
The Owners shall not contribute to General Average. 607

**22.  Assignment, Sub-Charter and Sale** 608
**(a)** The Charterers shall not assign this Charter nor 609
sub-charter the Vessel on a bareboat basis except with 610
the prior consent in writing of the Owners, which shall 611
not be unreasonably withheld, and subject to such terms 612
and conditions as the Owners shall approve. 613
**(b)** The Owners shall not sell the Vessel during the 614
currency of this Charter except with the prior written 615
consent of the Charterers, which shall not be unreason- 616
ably withheld, and subject to the buyer accepting an 617
assignment of this Charter. 618

**23.  Contracts of Carriage** 619
\*) **(a)** The Charterers are to procure that all documents 620
issued during the Charter Period evidencing the terms 621
and conditions agreed in respect of carriage of goods 622
shall contain a paramount clause incorporating any 623
legislation relating to carrier's liability for cargo 624
compulsorily applicable in the trade; if no such legislation 625
exists, the documents shall incorporate the Hague-Visby 626
Rules. The documents shall also contain the New Jason 627
Clause and the Both-to-Blame Collision Clause. 628
\*) ~~(b) The Charterers are to procure that all passenger~~ 629
~~tickets issued during the Charter Period for the carriage~~ 630
~~of passengers and their luggage under this Charter shall~~ 631
~~contain a paramount clause incorporating any legislation~~ 632
~~relating to carrier's liability for passengers and their~~ 633
~~luggage compulsorily applicable in the trade; if no such~~ 634
~~legislation exists, the passenger tickets shall incorporate~~ 635
~~the Athens Convention Relating to the Carriage of~~ 636
~~Passengers and their Luggage by Sea, 1974, and any~~ 637
~~protocol thereto.~~ 638
\*) ~~Delete as applicable.~~ 639

**24.  Bank Guarantee** 640
~~(Optional, only to apply if Box 27 filled in)~~ 641
~~The Charterers undertake to furnish, before delivery of~~ 642
~~the Vessel, a first class bank guarantee or bond in the~~ 643
~~sum and at the place as indicated in Box 27 as guarantee~~ 644
~~for full performance of their obligations under this~~ 645
~~Charter.~~ **Corporate Guarantee to be attached to the** 646
**BBCHP.**

**25.  Requisition/Acquisition** 647
**(a)** In the event of the Requisition for Hire of the Vessel 648
by any governmental or other competent authority 649
(hereinafter referred to as "Requisition for Hire") 650
irrespective of the date during the Charter Period when 651
"Requisition for Hire" may occur and irrespective of the 652
length thereof and whether or not it be for an indefinite 653
or a limited period of time, and irrespective of whether it 654
may or will remain in force for the remainder of the 655
Charter Period, this Charter shall not be deemed thereby 656
or thereupon to be frustrated or otherwise terminated 657
and the Charterers shall continue to pay the stipulated 658
hire in the manner provided by this Charter until the time 659
when the Charter would have terminated pursuant to 660
any of the provisions hereof always provided however 661
that in the event of "Requisition for Hire" any Requisition 662
Hire or compensation received or receivable by the 663
Owners shall be payable to the Charterers during the 664
remainder of the Charter Period or the period of the 665
"Requisition for Hire" whichever be the shorter. 666
**(b)** In the event of the Owners being deprived of their 667
ownership in the Vessel by any Compulsory Acquisition 668
of the Vessel or requisition for title by any governmental 669
or other competent authority (hereinafter referred to as 670
"Compulsory Acquisition"), then, irrespective of the date 671
during the Charter Period when "Compulsory Acqui- 672
sition" may occur, this Charter shall be deemed 673
terminated as of the date of such "Compulsory 674
Acquisition". In such event Charter Hire to be considered 675
as earned and to be paid up to the date and time of 676
such "Compulsory Acquisition". 677

**26.  War** 678
**(a)** For the purpose of this Clause, the words "War 679
Risks" shall include any war (whether actual or 680
threatened), act of war, civil war, hostilities, revolution, 681
rebellion, civil commotion, warlike operations, the laying 682
of mines (whether actual or reported), acts of piracy, 683
acts of terrorists, acts of hostility or malicious damage, 684
blockades (whether imposed against all vessels or 685
imposed selectively against vessels of certain flags or 686
ownership, or against certain cargoes or crews or 687
otherwise howsoever), by any person, body, terrorist or 688
political group, or the Government of any state 689
whatsoever, which may be dangerous or are likely to be 690
or to become dangerous to the Vessel, her cargo, crew 691
or other persons on board the Vessel. 692
**(b)** The Charterers shall be at liberty to trade the 693
**Vessel in War Risk Areas and any applicable**
**additional premium shall be for the Charterers'**
**account, but with full indemnity to Owners in regards**
**to ransoms/accidents/deaths or loss of cargo,**
**Charterers to show evidence of extra premia being**
**paid.** ~~The Vessel, unless the written consent of the~~ 694
~~Owners be first obtained, shall not continue to or go~~ 695
~~through any port, place, area or zone (whether of land~~ 696
~~or sea), or any waterway or canal, where it reasonably~~ 697
~~appears that the Vessel, her cargo, crew or other~~ 698
~~persons on board the Vessel, in the reasonable~~ 699
~~judgement of the Owners, may be, or are likely to be,~~

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

~~exposed to War Risks. Should the Vessel be within any~~ 700
~~such place as aforesaid, which only becomes danger-~~ 701
~~ous, or is likely to be or to become dangerous, after her~~ 702
~~entry into it, the Owners shall have the right to require~~ 703
~~the Vessel to leave such area.~~ 704

**(c)** The Vessel shall not load contraband cargo, or to 705
pass through any blockade, whether such blockade be 706
imposed on all vessels, or is imposed selectively in any 707
way whatsoever against vessels of certain flags or 708
ownership, or against certain cargoes or crews or 709
otherwise howsoever, or to proceed to an area where 710
she shall be subject, or is likely to be subject to 711
a belligerent's right of search and/or confiscation. 712

~~(d)   If the insurers of the war risks insurance, when~~ 713
~~Clause 14 is applicable, should require payment of~~ 714
~~premiums and/or calls because, pursuant to the~~ 715
~~Charterers' orders, the Vessel is within, or is due to enter~~ 716
~~and remain within, any area or areas which are specified~~ 717
~~by such insurers as being subject to additional premiums~~ 718
~~because of War Risks, then such premiums and/or calls~~ 719
~~shall be reimbursed by the Charterers to the Owners at~~ 720
~~the same time as the next payment of hire is due.~~ 721

**(e)** The Charterers shall have the liberty: 722
**(i)** to comply with all orders, directions, recommend- 723
ations or advice as to departure, arrival, routes, 724
sailing in convoy, ports of call, stoppages, 725
destinations, discharge of cargo, delivery, or in any 726
other way whatsoever, which are given by the 727
Government of the Nation under whose flag the 728
Vessel sails, or any other Government, body or 729
group whatsoever acting with the power to compel 730
compliance with their orders or directions; 731
**(ii)** to comply with the orders, directions or recom- 732
mendations of any war risks underwriters who have 733
the authority to give the same under the terms of 734
the war risks insurance; 735
**(iii)** to comply with the terms of any resolution of the 736
Security Council of the United Nations, any 737
directives of the European Community, the effective 738
orders of any other Supranational body which has 739
the right to issue and give the same, and with 740
national laws aimed at enforcing the same to which 741
the Owners are subject, and to obey the orders 742
and directions of those who are charged with their 743
enforcement. 744
**(f)** In the event of outbreak of war (whether there be a 745
declaration of war or not) (i) between any two or more 746
of the following countries: the United States of America; 747
Russia; the United Kingdom; ~~France;~~ and the People's 748
Republic of China, (ii) between any two or more of the 749
countries stated in Box 36, both the Owners and the 750
Charterers shall have the right to cancel this Charter, 751
whereupon the Charterers shall redeliver the Vessel to 752
the Owners in accordance with Clause 15, if the Vessel 753
has cargo on board after discharge thereof at 754
destination, or if debarred under this Clause from 755
reaching or entering it at a near, open and safe port as 756
directed by the Owners, or if the Vessel has no cargo 757
on board, at the port at which the Vessel then is or if at 758
sea at a near, open and safe port as directed by the 759
Owners. In all cases hire shall continue to be paid in 760
accordance with Clause 11 and except as aforesaid all 761
other provisions of this Charter shall apply until 762
redelivery. 763

**27.  Commission** 764
The Owners to pay a commission at the rate indicated 765
in Box 33 to the Brokers named in Box 33 on any hire 766
paid under the Charter. ~~If no rate is indicated in Box 33,~~ 767
~~the commission to be paid by the Owners shall cover~~ 768
~~the actual expenses of the Brokers and a reasonable~~ 769
~~fee for their work.~~ 770
~~If the full hire is not paid owing to breach of the Charter~~ 771
~~by either of the parties the party liable therefor shall~~ 772
~~indemnify the Brokers against their loss of commission.~~ 773

~~Should the parties agree to cancel the Charter, the~~ 774
~~Owners shall indemnify the Brokers against any loss of~~ 775
~~commission but in such case the commission shall not~~ 776
~~exceed the brokerage on one year's hire.~~ 777

**28.  Termination** 778
**(a)   Charterers' Default** 779
The Owners shall be entitled to withdraw the Vessel from 780
the service of the Charterers and terminate the Charter 781
with immediate effect by written notice to the Charterers if: 782
**(i)** the Charterers fail to pay hire in accordance with 783
Clause 11.  However, where there is a failure to 784
make punctual payment of hire due to oversight, 785
negligence, errors or omissions on the part of the 786
Charterers or their bankers, the Owners shall give 787
the Charterers written notice of the number of clear 788
banking days stated in Box 34 (as recognised at 789
the agreed place of payment) in which to rectify 790
the failure, and when so rectified within such 791
number of days following the Owners' notice, the 792
payment shall stand as regular and punctual. 793
Failure by the Charterers to pay hire within the 794
number of days stated in Box 34 of their receiving 795
the Owners' notice as provided herein, shall entitle 796
the Owners to withdraw the Vessel from the service 797
of the Charterers and terminate the Charter without 798
further notice. 799
**(ii)** the Charterers fail to comply with the requirements of: 800
**(1)** Clause 6 (Trading Restrictions) 801
**(2)** Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803
written notice to the Charterers, to give the 804
Charterers a specified number of days grace within 805
which to rectify the failure without prejudice to the 806
Owners' right to withdraw and terminate under this 807
Clause if the Charterers fail to comply with such 808
notice; 809
**(iii)** the Charterers fail to rectify any failure to comply 810
with the requirements of sub-clause 10(a)(i) 811
(Maintenance and Repairs) as soon as practically 812
possible after the Owners have requested them in 813
writing so to do and in any event so that the Vessel's 814
insurance cover is not prejudiced. 815
**(b)   Owners' Default** 816
If the Owners shall by any act or omission be in breach 817
of their obligations under this Charter to the extent that 818
the Charterers are deprived of the use of the Vessel 819
and such breach continues for a period of fourteen (14) 820
running days after written notice thereof has been given 821
by the Charterers to the Owners, the Charterers shall 822
be entitled to terminate this Charter with immediate effect 823
by written notice to the Owners. 824
**(c)   Loss of Vessel** 825
This Charter shall be deemed to be terminated if the 826
Vessel becomes a total loss or is declared as a 827
constructive or compromised or arranged total loss.  For 828
the purpose of this sub-clause, the Vessel shall not be 829
deemed to be lost unless she has either become an 830
actual total loss or agreement has been reached with 831
her underwriters in respect of her constructive, 832
compromised or arranged total loss or if such agreement 833
with her underwriters is not reached it is adjudged by a 834
competent tribunal that a constructive loss of the Vessel 835
has occurred. 836
~~(d)   Either party shall be entitled to terminate this~~ 837
~~Charter with immediate effect by written notice to the~~ 838
~~other party in the event of an order being made or~~ 839
~~resolution passed for the winding up, dissolution,~~ 840
~~liquidation or bankruptcy of the other party (otherwise~~ 841
~~than for the purpose of reconstruction or amalgamation)~~ 842
~~or if a receiver is appointed, or if it suspends payment,~~ 843
~~ceases to carry on business or makes any special~~ 844
~~arrangement or composition with its creditors.~~ 845
**(e)** The termination of this Charter shall be without 846
prejudice to all rights accrued due between the parties 847

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

**PART II**
**"BARECON 2001" Standard Bareboat Charter**

prior to the date of termination and to any claim that 848
either party might have. 849

**29. Repossession** 850
In the event of the termination of this Charter in 851
accordance with the applicable provisions of <u>Clause 28</u>, 852
the Owners shall have the right to repossess the Vessel 853
from the Charterers at her current or next port of call, or 854
at a port or place convenient to them without hindrance 855
or interference by the Charterers, courts or local 856
authorities. Pending physical repossession of the Vessel 857
in accordance with this <u>Clause 29</u>, the Charterers shall 858
hold the Vessel as gratuitous bailee only to the Owners. 859
The Owners shall arrange for an authorised represent- 860
ative to board the Vessel as soon as reasonably 861
practicable following the termination of the Charter. The 862
Vessel shall be deemed to be repossessed by the 863
Owners from the Charterers upon the boarding of the 864
Vessel by the Owners' representative. All arrangements 865
and expenses relating to the settling of wages, 866
disembarkation and repatriation of the Charterers' 867
Master, officers and crew shall be the sole responsibility 868
of the Charterers. 869

**30. Dispute Resolution** 870
\*) **(a)** This Contract shall be governed by and construed 871
in accordance with English law and any dispute arising 872
out of or in connection with this Contract shall be referred 873
to arbitration in London in accordance with the Arbitration 874
Act 1996 or any statutory modification or re-enactment 875
thereof save to the extent necessary to give effect to 876
the provisions of this Clause. 877
The arbitration shall be conducted in accordance with 878
the London Maritime Arbitrators Association (LMAA) 879
Terms current at the time when the arbitration proceed- 880
ings are commenced. 881
The reference shall be to three arbitrators. A party 882
wishing to refer a dispute to arbitration shall appoint its 883
arbitrator and send notice of such appointment in writing 884
to the other party requiring the other party to appoint its 885
own arbitrator within 14 calendar days of that notice and 886
stating that it will appoint its arbitrator as sole arbitrator 887
unless the other party appoints its own arbitrator and 888
gives notice that it has done so within the 14 days 889
specified. If the other party does not appoint its own 890
arbitrator and give notice that it has done so within the 891
14 days specified, the party referring a dispute to 892
arbitration may, without the requirement of any further 893
prior notice to the other party, appoint its arbitrator as 894
sole arbitrator and shall advise the other party 895
accordingly. The award of a sole arbitrator shall be 896
binding on both parties as if he had been appointed by 897
agreement. 898
Nothing herein shall prevent the parties agreeing in 899
writing to vary these provisions to provide for the 900
appointment of a sole arbitrator. 901
In cases where neither the claim nor any counterclaim 902
exceeds the sum of US$50,000 (or such other sum as 903
the parties may agree) the arbitration shall be conducted 904
in accordance with the LMAA Small Claims Procedure 905
current at the time when the arbitration proceedings are 906
commenced. 907
\*) ~~**(b)** This Contract shall be governed by and construed~~ 908
~~in accordance with Title 9 of the United States Code~~ 909
~~and the Maritime Law of the United States and any~~ 910
~~dispute arising out of or in connection with this Contract~~ 911
~~shall be referred to three persons at New York, one to~~ 912
~~be appointed by each of the parties hereto, and the third~~ 913
~~by the two so chosen; their decision or that of any two~~ 914
~~of them shall be final, and for the purposes of enforcing~~ 915
~~any award, judgement may be entered on an award by~~ 916
~~any court of competent jurisdiction. The proceedings~~ 917
~~shall be conducted in accordance with the rules of the~~ 918
~~Society of Maritime Arbitrators, Inc.~~ 919
~~In cases where neither the claim nor any counterclaim~~ 920
~~exceeds the sum of US$50,000 (or such other sum as~~ 921
~~the parties may agree) the arbitration shall be conducted~~ 922
~~in accordance with the Shortened Arbitration Procedure~~ 923
~~of the Society of Maritime Arbitrators, Inc. current at~~ 924
~~the time when the arbitration proceedings are commenced.~~ 925
\*) ~~**(c)** This Contract shall be governed by and construed~~ 926
~~in accordance with the laws of the place mutually agreed~~ 927
~~by the parties and any dispute arising out of or in~~ 928
~~connection with this Contract shall be referred to~~ 929
~~arbitration at a mutually agreed place, subject to the~~ 930
~~procedures applicable there.~~ 931
**(d)** Notwithstanding (a), (b) or (c) above, the parties 932
may agree at any time to refer to mediation any 933
difference and/or dispute arising out of or in connection 934
with this Contract. 935
In the case of a dispute in respect of which arbitration 936
has been commenced under (a), (b) or (c) above, the 937
following shall apply:- 938
(i) Either party may at any time and from time to time 939
elect to refer the dispute or part of the dispute to 940
mediation by service on the other party of a written 941
notice (the "Mediation Notice") calling on the other 942
party to agree to mediation. 943
(ii) The other party shall thereupon within 14 calendar 944
days of receipt of the Mediation Notice confirm that 945
they agree to mediation, in which case the parties 946
shall thereafter agree a mediator within a further 947
14 calendar days, failing which on the application 948
of either party a mediator will be appointed promptly 949
by the Arbitration Tribunal ("the Tribunal") or such 950
person as the Tribunal may designate for that 951
purpose. The mediation shall be conducted in such 952
place and in accordance with such procedure and 953
on such terms as the parties may agree or, in the 954
event of disagreement, as may be set by the 955
mediator. 956
(iii) If the other party does not agree to mediate, that 957
fact may be brought to the attention of the Tribunal 958
and may be taken into account by the Tribunal when 959
allocating the costs of the arbitration as between 960
the parties. 961
(iv) The mediation shall not affect the right of either 962
party to seek such relief or take such steps as it 963
considers necessary to protect its interest. 964
(v) Either party may advise the Tribunal that they have 965
agreed to mediation. The arbitration procedure shall 966
continue during the conduct of the mediation but 967
the Tribunal may take the mediation timetable into 968
account when setting the timetable for steps in the 969
arbitration. 970
(vi) Unless otherwise agreed or specified in the 971
mediation terms, each party shall bear its own costs 972
incurred in the mediation and the parties shall share 973
equally the mediator's costs and expenses. 974
(vii) The mediation process shall be without prejudice 975
and confidential and no information or documents 976
disclosed during it shall be revealed to the Tribunal 977
except to the extent that they are disclosable under 978
the law and procedure governing the arbitration. 979
*(Note: The parties should be aware that the mediation* 980
*process may not necessarily interrupt time limits.)* 981
**(e)** If <u>Box 35</u> in Part I is not appropriately filled in, sub-clause 982
30(a) of this Clause shall apply. <u>Sub-clause 30(d)</u> shall 983
apply in all cases. 984
\*) <u>Sub-clauses 30(a), 30(b) and 30(c)</u> are alternatives; 985
indicate alternative agreed in <u>Box 35</u>. 986

**31. Notices** 987
**(a)** Any notice to be given by either party to the other 988
party shall be in writing and may be sent by fax, telex, e- 989
mail
registered or recorded mail or by personal service. 990
**(b)** The address including e-mail(s) of the Parties for 991
service of such
communication shall be as stated in <u>Boxes 3</u> and <u>4</u> 992
respectively. 993

---

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

## "BARECON 2001" Standard Bareboat Charter

### PART III
### PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
*(Optional, only to apply if expressly agreed and stated in Box 37)*

| OPTIONAL |
| PART |

1. Specifications and Building Contract
(a)  The Vessel shall be constructed in accordance with
the Building Contract (hereafter called "the Building
Contract") as annexed to this Charter, made between the
Builders and the Owners and in accordance with the
specifications and plans annexed thereto, such Building
Contract, specifications and plans having been counter-
signed as approved by the Charterers.
(b)  No change shall be made in the Building Contract or
in the specifications or plans of the Vessel as approved by
the Charterers as aforesaid, without the Charterers'
consent.
(c)  The Charterers shall have the right to send their
representative to the Builders' Yard to inspect the Vessel
during the course of her construction to satisfy themselves
that construction is in accordance with such approved
specifications and plans as referred to under sub-clause
(a) of this Clause.
(d)  The Vessel shall be built in accordance with the
Building Contract and shall be of the description set out
therein. Subject to the provisions of sub-clause 2(c)(ii)
hereunder, the Charterers shall be bound to accept the
Vessel from the Owners, completed and constructed in
accordance with the Building Contract, on the date of
delivery by the Builders. The Charterers undertake that
having accepted the Vessel they will not thereafter raise
any claims against the Owners in respect of the Vessel's
performance or specification or defects, if any.
Nevertheless, in respect of any repairs, replacements or
defects which appear within the first 12 months from
delivery by the Builders, the Owners shall  endeavour to
compel the Builders to repair, replace or remedy any defects
or to recover from the Builders any expenditure incurred in
carrying out such repairs, replacements or remedies.
However, the Owners' liability to the Charterers shall be
limited  to the extent the Owners have a valid claim against
the Builders under the guarantee clause of the Building
Contract (a copy whereof has been supplied to the
Charterers) The Charterers shall be bound to accept such
sums as the Owners are reasonably able to recover under
this Clause and shall make no further claim on the Owners
for the difference between the amount(s) so recovered and
the actual expenditure on repairs, replacement or
remedying defects or for any loss of time incurred.
Any liquidated damages for physical defects or deficiencies
shall accrue to the account of the party stated in Box 41(a)
or if not filled in shall be shared equally between the parties.
The costs of pursuing a claim or claims against the Builders
under this Clause (including any liability to the Builders)
shall be borne by the party stated in Box 41(b) or if not
filled in shall be shared equally between the parties.

2.  Time and Place of Delivery
(a)  Subject to the Vessel having completed her
acceptance trials including trials of cargo equipment in
accordance with the Building Contract and specifications
to the satisfaction of the Charterers, the Owners shall give
and the Charterers shall take delivery of the Vessel afloat
when ready for delivery and properly documented at the
Builders' Yard or some other safe and readily accessible
dock, wharf or place as may be agreed between the parties
hereto and the Builders. Under the Building Contract the
Builders have estimated that the Vessel will be ready for
delivery to the Owners as therein provided but the delivery
date for the purpose of this Charter shall be the date when
the Vessel is in fact ready for delivery by the Builders after
completion of trials whether that be before or after as
indicated in the Building Contract. The Charterers shall not
be entitled to refuse acceptance of delivery of the Vessel

and upon and after such acceptance, subject to Clause
1(d), the Charterers shall not be entitled to make any claim
against the Owners in respect of any conditions,
representations or warranties, whether express or implied,
as to the seaworthiness of the Vessel or in respect of delay
in delivery.
(b)  If for any reason other than a default by the Owners
under the Building Contract, the Builders become entitled
under that Contract not to deliver the Vessel to the Owners,
the Owners shall upon giving to the Charterers written
notice of Builders becoming so entitled, be excused from
giving delivery of the Vessel to the Charterers and upon
receipt of such notice by the Charterers this Charter shall
cease to have effect.
(c)  If for any reason the Owners become entitled under
the Building Contract to reject the Vessel the Owners shall,
before exercising such right of rejection, consult the
Charterers and thereupon
(i) if the Charterers do not wish to take delivery of the Vessel
they shall inform the Owners within seven (7) running days
by notice in writing and upon receipt by the Owners of such
notice this Charter shall cease to have effect; or
(ii) if the Charterers wish to take delivery of the Vessel
they may by notice in writing within seven (7) running days
require the Owners to negotiate with the Builders as to the
terms on which delivery should be taken and/or refrain from
exercising their right to rejection and upon receipt of such
notice the Owners shall commence such negotiations and
or take delivery of the Vessel from the Builders and deliver
her to the Charterers;
(iii) in no circumstances shall the Charterers be entitled to
reject the Vessel unless the Owners are able to reject the
Vessel from the Builders;
(iv) if this Charter terminates under sub-clause (b) or (c) of
this Clause, the Owners shall thereafter not be liable to the
Charterers for any claim under or arising out of this Charter
or its termination.
(d) Any liquidated damages for delay in delivery under the
Building Contract and any costs incurred in pursuing a claim
therefor shall accrue to the account of the party stated in
Box 41(c) or if not filled in shall be shared equally between
the parties.

3.  Guarantee Works
If not otherwise agreed, the Owners authorise the
Charterers to arrange for the guarantee works to be
performed in accordance with the building contract terms,
and hire to continue during the period of guarantee works.
The Charterers have to advise the Owners about the
performance to the extent the Owners may request.

4.  Name of Vessel
The name of the Vessel shall be mutually agreed between
the Owners and the Charterers and the Vessel shall be
painted in the colours, display the funnel insignia and fly
the house flag as required by the Charterers.

5.  Survey on Redelivery
The Owners and the Charterers shall appoint surveyors
for the purpose of determining and agreeing in writing the
condition of the Vessel at the time of re-delivery.
Without prejudice to Clause 15 (Part II), the Charterers
shall bear all survey expenses and all other costs, if any,
including the cost of docking and undocking, if required,
as well as all repair costs incurred. The Charterers shall
also bear all loss of time spent in connection with any
docking and undocking as well as repairs, which shall be
paid at the rate of hire per day or pro rata.

*(right-margin line numbers)* 1–133

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

2nd original

## "BARECON 2001" Standard Bareboat Charter

### PART IV
### HIRE/PURCHASE AGREEMENT
*(Optional, only to apply if expressly agreed and stated in Box 42)*

OPTIONAL PART

On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for. (1–7)

*In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.* (8–9)

The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter. (10–11)

The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account. (12–27)

In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers. The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession. (28–38)

The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment. (39–41)

The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description. (42–48)

The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3 (Part II) or to pay the equivalent cost for their journey to any other place. (49–53)

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**2nd original**

**"BARECON 2001" Standard Bareboat Charter**

OPTIONAL
PART

**PART V**
**PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY**
*(Optional, only to apply if expressly agreed and stated in Box 43)*

1. ~~Definitions~~                                                                                          1
   ~~For the purpose of this PART V, the following terms shall~~    2
   ~~have the meanings hereby assigned to them:~~                              3
   ~~"The Bareboat Charter Registry" shall mean the registry~~      4
   ~~of the State whose flag the Vessel will fly and in which~~      5
   ~~the Charterers are registered as the bareboat charterers~~    6
   ~~during the period of the Bareboat Charter.~~                              7
   ~~"The Underlying Registry" shall mean the registry of the~~      8
   ~~state in which the Owners of the Vessel are registered~~        9
   ~~as Owners and to which jurisdiction and control of the~~       10
   ~~Vessel will revert upon termination of the Bareboat~~          11
   ~~Charter Registration.~~                                                             12

2. ~~Mortgage~~                                                                                         13
   ~~The Vessel chartered under this Charter is financed by~~       14
   ~~a mortgage and the provisions of Clause 12(b) (Part II)~~      15
   ~~shall apply.~~                                                                             16

3. ~~Termination of Charter by Default~~                                           17
   ~~If the Vessel chartered under this Charter is registered~~      18
   ~~in a Bareboat Charter Registry as stated in Box 44, and~~      19
   ~~if the Owners shall default in the payment of any amounts~~  20
   ~~due under the mortgage(s) specified in Box 28, the~~           21
   ~~Charterers shall, if so required by the mortgagee, direct~~    22
   ~~the Owners to re-register the Vessel in the Underlying~~       23
   ~~Registry as shown in Box 45.~~                                               24
   ~~In the event of the Vessel being deleted from the~~              25
   ~~Bareboat Charter Registry as stated in Box 44, due to a~~     26
   ~~default by the Owners in the payment of any amounts~~         27
   ~~due under the mortgage(s), the Charterers shall have~~        28
   ~~the right to terminate this Charter forthwith and without~~   29
   ~~prejudice to any other claim they may have against the~~      30
   ~~Owners under this Charter.~~                                                  31

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



ARROW
TANKERS A/S

### RIDER CLAUSES TO CHARTER PARTY
### M.T. "CV STEALTH "
### DATED 23rd February 2010

**CLAUSE 1.   CANCELLATION OF BAREBOAT CHARTER:**
Owners during this charter have the right to sell the Vessel to a third party at any time hereunder with the following conditions:
(a) Sale of the vessel to third party shall by no means affect the continuation of this charter and the new owner shall comply in full with a] I the terms and conditions of this Charter Party.
(b) Charterers always to have the right of first refusal to buy the Vessel.
(c) Any new owner always to be approved by Charterer, such approval shall not be unreasonably withheld.

**CLAUSE 2.   DRY DRY-DOCKS:**
Charterers have the obligation to dry-dock the Vessel and/or to pass all surveys strictly in accordance with the rules and regulations of Vessel's Class and flag including Special Survey and Dry Dock always un-extended at Charterers cost and expenses.

**CLAUSE 3.   BUNKER CLAUSE:**
Charterers warrant that all bunkers in accordance with herewith shall be of a quality complying 380 CST with ISO 8217 RMG 35 and with its specification for marine fuels as amended from time to time.

**CLAUSE 4.   CHARTERERS LIABILITIES:**
Charterers hereby indemnify Owners from and again any all liabilities, claims, losses, damage, costs or expenses suffered or incurred, against Owners arising out of Charterers' negligence or failure to comply with the requirements of any government, including Federal, state or municipal or other division or authorities.

**CLAUSE 5.   OIL POLLUTION:**
Charterers warrant that the Vessel shall have a valid P&I insurance against liability for pollution, including ITOPF/CLC obligations for an amount not less than USD One (1) billion per incident, provided, however that if the P&I Club in which the vessel entered and/or the underwriter(s)

1



cease to provide Pollution Liability Coverage to such Club's Members in the amount(s) as just described then Charterers shall promptly obtain Pollution Liability Cover (both basis P&I Clubs and Additional Insurance) in the highest amount(s) then made available by any first class Underwriter.

## CLAUSE 6.    RISKS AND INSURANCE OF THE VESSEL:

(a) For the purpose of this Charter, "Total Loss" has the meaning given to it in Part 11, "Compulsory Acquisition" has the meaning given to it in Clause 25 above and "Major Casualty" mean a casualty to the Vessel or incident (other than a Total Loss) in respect of which the claim or aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds Five Hundred Thousand United States Dollars (US$500,000) or the equivalents in any other currency.

(b) The Vessel shall throughout the term of this Charter be in every respect at the risk of the Charterers who shall bear all risks however arising whether of navigation operation or maintenance of the Vessel or otherwise.

(c) In addition to the insurance's referred to in Clause 13 and in this clause, the owners shall be entitled to effect and maintain for its own benefit and its own cost, innocent Owner's interest insurance for an amount to be determined by Owners in Owners' role discretion and, for the benefit of any mortgagee or mortgagees pursuant to mortgagees indemnity insurance.

(d) The Charterers undertake throughout the term of this Charter, without prejudice to their obligation under Clause 13 above:

(i) to effect and maintain sufficient insurance on and over the Vessel inrespect of hull, machinery and equipment, marine and war risks (including excess risks), protection and indemnity risks, FD and D, and oil pollution liability (if appropriate) upon such terms as shall from time to time be approved in writing by the owners and in such amounts in United States Dollars from time to time as are set out in the Schedule to these Additional Clauses in the case of bull ,machinery and equipment, marine and war risks and excess risks and in the case of protection and indemnity risks and oil pollution liability, for the maximum amount obtainable from the protection and indemnity association in which the Vessel is from time to time entered;

(ii) Without prejudice to the provisions of sub-clause (i) above, Charterers shall procure and arrange at their own expense Hull and Machinery and war risks insurance's under terms not less favourable than those of Institute Time clauses Hulls edition 1.10.83 and/or as amended from time to time and Institute War and Strike Clauses Hull Time addition 1.. 10.83 with deductible not exceeding USD 225,000. Charterers shall in addition procure and maintain at their own expense full entry of the Vessel for oil pollution liabilities at the maximum amount available on the insurance market (presently such amount is equal to One Thousand Million United States Dollars (US$ 1,000,000,000) and

2



m.t. CV STEALTH – CP dated 23rd February 2010



to arrange and pay for extra cover required by protection and indemnity associations for voyagers to any other country.

(iii) To effect the insurances aforesaid through first class insurance companies, underwriters and war risks associations operating in the London, American or others Insurance market and protection and Indemnity associations which are members of the International Group of Protection and Indemnity Associations;

(iv) To renew the insurances aforesaid at least fourteen (14) days before the relevant policies or contracts expire and to procure that the said brokers, and any war risks and protection and indemnity association with which such insurances are effected, shall promptly confirm in writing to the Owners the terms and conditions of such renewal as and when the same occurs;

(v) Punctually to pay all premiums, calls, contributions or other sums in respect of the insurances and to produce all relevant receipts when so required by the Owners;

(vi) To procure that a loss payable clause in such form as may be required by the Owners is endorsed upon all slips, cover notes, policies, certificates of entry or other instruments of insurance issued or to be issued in respect of the insurance of the vessel;

(vii) To procure that all such instruments of insurance referred to sub-clause (iv) above are as effected through the said brokers shall be deposited with the said brokers, and that such brokers shall furnish the Owners with proforma copies and a letter or letters of undertaking in such form as may be required by the Owners;

(viii) To procure that the protection and indemnity and/or war risks associations in which the Vessel is entered shall furnish the Owners with a certified copy of the certificate of entry for the vessel and a letter or letters of undertaking in the Protection & Indemnity Association's standard wording;

(ix) To apply all such sums receivable in respect of the insurances of the Vessel as are paid to Charterers in accordance with the provisions of this Charter for the purpose of making good the loss and fully repairing the damage in respect of which such sums have been received;

(x) Not to alter any of the terms of any if the instruments of insurance referred to in sub-clause (vi) above which have been approved by the Owners and not to make, do, consent or agree to any act or omission which would or might render any such instrument or insurance invalid, void, voidable or unenforceable or render any sum payable there under repayable in whole or in part

(xi) Not without the prior written consent of the Owners to settle, compromise or abandon any claim for Total Loss or a Major casualty

3





**m.t. CV STEALTH – CP dated 23rd February 2010**

(e) Unless and until a Termination Event shall occur whereupon all insurance recoveries shall be payable to the Owners, any sums receivable in respect of the insurances effected by the Charterers pursuant to Clause 13 above and this Clause shall be payable as follows ;

(i) there shall be paid to the Owners all sums receivable in respect of Total loss and, unless otherwise authorized by the Owners, any and every sum receivable in respect of a Major Casualty, but so that the insurance moneys received by the Owners in respect of any such Major Casualty shall be paid over to the Charterers upon the charterers furnishing evidence to Owner's underwriter's satisfaction that all loss and damage resulting from the casualty has been properly made good and repaired, and that all repair accounts and other liabilities whatsoever in connection with the casualty have been fully paid and discharged by the Charterers, provided that the insurers may with the consent of the Owners make payment on account of repairs in the course of their being effected

(ii) all other sums receivable in respect of the insurances shall be paid to the Charterers and shall be applied by them for the purpose of making good the loss and fully repairing all damage in respect of which the insurance moneys have been received.

(f) The provisions of Clause 13 and of this Clause shall not apply to the proceeds of any additional insurance cover effected by the Owners and/or the Charterers for their own account and benefit, provided that such cover shall only be effected if and to the extent that the insurances effected by the Charterers pursuant to Clause 13 and to this Clause permit.

(g) In the event that at any time during the term of this Charter the Charterers shall not have paid the premiums in respect of the insurance cover required by this charter, the Owners shall notify the Charterers requiring rectification thereof but in any event shall be at liberty to pay such premiums or to effect, at the Charterers  expense, such  alternative insurance as the Owners may in their discretion determine to be necessary  to protect the interests of the Owners under this Charter (and approved mortgagees if any) and the costs thereof shall be payable by the Charterers on demand and shall be recoverable as additional hire hereunder.

## CLAUSE 7.    INTEREST:

The Charterers shall pay on demand by the Owners interest on any sum due under this Charter and unpaid from and including the date which it fell due for payment (subject as provided below) until the date of actual payment (as well after as before judgement) at the rate per annum determined by the Owners and certified by them to the Charterers

to be equal to one month London Interbank Offer Rate (LIB OR) plus 2 percent (2%) per annum~ provided always that where the Owners pay or incur any such costs, charges

4

**2nd original**



ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

expenses claims, liabilities, losses, penalties, fines, duty, fee tax or other moneys as are stated in the Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to indemnify Owners, Interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax of or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid. All payments of Interest to be made under the Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.

## CLAUSE 8. <u>CHARTERERS' COVENANTS:</u>

The Charterers Covenant with the Owners undertake throughout the term of this Charter that!

(a) they will provide the Owners with such information concerning the Vessel as the Owners may from time to time reasonable require including (without limitation) information regarding the employment, condition, geographical position and crewing of the vessel;

(b) They will, forthwith upon becoming aware of the same, notify the owners in writing of any termination event (or event of which they are aware which, with the giving of notice and/or lapse of time would constitute a termination event);

(c) They will obtain and promptly renew from time to time and will whenever so required promptly furnish certified copies to the Owners of all such authorizations, approvals, consents, and licenses (if any) as may be required under any applicable law or regulation to enable the Charterers to perform their obligations under this Charter or required for the validity or enforceability of this Charter, and the Charterers shall in all material respects comply with the terms of the same;

(d) they will- (i) at any time during this charter, subject to a limit of one (1) month in ever calendar year, allow one representative of Owners, and, (ii) during the last voyage) prior to vessel' s dry dock or special survey (laden voyage), two representatives to be allowed onboard (iii) during the last round voyage (ballast and laden legs) before redelivery of the Vessel allow up to two (2) representatives of the Owners to attend on board the Vessel for general observation and inspection purposes always at the risk-and expense of the Owners provided that such observation and inspection shall not interfere with the ordinary work on board and the trading of the Vessel and subject to signing Charterers P&I Club Indemnity forms which shall be presented to them for signature upon boarding;



2nd original


ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

(e) They will notify the Owners forthwith by telex, telefax or e -mail previously provided of:

(1) Any accident to the Vessel or incident which is or is likely to be a Major Casualty;

(2) Any occurrence resulting in the Vessel becoming or being likely to become a Total loss;

(3) Any requirement or recommendation made by an insurer or classification society, or by any competent authority, which is not complied with within any time limit imposed by such insurer, classification society or authority;

(4) Any arrest of the Vessel, or the exercise or purported exercise of any lien on the vessel or any requisition of the Vessel for hire.

(f) They will procure that at all times the Vessel is managed only by the Charterers or Charterers' associated company or such managers as shall be approved in writing by the Owners such approval not to be unreasonably withheld. In the event Charterers decide to appoint a third-party manager then Charterers shall invite Owners or their nominees to submit a quotation for the management of the Vessel;

(g) They will maintain the Vessel at all times in accordance with the requirements of (INSERT CLASS) to a standard not less than that to which the Charterers maintain the other vessels owned by the Charterers or their associated companies;

(h) That the Vessel shall remain the property of the Owners and that the Charterers shall have no rights or interest therein otherwise than as Charterers hereunder and that the Charterers shall at no time do or permit to be done any act or thing which might prejudice the rights of the Owners in and to the Vessel.


**CLAUSE 9.    INDEMNITY:**

The Charterers shall pay to the Owners on demand, and indemnity and keep the Owners indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal)~ liabilities, losses~ penalties, fines, duties and fees (including, but not limited to reasonable, legal fees and expenses on a full indemnity basis provided that Owner's are the prevailing party on any such claim generating such legal fees and expenses) and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering, navigation, victualling, fuelling, manning, supply, insurance, use, operation, return, re-deli very, laying up or storage of or loss of or damage of the Vessel or any other vessel in the actual or disponent ownership of the Charterers or any part thereof or from any maintenance, service, modification~ repair, classification or overhaul of, or otherwise in connection with, the Vessel or such other vessel or any part thereof or any cargo carried therein, and regardless of when the same shall arise and whether or not the Vessel or other vessel or the relevant part thereof

**2nd original**



ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

is in the possession or control of the Charterers; the indemnities contained in this Clause 10, and each other indemnity contained in this Charter shall survive any termination or expiry of this Charter for a period of twelve (12) months from the date thereof and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter. Charterers will cover all taxes including US freight taxes if any but excluding tax on income from Vessel's trading.

## CLAUSE 10. **TERMINATION EVENTS:**

Each of the following events shall be a "Termination Event" for the purposes of this Charter:

(a) The Charterers fail to make any payment on its due date or in respect of money payable on demand, (unless otherwise specifically provided) within seven (7) days from the date of such demand;

(b) The Charterers are in breach of anyone or more of the provisions of this Charter relation to the insurance of the Vessel;

(c) The Charterers fail to comply with any provision of this Charter other than those referred to in sub-clauses (a) and (b) above and in case of any such default which the Owners considers capable of remedy, such default continues for a period fourteen  (14) days after the Owners, by notice to the Charterers, require the same to be remedied;

(d)  Any license, approval, consent authorization or registration at any time necessary for  the validity, enforceability, admissibility in evidence of this Charter, or for the Charterers to comply with their obligations hereunder or in connection with the ownership or operation of the vessel is revoked, withheld or expires;

(e) The Vessel becomes a Total Loss;

(f) A petition is filed, or an order made, or an effective resolution passed, for the compulsory or voluntary winding-up or dissolution of the Charterers (other than the purposes of amalgamation or reconstruction in respect of which the prior written approval shall not be unreasonably withheld) or any proceedings analogous to winding-up proceedings are begun in any jurisdiction in relation to the Charterers or if the Charterers suspend payment of, or are unable to or admit inability to pay ~ their debts as they fall due or make any special arrangement or composition with their creditors generally or any class of their creditors;

(g) As administrator, administrative receivers, receiver or trustee or similar official is appointed of or an encumbrances takes possession of, or execution or distress *is* levied upon~ the whole, or what the Owners consider a material part, of the property, assets or undertaking of the Charterers, or the Charterers apply for, or consent to, any such appointment;

(h) The Charterers cease, or threaten to cease, to carry on their business} or dispose or threaten to dispose of what the Owners consider a material part of their property, assets or undertaking, or such a part is seized or appropriated;

7

**2nd original**



ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

(i) The Vessel is the subject of a Compulsory Acquisition;

(j) It becomes impossible or unlawful for the Charterers to fulfil any of their obligations under this Charter

Each of the events specified in the above-mentioned clause shall constitute (as the case may be) a repudiatory breach or a breach of condition of this Charter by the Charterers, the occurrence of which will entitle the Owners by notice to the Charterers to terminate the chartering of the Vessel by the Charterers under this Charter, to recover amounts, to claim damages and/or to exercise any other right or remedy to which the Owners may be entitled under this Charter or at law, in equity or otherwise as a consequence of the occurrence of the termination event.

## CLAUSE 11.  OWNERS' RIGHTS ON A TERMINATION EVENT:

(a) If any termination even shall occur, the Owners may thereupon and at any time thereafter at their option take anyone or more of the following actions:

(i) Take all action which the Owners may reasonably consider necessary to cure any such Termination Event and recover from Charterers all liabilities, reasonable costs and expenses or incurred by the Owners in doing so;

(ii) By notice to the Charterers terminate the chartering of the Vessel by the Charterers under this Charter, either immediately or on such date as the Owners may specify, whereupon:

A) the Vessel shall no longer be in the possession of the Charterers, in accordance with Owner's instructions with the consent of the Owners and the Charterers shall promptly redeliver the Vessel to the Owners with all reasonable dispatch in the manner and in the condition governing redelivery as specified under this charter; and;

B) the Owners shall be entitled but not bound (and not without prejudice to the Charterers' obligation under sub-clause (A) above) to retake possession of the Vessel wherever found, irrespective of whether the Charterers, any sub-charterer or any other person may be in possession of the Vessel without being bound to give any prior notice or take any legal process and without liability to the part of the Owners, and the Charterers hereby authorize the Owners, for that purpose, to enter upon any premises where the Vessel may be located.

(b) If the Owners give notice pursuant to sub-clause (a) above to terminate the chartering of the vessel by the charterers, the charterers shall forthwith pay to the Owners all sums of money whether of hire or otherwise due and payable but unpaid under this Charter upon which the Charterers' obligation to pay hire shall cease and the Vessel shall be redelivered to the

**2nd original**



ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

Owners in accordance with this Charter Party.

(c) At any time after giving notice of termination in accordance with sub-clause (a) above the Owners shall be entitled (but not bound) to sell the vessel, free of this Charter and any right or claim of whatsoever nature of the Charterers whether under this Charter or otherwise and free of any other charter or other engagement concerning her, for such price and on such terms and conditions as they may in their abso1ute discretion think fit.

## CLAUSE 12. CONTRADICTION CLAUSE

If there happens to be a discrepancy between the "Barecon 01" as mutually agreed and amended by Owners and Charterers and the Owners additional terms, then additional terms to always supersede the CIP.

## CLAUSE 13. THE CHARTER SHALL HAVE THE OPTION TO PURCHASE THE VESSEL AT THE ALTERNATIVE DATES AND PRICES SET OUT BELOW:

On the 3rd Anniversary of the delivery date for a price of USD 47 million
On the 4th Anniversary of the delivery date for a price of USD 45.5 million
On the 5th Anniversary of the delivery date for a price of USD 42 million
On the 6th Anniversary of the delivery date for a price of USD 41 million
On the 7th Anniversary of the delivery date for a price of USD 39 million

(Each of the 3rd, 4th, 5th, 6th and 7th Anniversary of the delivery date shall hereinafter be referred to as the "Purchase Option Date")

The Charterers shall give the Owners notice in writing (the "Notice") of their intention to exercise the purchase option at least 5 MONTHS prior to the relevant Purchase Option Date. On receipt of the Notice the Owners shall take all necessary steps to ensure that there is a smooth transfer of ownership of the Vessel to the Charterers on the relevant Purchase Option Date. The Owners and Charterers agree that the sale and purchase of the Vessel shall be on the terms and conditions of the standard NSF 93 form with logical amendments which the Owners and Charterers agree to conclude and sign at least 90 days prior to the relevant Purchase Option Date.

2nd original



ARROW
TANKERS A/S

m.t. CV STEALTH – CP dated 23rd February 2010

## CLAUSE 14.

MT CV Stealth shall not be delivered to Charterers before 15 April 2010 / 0001hrs lt and Chrtrs shall have the option of cancelling this charter if the ship is not ready and at their disposal on or before 30 August 2010 / 2359hrs lt.

## CLAUSE 15.

Owners to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of delivery.
Charterers to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of redelivery.

## CLAUSE 16.

Owners warrant to the best of their knowledge that at the time of delivery into the bareboat charter the ship is not blacklisted by the Arab Boycott League.

## CLAUSE 17.

Charterers have the option to load and/or discharge and/or lighten the vessel via ship to ship transfer in accordance with the procedure set out in OCIM's `Ship to Ship Transfer Guide´. But not more than 60 lightering days per annum.

## CLAUSE 18.

Local time for laycan, GMT for hire calculation.

## CLAUSE 19.

Antifouling application will be 60 months period during the next drydocking and Owners will maintain the original paint condition of entire hull of the both ships applying appropriate touch up and final coats as per NB specifications. If present BB Charterers normally apply 30 months paint, Headowners will ask present BB Charterers (AET) to apply 60 months paint when in drydock for SS. Difference in cost will be borne by new BB Charterers (GEDEN)



10





**m.t. CV STEALTH – CP dated 23rd February 2010**

ARROW
TANKERS A/S

**CLAUSE 20.**

With regard to EU Directive 2005/33/EC low Sulphur use in EU, the Charterers are seeking to get confirmation from the existing Bareboat Charterers ( Messrs AET )  to make the necessary applications and communications with the Class to get an extension of 8 months of the implementation date 01.01.2010.

For the Charterers

For the Owners

11

## ADDENDUM NO. 1

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

Box 4 of the Barecon Charter Party should read:

"Geden Holdings Limited, Malta or nominee always guaranteed by Geden Holdings Limited, Malta. Performance Guarantee to the satisfaction of Owners and their financiers to be mutually agreed."

IN WITNESS WHEREOF, the parties have caused this Addendum No.1 to be duly executed in Copenhagen on this 2nd day of June 2010.

Owners :                                      Charterers:

By    : Himoza Dimareli              By    : Bjarne Tederop
Title : Director                            Title : Director

## ADDENDUM NO. 2

Charter Party dated 23rd February 2010 for

M.T. "CV STEALTH"

With reference to the captioned Charter Party, IT IS THIS DAY HEREBY AGREED BETWEEN THE PARTIES TO AMMEND BARECON CHARTER PARTY AS FOLLOWS:

**Box 22 of the Barecon Charter Party should read:**

USD 8,750 gross pdpr for the first 365 days after delivery

USD 9,750 gross pdpr for the 2nd charter year

USD 10,750 gross pdpr for the period starting from 730th day after delivery until end of 3rd year

USD 9,750 gross pdpr for the 4th charter year

USD 9,750 gross pdpr for the 5th charter year

USD 13,250 for the optional period.

**Clause 13 of Rider Clauses:**

To be deleted.

**Delivery:**

Delivery is agreed to be effected when inventory count is completed and agreed between the parties onboard the vessel.

IN WITNESS WHEREOF, the parties have caused this Addendum No.2 to be duly executed in Copenhagen on this 21st day of June 2010.

Owners :                                    Charterers:

By  :  Mimoza Dimaxeli              By  :  Tugrun Tokan
Title :    DIRECTOR                     Title :   DIRECTOR

**ADDENDUM NO 3**

Dated 23 January 2013

**To the Bareboat Charter dated 23rd February 2010 (the "BBCP")
as amended by an Addendum No 1 dated 2nd June 2010
and by an Addendum No 2 dated 21st June 2010**

BETWEEN

Psara Energy Limited, of the Marshall Islands (the "Owners")

AND

Space Shipping Ltd, of Malta (the "Charterers")
Geden Holdings Ltd, of Malta (as "Guarantor")

Relating to the charter of the crude oil carrier m/t "CV Stealth" (the "Vessel")
pursuant to the terms and conditions of the BBCP.

With reference to the terms and conditions of the BBCP, it is hereby agreed and confirmed that:

1. The payment of a portion of the daily charter hire of an amount of USD 3.225 arising from the charter hires starting 1st December 2012 until 1st December 2013 shall be deferred. With effect from 1st December 2013 the total amount of deferred charter hires as per this clause (i.e. USD 1.177.125) shall be repaid in proportionately equal instalments until 22nd June 2015 and added to the daily charter hire.

2. Accordingly, the amount of USD 2.072 shall be added to the daily charter hire of Box 22 of the BBCP, from 1st December 2013 until 22nd June 2015.

3. In the event of default of payment by the charterers under the bareboat charters of the Maltese flagged vessel "C.S. Stealth", then such event of default shall be considered as Charterers' Default under the present BBCP.

All other terms and conditions of the BBCP and its Addenda or supplemental agreements or undertakings thereto remain unaltered and in full force and effect.

---------------------
For and on behalf of
the Charterers

---------------------
For and on behalf of
the Guarantor

---------------------
For and on behalf of
the Owners

Georgios Amanatidis
Sole Director

# EXHIBIT 2

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island

## IRREVOCABLE PERFORMANCE GUARANTEE

In consideration of you, Psara Energy Limited / Marshall Island (hereinafter the "Company" ), entering into a Bareboat Charterparty and MoA as per rider clause 13 of "BARECON 2001" dated 23 February 2010 and any and all subsequent addenda thereto (the "Contract") with Space Shipping Ltd / Malta (the "Charterer") as charterer and or buyer, we, subject to the provision of the paragraphs below, Geden Holdings Ltd of Malta hereby unconditionally and irrevocably guarantee as primary obligor on first demand the full and timely performance by the Charterer of all its obligations under the Contract, including, but not limited to, the punctual payment of the hire and or the purchase price of the vessel MT CV STEALTH under the Charterparty according to the Contract, providing the Charterer with sufficient funds to fulfill the Contract, due and punctual payment to you of all amounts (if any) owing by the Charterer under or pursuant to the Contract.

Upon receipt your first written demand stating (i) that the claimed amount is due to you and remains unpaid for a period of seven (7) calendar days from the due date and (ii) copies of the hire statement for the relevant period, we especially undertake to make any payment which was due to you under the above-mentioned Contract but has not been paid on the due date by the Charterers to you to your account as specified in the Contract. Such demand is to specify the amount overdue and the date it was due.

A further consideration of the provision of this guarantee is your undertaking, confirmed by your countersignature hereunder, that subject to our payment of any overdue amount under this guarantee within 7 days of receipt of your demand, you will not execute your right of withdrawal of the Vessel as per the Contract and you will refrain from arresting or otherwise detaining any of our assets.

However, in the event of any dispute between you and the Charterer in relation to:

(1) whether the Charterers shall be liable to pay the sum to you and;

(2) consequently whether you shall have the right to demand payment from us;

and such dispute shall have been submitted either by the Charterers or by you to Arbitration in accordance with clause 30 part II of the Contract within seven (7) calendar days from the Charterers' receipt of your demand for repayment, then we shall be entitled to withhold and defer payment until the awards is published. We shall not be obligated to make any payment to you unless the judgement orders the Charterers to make repayment. If the Charterers fails to honour the judgement within seven (7) days after that the final judgement had been rendered in the proceedings then we shall pay to you to the extent the judgement orders.

Any compliance with a demand hereunder shall be under strict reservation of, and shall not constitute a waiver of, our and the Charterer's rights in Contract and in Law.

No amendments, additions or variations to or extensions of the Contract, nor the granting of any additional time or other forbearance to the Nominee by you, nor any act or omission by you, shall release us from liability under the terms of this guarantee.

This Guarantee shall come into full force and effect upon the delivery of the same to you and shall continue in force and effect from the time when the charter period commences for a period of  (7) seven years plus an additional period of further 12 months, in the case that the first option is declared by the Charterers in accordance with Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the second option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract, plus another additional period of further 12 months, in the case that also the third option is declared by the Charterer in accordance with Clause Box 21 Part I of the Contract. Notwithstanding the provisions hereinabove, in case we receive notification from you or from the Charterers stating that a claim covered by this Guarantee has been disputed and referred to Arbitration in accordance with the provisions of the Contract the period of validity of this Guarantee shall be extended until thirty (30) days after the final judgment shall be rendered in the proceedings. In such case, this Guarantee shall not be available unless and until such certified copy of the final awards in the Arbitration justifying your claim is presented to us or a written agreement between the parties terminating the dispute is presented to us.

When this Guarantee shall have expired as aforesaid, you will return the same to us immediately without any request or demand from us, but non-return shall not affect the expiry of our commitment hereunder.

This guarantee shall be governed by and construed in accordance with the laws of England and we agree to submit to the non-exclusive jurisdiction of the English High Court.

The address and full style details of the Guarantor are as follows:

Mailing address:
GEDEN HOLDINGS LTD
C/O
BUYUKDERE CADDESI
YAPI KREDI PLAZA A BLOK K-12
LEVENT-ISTANBUL-TURKIYE

E-mail address:
chartering@gedenlines.com
Tel. +90 212 319 51 00  Fax +90 212 283 1604

04, March, 2010                    GEDEN HOLDINGS LTD of MALTA

Countersigned:
04, March, 2010                    SUPER SHIPPING LTD of MALTA

# EXHIBIT 3

SCHEDULE 11 – Organisational Chart



*All Nine Advantage Shipping Entities are Member-managed*

1.14.6180.00 21327756 v4

# EXHIBIT 4

CONSENT LETTER

From:  Geden Holdings Ltd (the "Shareholder")
       85 St.John's Street, Valletta, Malta

To:    Shell Western Supply and Trading Limited (the "Charterer")
       Barbados

06.02. 2015

Dear Sirs

1   We refer to the time charter parties each dated 13 March 2012 (in the case of the vessel "Royal", dated 17 October 2012) (the "Existing Charters") and entered into between the companies listed in Annex 1 hereto as owners (the "Existing Owners") and the Charterer in respect of the vessels listed in Annex 1 hereto (the "Vessels").

2   As part of certain reorganisation efforts being conducted by the existing shareholders of each Existing Owner, it has been proposed that each Existing Owner will sell (the "Vessel Sales") all its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 here to as new owners (and each wholly owned by the Shareholder, the "New Owners").

3   Upon each Vessel Sale:

    (a)  the relevant Existing Owner will delete that Vessel from Maltese flag and the relevant New Owner will register that Vessel in its name under Marshall Islands flag;

    (b)  the relevant ship mortgage over that Vessel registered in the name of the banks and financial institutions listed in Annex 1 hereto as Existing Mortgagees shall be discharged and shall be replaced (as part of the financing and/or refinancing arrangements between that New Owner and its financiers) with a new ship mortgage s to be registered in the name of the banks and financial institutions listed in Annex 1 hereto as New Mortgagees;

    (c)  subject to the respective New Owners being acceptable to Charterer following Charterer's KYC and other relevant checks, the Existing Charters will be terminated by mutual agreement between the respective Existing Owners and Charterer and new charters (the "New Charters") will be entered into between the Charterer and the relevant New Owner on terms, inter alia, as follows:

        (i)   each New Charter shall come into effect on the time on which the relevant Vessel is delivered to, and accepted by, the relevant New Owner from the relevant Existing Owner pursuant to that Vessel Sale (the "Vessel Sale Effective Dates");

        (ii)  the duration of each New Charter shall be 5 years from the Vessel Sale Effective Date plus the optional period (3 years for aframaxes and 1 year for suezmaxes);

        (iii) the charter hire (the "Hire") will be the aggregate of a base rate and profit sharing amount (the "PSA"). The Base Rate payable by the Charterer to the relevant New Owner shall be US$17,500 per day other than the vessels Advantage Sun, Advantage Sky, Advantage Solar, Advantage Start whereas the base rate shall be US$18,500 during the initial period of 24 months (the "Base Rate"); The PSA will be calculated as the monthly averages of certain trading routes as described in the relevant charter parties.

54142984v2

D01248

    (iv)   the terms of each New Charter shall otherwise be substantially the same as the terms of its corresponding Existing Charter, save as contemplated by this paragraph 3(c) and for logical amendments.

4    A pro-forma of New Charter is annexed to this Letter as Annex 2.

5    The Shareholder confirms to the Charterer that:

    (a)   it shall procure that an opinion on matters of Maltese law relating to the Title Transfers is given from Fenech & Fenech to the Charterer, in form and substance reasonably satisfactory to the Charterer, within 30 days from the date of this Letter;

    (b)   it shall provide to the Charterer promptly on reasonable request such information regarding the New Owners as the Charterer requires for KYC purposes.

6    The Shareholder hereby:

    (a)   notifies the Charterer of its intention to complete the Vessel Sales;

    (b)   confirms that it shall be keep the Charterer (i) updated of the intended dates  and schedule for the completion of each Vessel Sale and (ii) notified on the date on which each Vessel Sale is completed; and

    (c)   requests that the Charterer consents to the termination of the Existing Charters and entry into the New Charters (substantially on the terms above), each to come into effect on the relevant Vessel Sale Effective Date.

    (d)   agrees to procure that upon each Vessel Sale the relevant Existing Owner executes a Memorandum of Termination with Charterer agreeing  and confirming that all rights and obligations of the parties under the Existing Charter shall cease and determine with effect from the date of termination provided that this shall not affect or prejudice any claim or demand that either party may have against the other under or in connection with the Existing Charter arising before the date of termination (it being acknowledged and agreed by the Existing Owner that it shall have no claim against the Charterer for early or wrongful termination of the Charter or early redelivery of the Ship.

    (e)   agrees to procure that upon each Vessel Sale each New Owner and the respective New Mortgagee enters into a subordination and non-disturbance agreement with Charterer in a form acceptable to the Charterer and New Mortgagee.

7    For the avoidance of any doubt, if, due to any reason whatsoever, any of the above matters falls to be fulfilled until 30 April 2015 , as a consequence the matters contained in this letter becomes null and void. The Existing Charters shall however remain valid and binding in all respects between the parties thereof.

8    The Charterer, by countersigning this Letter, hereby agrees and consents to the contents contained herein.



54142984v2

D01249

9       This Letter and any non-contractual obligations arising under or in connection with it shall be governed by English law.


Yours faithfully


For and on behalf of
GEDEN HOLDINGS LTD.

Name: Tuğrul Tokgöz
Title:   Director


Agreed, consented and accepted:


For and on behalf of
SHELL WESTERN SUPPLY AND TRADING LIMITED

Name: David Chapman
Title:   General Manager

54142964v2

D01250

ANNEX 1

VESSELS

| Vessel | Existing Owner | New Owner | Existing Mortgagee | New Mortgagee |
|---|---|---|---|---|
| Profit (tbr Advantage Solar) | Profit Shipping Ltd. of Malta | Advantage Solar Shipping LLC of the Marshall Islands | DVB Bank NV | DVB Bank NV |
| Target (tbr Advantage Arrow) | Target Shipping Ltd. of Malta | Advantage Arrow Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Bravo (tbr Advantage Atom ) | Bravo Shipping Ltd. of Malta | Advantage Atom Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| True (tbr Advantage Avenue) | True Shipping Ltd. of Malta | Advantage Avenue Shipping LLC of the Marshall Islands | Norddeutsche Landesbank Girozentrale | Norddeutsche Landesbank Girozentrale |
| Blue (tbr Advantage Sky) | Blue Shipping Ltd. of Malta | Advantage Sky Shipping LLC of the Marshall Islands | Commerzbank AG | Hayfin Capital Management LLP |
| Blank (tbr Advantage Start ) | Blank Shipping Ltd. of Malta | Advantage Start Shipping LLC of the Marshall Islands | Bank of America NA | CIT Finance LLC |



54142964v2

D01251

| Value (tbr Advantage Award) | Value Shipping Ltd. of Malta | Advantage Award Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| --- | --- | --- | --- | --- |
| Power (tbr Advantage Anthem) | Barbaros Maritime Ltd. of Malta | Advantage Anthem Shipping LLC of Bahamas | Unicredit AG | Unicredit AG |
| Royal (tbr Advantage Sun) | Prima Shipping Ltd. of Malta | Advantage Sun Shipping LLC of the Marshall Islands | Credit Europe NV | CIT Finance LLC |

54142964v2

D01252

# EXHIBIT 5

Dave Chapman

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
   PSARA ENERGY, LTD.,        )
 3      Plaintiff,            )
                             )
 4  VS.                       )  CIV. ACTION NO. 16-CV-04840
                             )
 5  SPACE SHIPPING, LTD.;     )
   ADVANTAGE AVENUE           )
 6  SHIPPING, LLC; GENEL      )
   DENIZCILIK NAKLIYATI A.S.)
 7  A/K/A GEDEN LINES;        )
   ADVANTAGE TANKERS, LLC,    )
 8  ADVANTAGE HOLDINGS, LLC;  )
   FORWARD HOLDINGS, LLC;     )
 9  MEHMET EMIN KARAMEHMET     )
   and GULSUN NAZLI           )
10  KARAMEHMET WILLIAMS,      )
       Defendants.            )
11
12              ********************************

13                   ORAL DEPOSITION OF
                        DAVE CHAPMAN
14                   NOVEMBER 30, 2016

15              ********************************

16       ORAL DEPOSITION of DAVE CHAPMAN, produced as a

17  witness at the instance of the Plaintiff, and duly

18  sworn, was taken in the above-styled and numbered cause

19  on November 30, 2016, from 1:22 p.m. to 2:32 p.m.,

20  before Patricia L. Fairley, RPR, CSR in and for the

21  State of Texas, reported by machine shorthand at the

22  offices of DepoTexas, 13101 Northwest Freeway,

23  Suite 210, Houston, Texas, pursuant to the Federal Rules

24  of Civil Procedure and the provisions stated in the

25  record or attached hereto.
```

Dave Chapman

2

1                     A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4        Mr. George A. Gaitas
         Mr. Jonathan M. Chalos
5        CHALOS & CO., P.C.
         7210 Tickner Street
6        Houston, Texas   77055
         (713)936-2427          (866)702-4577 Facsimile
7        georgegaitas@chaloslaw.com
         jmc@chaloslaw.com
8

9    FOR THE DEFENDANTS ADVANTAGE AVENUE SHIPPING, LLC,
     ADVANTAGE TANKERS, LLC AND ADVANTAGE HOLDINGS, LLC:
10

11       Mr. Marc Matthews (Not Present)
         PHELPS DUNBAR, LLP
12       500 Dallas Street
         Suite 1300
13       Houston, Texas   77002
         (713)626-1386          (713)626-1388 Facsimile
14       marc.matthews@phelps.com

15   FOR SHELL OIL COMPANY:

16       Mr. Marcus A. Carter
         SHELL OIL COMPANY
17       P.O. Box 2463
         Houston, Texas   77252-2463
18       (713)241-1232          (713)241-1427 Facsimile
         m.carter2@shell.com
19

20                     * * * * *

21

22

23

24

25

Dave Chapman

42

1          A.   I believe that's correct.

2          Q.   It was acknowledged on behalf of Shell Western?

3          A.   Yes.

4          Q.   And would -- would you agree with me that these

5     were binding contracts on Shell Western?

6          A.   Yes, I would agree.

7          Q.   And if someone told you in one of these time

8     charters that the daily rate was going to be $50,000 a

9     day and the charter itself said 18 1/2 thousand, they

10    would be wrong?   The charter party would be correct?

11    What it says in the charter would be correct?

12         A.   Well, it depends upon what other agreements

13    were entered into beyond the charter party agreement.

14    You can write amendments to various agreements.

15         Q.   Of course.   But if -- if the charter party

16    specifies 18 1/2 thousand dollars daily rate, that would

17    be correct?   These are correct documents that you were

18    signing; they were not fictitious or --

19         A.   No.   Those are binding documents that I signed.

20         Q.   Binding and accurate?

21         A.   They should be accurate.

22         Q.   Truthful?

23         A.   Yes.   Correct.

24         Q.   So I want to show you now a document,

25    Exhibit 17.

Dave Chapman

51

1    executing the document.  There were people in Shell that

2    had done that work, I'm certain, because I would have

3    asked for evidence to that effect; but I wouldn't have

4    done the work myself.

5         Q.  So if you look at Paragraph 2 again, "It has

6    been proposed that each Existing Owner will sell, the

7    Vessel Sales, all its title, interest to and right in

8    its Vessel to the relevant companies listed in Annex 1

9    hereto as new owners, and each wholly owned by the

10   Shareholder, the New Owners."

11             What sense does this make to you?  Who owns

12   the new owners?

13        A.  It says, "each wholly owned by the Shareholder,

14   the New Owner."  I mean, I can't -- I can't interpret it

15   any differently than it says in the paragraph.

16        Q.  Right.  And would you -- would you look at the

17   very first line, please, where it says, "From" --

18        A.  Yes.

19        Q.  -- "Geden Holdings, Limited" --

20        A.  Yes.

21        Q.  -- "the Shareholder"?

22        A.  Correct.

23        Q.  Do you have any reason to believe -- reason to

24   believe this is -- there is anything in here that's

25   untrue or inaccurate?

Dave Chapman

52

1    A.  No, I have no reason to believe that.

2    Q.  Give us a minute.

3    A.  Yeah, please.

4            (Discussion off the record)

5    Q.  (BY MR. GAITAS)  All right.  Let's go back on

6    the record.

7    A.  Okay.

8    Q.  Or do you want to take a break?

9    A.  No, I'm good.  I just don't normally talk this

10   much.  No one at the office lets me.

11   Q.  Right.  Then I'll -- I'll ask you to please

12   look at -- there's -- there's an Appendix 1 that is --

13   Annex 1 that is attached to this.

14   A.  Yes.

15   Q.  Do you see that?

16   A.  I do see that.

17   Q.  And if you -- if you go to the Consent Letter,

18   the front -- the front page --

19   A.  Yes.

20   Q.  -- Item 3, "Upon each Vessel Sale:  the

21   relevant Existing Owner will delete the Vessel from the

22   Maltese flag and the relevant New Owner will register

23   the vessel in its name under the Marshall Islands flag."

24   A.  Yes, I can see that.

25   Q.  From -- from the documents that we saw before,

Dave Chapman

53

1    Exhibits 1 with the exception of that letter of
2    Mr. Soudant, this was done?
3        A.  I presume so.  I --
4        Q.  If you look -- if you look at the -- if you
5    look at the Appendix 1 -- Annex 1 --
6        A.  Yes.
7        Q.  -- vessel PROFIT was renamed ADVANTAGE SOLAR?
8        A.  Correct, and went from --
9        Q.  And --
10       A.  -- the Malta flag to the Marshall flag.
11       Q.  -- went -- and from the charter parties you've
12   seen or if you can see, if you want to -- to look at
13   them closely, indeed, the flag changed?
14       A.  I -- yes, I presume so.
15       Q.  Yeah.  And from the documents we have seen
16   before, the previous exhibits, the condition of this
17   Consent Letter, (b), "the relevant ship mortgage
18   registered in the name of the banks and financial
19   institutions listed in Annex 1 hereto as Existing
20   Mortgagees shall be discharged and shall be replaced
21   with a new ship mortgage to be registered in the name of
22   the banks and financial institutions listed in Annex 1
23   hereto as New Mortgagees," again, from the documents you
24   have seen, this has taken place, has it not?
25       A.  I presume so.