# EXHIBIT 5

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN LMAA ARBITRATION**

**BETWEEN:**

PSARA ENERGY LIMITED

<u>Claimants ("Owners")</u>

and

SPACE SHIPPING LIMITED

<u>Respondents ("Charterers")</u>

"MT *CV STEALTH*" ("the Vessel")
CP dd 23.02.10 ("the Charterparty")
───────────────────────────────────────

**FURTHER CLAIM SUBMISSIONS**
───────────────────────────────────────

1. These are Owners' Further Claim Submissions for:

   (i) unpaid hire for the month of March 2018 up to and including the Vessel's redelivery on 24 March 2018, alternatively damages in the same sum; and

   (ii) damages and/or an indemnity, following Charterers' redelivery of the Vessel in a damaged condition.

2. References in the format [page x] are to documents annexed to these Further Claim Submissions.

**The Charterparty**

3. By the Charterparty dated 23 February 2010 on an amended Barecon 2001 form Owners chartered the Vessel to Geden Holdings Limited ("**Geden**") or its guaranteed nominee. A copy of the Charterparty is exhibited at [pages 1 - 24].

4. On 2 June 2010 Geden nominated Charterers as charterers.

5. An irrevocable performance guarantee ("**Guarantee**") was provided by Geden on 4 March 2010 unconditionally and irrevocably guaranteeing Charterers' performance under the Charterparty. That Guarantee is subject to English law and English High Court jurisdiction.

6. The Charterparty provided *inter alia* as follows:

   *Box 21: Charter period*
   *5 years straight period firm +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterer 5 months prior end of firm period.*

   *Box 22: Charter hire*
   *US$10,750 gross pdpr for 5th charter year*

*Part II*

*7. Surveys on Deliver and Redelivery*

*…Charterers shall bear all expenses of the Off-hire Survey including loss of time, if any, at the daily equivalent to the rate of hire or pro rata thereof*

*10. Maintenance and Operation*

*a. Maintenance and Repairs…The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice…shall at all times keep the Vessel's Class fully up to date with the Classification society…and maintain al other necessary certificates in full force at all times*

*11.  Hire*

*a.    The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence.*

*b.    Payment of hire shall be made as per daily hire in Box 22 basis per calendar month in advance…*

*f.    Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 24.  If Box 24 has not been filled in, the three months Interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent, shall apply.*

*g.    Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date.*

*15.   Redelivery*

*…The Charterers shall give the Owners not less than thirty (30) running days' preliminary notice of expected date, range of ports of redelivery or port or place of redelivery and not less than 5/3/2/1 running days' definite notice of expected date and port or place of redelivery…*

*Subject to the provisions of Clause 10, the Vessel shall be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted.*

*The Vessel upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 17.*

*17.   Indemnity*

*(a) The Charterers shall indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the Vessel by the Charterers…*

*Rider Clauses*

*CLAUSE 7. INTEREST*

*The Charterers shall pay on demand by the Owners interest on any sum due under this Charter and unpaid from and including the date which it feel due for payment (subject as provided below) until the date of actual payment (as well after as before judgement) at the rate per annum determined by the Owners and certified by them to the Charterers to be equal to one-month London Interbank Offer Rate (LIBOR) plus 2 percent (2%) per annum provided always that where the Owners pay or incur any such costs, charges, expenses, claims, liabilities, losses, penalties, fines, duty, fee tax or other moneys as are stated in the Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to indemnify Owners, interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax of or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid. All payments of interest to be made under the Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.*

*Clause 9 INDEMNITY*

*The Charterers shall pay to the Owners on demand, and indemnity (sic) and keep the Owners indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal) ~ liabilities, losses ~ penalties, duties and fees…and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering…use, operation, return, redelivery…of the Vessel…and regardless of when the same shall arise…*

*Clause 15*

*…Charterers to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of redelivery.*

7. Pursuant to clause 7 of the Settlement Agreement dated 8 December 2016 and entered into between Owners, Charterers and Geden, hire payable under the Charterparty was amended to US$9,875 per day from 1 January 2017 onwards.

**Unpaid Hire**

8. In accordance with Box 22 (as varied by clause 7 of the Settlement Agreement) and clause 11 of Part II of the Charterparty, Charterers are required to pay hire monthly in advance.

9. Owners have obtained awards for hire payable up to and including the end of February 2018. In further breach of the Charterparty, Charterers have failed to pay hire due and owing for March 2018.

10. Owners accordingly seek a further award for hire payable up to and including 16:00 on 24 March 2018 when the Vessel was redelivered. Owners exhibit a copy of the Vessel's redelivery certificate at [page 25].

11. The amount of hire due and unpaid is US$233,708.33 and is recoverable by Owners as a debt, alternatively as damages for breach of the Charterparty. A copy of Owners' hire invoices are exhibited at [pages 26 - 27].

12. Owners will also claim interest pursuant to Rider Clause 7 at the rate of 2% above one month LIBOR, alternatively at such rate over such period and compounded with such rests as the Tribunal may see fit pursuant to section 49 of the Arbitration Act 1996.

13. Owners understand that Charterers will say that the Vessel was in fact redelivered, or should have been redelivered, on 24 February 2018. Owners will wait to see how Charterers put their case and will set out their response in full in their Reply Submissions, but for present purposes Owners say that:

    (i) Redelivery did not in fact take place until 24 March 2018, which was when Charterers' crew effected physical handover of the Vessel. Redelivery cannot have taken place on 24 February 2018 as no handing over of physical possession of the Vessel took place at that time. Hire is due and payable until redelivery in fact took place on 24 March 2018. Charterers would have to advance some form of damages claim if they consider that Owners breached the Charterparty by failing to take redelivery earlier.

    (ii) In that regard, Owners will say that Charterers were not entitled to oblige Owners to take redelivery before 11 March 2018, being not less than 30 days after Charterers gave their 30 days' notice of redelivery on 9 February 2018;

    (iii) In any event Owners required at least until 11 March 2018 to make the necessary arrangements for redelivery.

    (iv) Furthermore, redelivery could not take place until 24 March 2018 in any event because Charterers were making arrangements to fit a second anchor (which Charterers were obliged to replace under the Charterparty) which was necessary before the Vessel could be considered to be at a safe place and before Owners could obtain insurance cover, which were prerequisites to Owners taking redelivery;

    (v) Furthermore and in any event, pursuant to Clause 7 the Charterers must bear all expenses of the "Off-hire Survey" including loss of time at the CP hire rate. The redelivery survey (which could not be completed and will need to be continued in due course) took place from 2-8 March 2018 inclusive, so the Charterers are liable for hire (or to pay for that time at the hire rate) in any event.

14. Alternatively, if (which is denied) the Vessel was considered to be redelivered earlier than 24 March 2018 notwithstanding the matters set out above, then Owners will claim damages for Charterers' breaches of their obligations concerning the notices of redelivery and the Vessel's condition on redelivery in Clause 15 of Part II and/or Rider Clause 15 of the Charterparty, in a sum equivalent to the amount of the hire otherwise payable in this period.

**Breach of Charterers' maintenance/redelivery obligations**

15. Pursuant to Clause 10(a) of Part II the Charterparty, Charterers were under an obligation to keep the Vessel well maintained and in a good state of repair throughout the duration of the Charterparty. The Charterers were also under an obligation to keep the Vessel's Class fully up to date and to maintain all other necessary certificates in full force at all times.

16. Further, pursuant to Clause 15 of Part II of the Charterparty, Charterers were obliged to redeliver the Vessel to Owners "*in the same or as good structure, state, condition*

*and class as that in which she was delivered, fair wear and tear not affecting class excepted*" and that the Vessel upon redelivery would have her survey cycles up to date and trading and class certificates valid. Box 17 required the Vessel to have passed her Special Survey dry docking without extensions.

17. In breach of Clauses 10(a) and/or 15 of Part II and/or Box 17 of the Charterparty, the Charterers did not undertake any (or any non-negligible) maintenance on the Vessel since September 2014, failed to pass her Special Survey dry docking, and instead redelivered the Vessel in a severely damaged condition on 24 March 2018 with all Class and statutory certificates expired.

18. Pending expert evidence, the best particulars Owners can currently give as to the work required to the Vessel to bring her back to the required redelivery condition, to pass Special Survey, and to have all Class and statutory certificated reinstated, include the following non-exhaustive list of works:

    (i) complete overhauling and/or repair and/or replacement of all machinery and equipment and extensive renewals of major and miscellaneous spares;

    (ii) extensive piping system renewals, overhauling of valves, sensors and gauges;

    (iii) full hull and deck blasting and extensive steel renewals and recoating;

    (iv) extensive renewal of outfitting, supports, ladders;

    (v) extensive steel renewals in cargo and ballast tanks;

    (vi) retubing and/or replacement of auxiliary boilers and exhaust gas boilers;

    (vii) overhauling and renewal of cargo system, cargo piping, cargo monitoring and cargo equipment and machinery;

    (viii) steam lines and heating coils renewals;

    (ix) deck machinery overhauling and renewal including cranes and their hydraulic systems;

    (x) electrical, electronics and automation system service, repair and renewal;

    (xi) extensive rewiring;

    (xii) bridge navigation and communication equipment service and renewals;

    (xiii) overhauling, repairs and renewal of steering and shafting system;

    (xiv) overhauling, service, repair and renewals of all safety equipment, firefighting systems and appliances including lifesaving equipment; and

    (xv) fitting of ballast water treatment system.

19. Owners reserve the right to amend their claim to provide further information and particulars in due course.

20. The Vessel is in such a bad condition that in Owners' view it would cost more to tow her and repair her than her (repaired) market value. Owners therefore claim as

damages an amount equivalent to the (repaired) market value of the Vessel, which is USD 18 million.

21. Further or in the alternative, the matters set out above constitute a "*loss…arising out of or in relation to the operation of the Vessel by the Charterers*" and/or one "*…arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering…use, operation, return, redelivery…of the Vessel*" and Owners are accordingly entitled to an indemnity pursuant to Clause 15 and/or Rider Clause 9 of the Charterparty as calculated above.

22. Alternatively, if contrary to the above the cost of towage and repairs is less than the Vessel's (repaired) market value, Owners claim damages and/or an indemnity in the following sums:

    (i) the cost of repairs to put the Vessel into the same good order and condition as that in which she was on delivery; alternatively diminution in the value of the Vessel in the same sum;

    (ii) loss of hire during the period of any repairs, at the prevailing market rate;

    (iii) any costs incidental to the repair, including but not limited to classification and superintendency costs.

AND OWNERS CLAIM:

(1) The sum of US$233,708.33 in unpaid hire as a debt and/or damages for breach of the Charterparty, alternatively such other sum as the Tribunal may determine;

(2) Damages of USD18 million as aforesaid and/or an indemnity in the same sum, alternatively such other sum as the Tribunal may assess.

(3) Interest.

(4) Costs.

**ALEXANDER WRIGHT**
**4 PUMP COURT**

Served this 29th day of March 2018 by Ince & Co LLP, Aldgate Tower, 2 Leman Street, London E1 8QN, Solicitors for the Owners.

1.15.0208.00 27219101