IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| PSARA ENERGY, LTD.,<br><br>    Plaintiff,<br>vs.<br><br>SPACE SHIPPING, LTD., et al.,<br><br>    Defendants. | NO.1:18-CV-00178-MAC |

## ORDER FOR SUBSTITUTE SECURITY

This case is assigned to the Honorable Marcia A. Crone, United States District Judge, and is referred to the undersigned United States Magistrate Judge for pretrial management. Pending before the court is the "Advantage Defendants' Motion to Vacate Attachment or, Alternatively, for Reduction in Security." Doc. No. 7.

### I. Background

On April 20, 2018, Plaintiff Psara Energy, Ltd. (Psara) filed suit for breach of contract against the Defendants pursuant to FED. R. CIV. P. 9(h), Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule B"), and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration. Doc. No. 1, at 1–2. According to the complaint, Psara alleges it entered into a bareboat charter agreement in 2010 with Defendant Geden Holdings, Ltd. to charter the CV STEALTH vessel. *Id.* at 5. The charter was amended so that Defendant Geden Holdings became the "performance guarantor" of Defendant Space Shipping, Ltd. *Id.* Though Defendant Space Shipping, Ltd. was obligated to keep the vessel in a good state of repair with up-to-date classifications, it failed to do so. *Id.* In 2014, the CV STEALTH was detained in Venezuela for more than three years by prosecutorial authorities, and Defendant Space Shipping, Ltd. failed

to return the ship by the contractual redelivery date. *Id.* at 7. When the CV STEALTH was finally released from Venezuela, it was out-of-class and so extensively damaged due to neglect that it was incapable of sailing and in need of extensive repairs. Doc. No. 1, at 8. Defendant Space Shipping, Ltd. towed the CV STEALTH to Trinidad where Psara took possession on March 24, 2018. *Id.* Due to the extensive damage to the CV STEALTH, Psara has initiated a London maritime arbitration claim for damages equivalent to the repaired market value of the ship ($18,000,000.00) and amounts for unpaid charter hire, legal costs, interest, and other costs (an additional $1,860,063.80). *Id.* at 10, 25. Due to the transfer of a vessel fleet from Defendant Geden Holdings, Ltd. to other corporate entities (including Defendants), Psara brings suit against the current slate of Defendants under fraudulent transfer and corporate succession theories. *See generally id.*

Psara filed its "Motion for Order Authorizing Issuance of Process of Maritime Attachment and Garnishment" (Doc. No. 3) on the same day as the complaint. The motion requested the court issue a writ of maritime attachment for a shipping vessel—the M/T ADVANTAGE ARROW, IMO #: 9419448, Call Sign: V7KZ7—located within this judicial district. Doc. No. 3, at 2. An *ex parte* order was entered directing the United States Marshal for the Eastern District of Texas to seize and attach the M/T ADVANTAGE ARROW, and a bond to obtain the release of the vessel was fixed at $19,860,063.80.[1] Doc. No. 4. The vessel was seized and attached. *See* Doc. No. 8.

On April 26, 2018, Defendants Advantage Arrow Shipping, LLC, Advantage Tankers, LLC, Advantage Holdings, LLC, and Forward Holdings, LLC ("Advantage Defendants") made a special appearance to file their "Motion to Vacate Attachment or, Alternatively, for Reduction in Security." Doc. No. 7. Psara filed a response to the motion to vacate (Doc. No. 11), and a hearing was held on the motion before the undersigned on April 30, 2018. Doc. No. 13. At the hearing,

---

[1] All monetary figures are in U.S. Dollars.

the parties were instructed to attempt to reach an agreement by May 4, 2018, concerning the amount of substitute security to be provided in lieu of keeping the M/T ADVANTAGE ARROW under attachment, otherwise the court would determine the amount of substitute security. On May 1, 2018, the Advantage Defendants informed the court that the parties are unable to reach an agreement because of "an apparent fundamental disagreement regarding how the amount of security should be calculated," and the Advantage Defendants request the court determine the amount of substitute security at the court's earliest convenience. Doc. No. 14, at 2. Psara's response, though blaming the Advantage Defendants for unilaterally deciding to cease negotiations, illustrates the fundamental disagreement regarding which figures should be used in calculating substitute security. *See* Doc. No. 15. At the hearing, and by subsequent motion (Doc. No. 17), the parties also dispute which party is responsible to pay dockage fees for the attachment of the M/T ADVANTAGE ARROW.

## II.  Legal Standard

Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule E") addresses substitute security:

> In the event of the inability or refusal of the parties [to stipulate the amount and nature of the security,] the court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property on due appraisement, whichever is smaller. The bond or stipulation shall be conditioned for the payment of the principal sum and interest thereon at 6 per cent per annum.

Rule E(5)(a). Rule E itself provides no further instructions on calculating the "fairly stated" value of a plaintiff's claim, and "guiding standards are sparse." *Billfish Marina One, Inc. v. M/Y Hideaway*, 2017 A.M.C. 1743 (S.D. Fla. Jan. 23, 2017). Evidence from outside the complaint (i.e. affidavits) may be considered in determining the fairly stated amount of a plaintiff's claim. *20th*

*Century Fox Film Corp. v. M.V. Ship Agencies, Inc.*, 992 F. Supp. 1429, 1430 (M.D. Fla. 1997) (The court "may look beyond the 'four corners' of the claim" in determining the "fairly stated" claim amount) (citing 7A Moores Fed. Prac. 2d Ed. ¶ E.13[2] at E–612–613); *see also Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp.*, 2009 A.M.C. 2628 (2d Cir. 2009) ("In light of the historical practice and purpose of maritime attachments, we conclude that a court may assess preliminarily the reasonableness of plaintiff's damages claim when setting a security under Rule E(5)."). A plaintiff does not need to prove damages with "exactitude," but the court should satisfy itself during the preliminary assessment that a plaintiff's claims are not "frivolous." *Transportes Navieros*, 2009 A.M.C. 2628.

The Advantage Defendants argue that under English law "the proper measure of damages is the diminution in value of the vessel by reason of the charterer's breach." Doc. No. 7, at 17 (citing M. Davis, Bareboat Charters § 15.12 at 90 (Informa Law 2005), citing *Channel Island Ferries Ltd. v. Cenargo Navigation Ltd.* (The "Rozel"), [1994] 2 Lloyd's Rep. 161). Psara does not explicitly refute this articulation of English law. Psara sets out a formula for all of the variables involved in such a calculation in the instant case. *See* Doc. No. 15, at 3–4.

The substitute security for the release of the vessel must include not only the amount that would be due at the time of the substitute security hearing, but a sufficient sum to cover payment of the claim when the case would ultimately come to trial. *Angad v. M/V Fareast Trader*, 1989 A.M.C. 2721 (S.D. Tex. 1989). "Any ultimate recovery against the res itself is limited to the amount of the bond; therefore it is prudent to err on the high side." *20th Century Fox*, 992 F. Supp. at 1434.

Under federal law, courts have not included attorney's fees in the substitute security amount because there is no federal statute authorizing such an award. *See Billfish Marina One*,

2017 A.M.C. at 1746; *Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394 (2d Cir. 1995) (holding, under the well-established "American Rule," prevailing parties do not recover attorney's fees from the losing party, absent a statute or contractual provision to the contrary.). Accordingly, the Advantage Defendants are likely not entitled to attorney's fees for defending the instant case in this court. However, Rule E(2)(b) does appear to authorize including attorney's fees as part of the substitute security amount (when appropriate), and Psara has requested its attorney's fees for London arbitration to be included. Doc. No. 1, at 11. The English legal system does not follow the "American Rule," and arbitration tribunals commonly tax costs and attorneys' fees to the losing party. *Arbitration Act of 1996*, c. 23, § 61 (Eng.).

### III. Analysis

#### A. Substitute Security Formula

As stated previously, the Advantage Defendants argue "the proper measure of damages is the diminution in value of the vessel by reason of the charterer's breach" under English law. Doc. No. 7, at 17. Accordingly, the Advantage Defendants simply calculate the proper amount of substitute security as the repaired value of the CV STEALTH ($9,500,000) subtracted by its scrap value ($7,825,000), resulting in $1,675,000. Doc. No. 7-4.

Psara's most recent filing argues the proper method to calculate the "quantum of its claim fairly stated" is to:

- begin with the **repaired value of the CV STEALTH vessel**;
- subtract the **scrap value of the vessel**;
- add the **towage fees related to scrapping the vessel**;
- add the **amount of unpaid charter hire**;
- add **interest**;
- add **costs**; and
- add **lawyer's fees**.

Doc. No. 15, at 3–4. Based on the figures suggested by Psara, this calculation results in a claim for "$15,910,208.30 at the very least." *Id.* at 4.[2] Though Rule E(5)(a) might allow them to request it, Psara does not request a substitute security of up to twice that amount. Instead, Psara requests a substitute security of $16,000,000 even. The formula suggested by Psara for calculating the value of the CV STEALTH itself is the same as the Advantage Defendants' formula, though Psara also specifically addresses the other damages that may be included in the overall claim amount. The parties obviously differ on the value of the variables within the formula.

### B.     Substitute Security Variables

#### 1. *Value of the CV STEALTH*

Psara argues that the market value of the CV STEALTH (fully repaired) is $18,000,000.00. Doc. No. 15, at 4. Psara arrived at this market value based on a claim written by Barrister Alexander Wright with Chambers at 4 Pump Court in London in March 2018. Doc. No. 11, at 15. However, Barrister Wright does not provide *any* facts underlying the bald assertion that the "(repaired) market value of the Vessel . . . is USD 18 million." Doc. No. 11, Ex. 5, at 5–6. Accordingly, the claim from Barrister Wright is unhelpful in determining the value of the CV STEALTH because he does not point to any underlying evidence that aided him in his conclusion.

By coincidence, one month *after* Barrister Wright made his claim that the CV STEALTH's repaired value was $18,000,000, an April 2018 valuation letter from "international ship sale and purchase brokers Cass Technava in Piraeus, Greece," states that the CV STEALTH (in good repair) is worth approximately $18,000,000. Doc. No. 11-6. Psara relies on Cass Technava's

---

[2] Psara's figures: $18,000,000 repaired value – $3,600,000 scrap value after towing fees + $510,208.33 unpaid charter hire + $1,000,000 for interest, legal costs, and recoverable legal fees = $15,910,208.33 (Psara miscalculated the figure by three cents). Doc. No. 15, at 3–4. The combined value for interest, legal costs, and recoverable legal fees is listed as $1,000,000 in Doc. No. 15, but in the complaint it was listed as $6515.50 in awarded legal costs, $943,340 in interest and $400,000 in recoverable legal fees. Doc. No. 1, at 25.

valuation in their argument concerning the market value of the ship. Doc. No. 11, at 15. However, the Cass Technava letter is also of little value for the following reasons: (1) no information is provided about the qualifications of the authors; and (2) there is no underlying factual basis for arriving at the valuation figure (i.e. the valuation does not specify if it has taken into account similar vessels which have been sold for comparable amounts). Doc. No. 11-6.

Psara's most recent filing addresses, for the first time, how the scrap value of the CV STEALTH should be subtracted from its market value when calculating the substitute security. Doc. No. 15. Without any supporting documentation of the scrap value or towing costs, Psara posits that the scrap value is $3,600,000 *after* towage fees to Trinidad. *Id.* at 3. The CV STEALTH is already in Trinidad according to Psara. Doc. No. 1, at 8. Psara bases its figure on a declaration from an English Solicitor, Jeremy Biggs, who represents Psara in London arbitration proceedings. Doc. No. 15-1, at 1. Mr. Biggs makes his claim that the scrap value is $3,600,000 after towing without *any* supporting documentation or reference to any external sources. *Id.* at 3. Mr. Biggs' estimate is conclusory because he does not point to any underlying evidence that aided him in his conclusion.

The Advantage Defendants provided a declaration and ship valuation from Mr. Paul Willcox of C.W. Kellock & Co., a ship valuation company based in London. Doc. No. 7-4. Mr. Willcox values the CV STEALTH "in sound trading condition" at $9,500,000, and the "demolition value" as $7,825,000. Mr. Willcox's valuations appear reliable for the following reasons: (1) Mr. Willcox is employed as a "senior ship valuer"; (2) he has prepared expert reports and given evidence in two separate cases in the United States Bankruptcy Court for the Southern District of Texas in 2011 and 2012; (3) under penalty of perjury, Mr. Willcox declares that the two valuation reports attached are true and accurate copies of the originals; (4) both valuations specify that Mr.

Willcox has taken into account similar vessels which have been offered for sale in light of the market knowledge and experience of C.W. Kellock & Co. within the industry; and (5) pursuant to his declaration, the Advantage Defendants have Mr. Willcox's written permission to rely on the valuations in this court. Doc. No. 7-4. Because Mr. Willcox's valuations have some factual basis, he sets forth his qualifications for his expertise (including the admission of his expert testimony in an adjacent federal district), and the Advantage Defendants have his permission to use his valuation in court, the undersigned finds his valuation more credible than Psara's valuation. The values from Mr. Willcox's valuation will be used in the substitute security amount.

### 2. Towing Costs

Neither party has specifically addressed the costs of actually towing the CV STEALTH for demolition. Psara argues that the scrap value itself is $3,600,000 *after* towing costs to Trinidad, but they do not offer an estimation of what the towing costs would be or any information about alternative destinations. Doc. No. 15-1, at 3. The Advantage Defendants rely on Mr. Willcox's valuation which assumes the ship will be delivered to India for demolition, but he does not specify the cost of towing to India or any alternative destination. It is the responsibility of Psara to state with "particularity" in the complaint the circumstances from which the claim arises to allow the Defendants to investigate and frame their responsive pleading. Rule E(2)(a). *See Marina Mgmt. Servs., Inc. v. Vessel My Girls*, 202 F.3d 315 (D.C. Cir. 2000) ("[I]t was incumbent on [plaintiff] under Rule E to state the amount of its claim with particularity, indicating the basis for arriving at that amount, inasmuch as [the parties] could not agree on the amount of the bond to be posted to secure release of his boat."). Because Psara has not stated towing costs with any particularity—Psara has not even given an estimated figure—no towing costs will be included in the substitute security amount.

*3. Interest*

Psara claims reasonable interest at 6% (compounded quarterly for one year) amounts to $943,340, but they did not inform the court exactly how this amount was calculated. Doc. No. 1, at 25. The Advantage Defendants implicitly concede that some interest may be proper in the substitute security amount, but they argue the interest amount requested by Psara is too high based on the CV STEALTH's proper valuation and should be "adjusted according[]" to the ship's true, lower valuation. Doc. No. 7, at 18. However, the Advantage Defendants also fail to inform the court exactly how the interest should be calculated. Based on a the calculated damages for the CV STEALTH at $1,675,000.00 (Mr. Willcox's fair market value minus scrap value), the interest rate of 6% (compounded quarterly for one year) results in an interest amount of $102,783.95. This amount will be included in the substitute security amount.

*4. Legal Costs*

For previously awarded legal costs, Psara claims $6515.50. The Advantage Defendants mention, but never challenge, the previously awarded legal costs claimed by Psara. *See* Doc. No. 7, at 17. Accordingly, this amount will be included in the substitute security amount. Psara also seeks $400,000 in legal costs that "will be incurred to pursue these claims in London maritime arbitration proceedings" because it is customary in London arbitration for the prevailing party to be entitled to legal costs and lawyers' fees. Doc. No. 1, at 11; *see also Arbitration Act of 1996*, c. 23, § 61 (Eng.). The Advantage Defendants argue that Psara has provided "no support or evidence for its claimed entitlement to security for $400,000 in recoverable legal fees and costs," but they do not provide the court with what they believe to be a reasonable figure. Doc. No. 7, at 18–19.

Given the already contentious nature of the proceedings in this court[3] concerning the Rule B attachment, $400,000 appears to be a reasonable figure if the parties pursue the claim in London arbitration. Psara will likely be awarded its costs if it wins in arbitration, and $400,000 will be included in the substitute security amount.

### C.     Dockage Fees

At the hearing on April 30, 2018 (Doc. No. 13), and by subsequent motion (Doc. No. 17), the parties also dispute which party is responsible to pay dockage fees after the attachment of the M/T ADVANTAGE ARROW. In *Beauregard*, the court required all seizing parties to share in the cost of maintaining a seized ship. *Beauregard, Inc. v. Sword Servs. L.L.C.*, 107 F.3d 351, 353 (5th Cir. 1997) ("Often the party that filed a suit will pay the entire cost of maintaining the *res* until the resolution of the case. At the judicially ordered sale, the cost of maintenance is deducted from the sale proceeds before the remaining proceeds are divided among the claimants. Therefore, even when a single litigant advances the cost of maintenance, all claimants are eventually required to share in this cost."). Under 28 U.S.C. § 1921(a)(1)(E), the United States marshals shall collect fees for "keeping of attached property," including ships. United States Marshal Service Policy Directive 11.9 implies that arresting parties are ordinarily responsible for dockage fees. *See* Doc. No. 17-5, at 8 ("The 'initial' arresting party is responsible for making the payments."). This appears to be the case even when the Marshal uses another entity to store the property. *See Marastro Compania Naviera S.A. v. Canadian Mar. Carriers, Ltd.*, 963 F.2d 754, 757 (5th Cir. 1992) ("The court holds the marshal responsible for the execution of the writ, including the storage and safekeeping of the seized property although it is customary and common practice for the

---

[3] Psara has also attached another ship owned by a related Advantage entity in the Eastern District of Louisiana based upon similar allegations. *See Psara Energy, Ltd. et al v. Space Shipping, Ltd. et al.*, Case No. 2:18-cv-4111-ILRL-JCW.

marshal on occasion to delegate certain of these duties, including storage and safekeeping to others."). Accordingly, the court determines, at this time, that Psara is responsible to pay the dockage fees (and other fees) associated with arresting the vehicle and docking it since the arrest.

### D.   Conclusions

For the purposes of this order for substitute security, the undersigned makes the following calculations:

| | |
|---|---:|
| Repaired Value of CV STEALTH | $9,500,000.00 |
| Scrap Value of CV STEALTH | ($7,825,000.00) |
| Unpaid Charter Hire[4] | $510,208.33 |
| Towing | $0.00 |
| Interest | $102,783.95 |
| Awarded Legal Costs | $6,515.50 |
| Future Legal Costs | $400,000.00 |
| | |
| **TOTAL of Fairly Stated Claim:** | **$2,694,507.78** |

Under Rule E(5)(a), the parties were unable (or refused) to stipulate to a substitute security amount, and the court fixes the sum. Psara's claim, fairly stated, amounts to $2,694,507.78. **The undersigned fixes the substitute security amount at $4,000,000.00** because "[a]ny ultimate recovery against the res itself is limited to the amount of the bond; therefore it is prudent to err on the high side." *20th Century Fox*, 992 F. Supp. at 1434. The substitute security of $4,000,000 does not, under Rule E(5)(a) "exceed (i) twice the amount of the Plaintiff's claim," nor does it exceed "(ii) the value of the property on due appraisement." Rule E(5)(a).

It is, therefore, **ORDERED** that the Advantage Defendants' "Motion to Vacate Attachment or, Alternatively, for Reduction in Security" is **GRANTED in part** because a

---

[4] *See* Doc. No. 7, at 17 (Advantage Defendants mention, but never challenge, the unpaid charter hire figure claimed by Psara).

reduction in security is appropriate at this time.  The court will address the "Motion to Vacate Attachment" at a later time.

It is further **ORDERED** that upon the posting of **$4,000,000.00** in cash security into the registry of the Court as substitute security, the attachment of the M/T ADVANTAGE ARROW shall then be released.  This order is intended to set substitute security for the claims alleged by Psara in this action, without additional seizure of the M/T ADVANTAGE ARROW, and is not intended to be and is not a waiver of any rights, remedies, claims, counterclaims, or defenses that may be available to any Party.

It is further **ORDERED** that Psara shall be responsible for paying the custodial costs associated with the attachment and docking of the ship in connection with the instant case.  Should the Advantage Defendants not post the substitute security by 8:00 AM on May 11, 2018, the Advantage Defendants will then be responsible for the costs associated with docking of the ship after that date.

It is further **ORDERED** that the Advantage Defendants' "Emergency Opposed Motion for Order Regarding Payment of Custodial Costs" (Doc. No. 17) is **DENIED** as moot.

SIGNED this 4th day of May, 2018.

_____
Zack Hawthorn
United States Magistrate Judge