# EXHIBIT 1

## HOUSE OF LORDS

30–31 July; 17 October 2007

FIONA TRUST & HOLDING CORPORATION
AND OTHERS
v
PRIVALOV AND OTHERS

[2007] UKHL 40

Before Lord Hoffmann,
Lord Hope of Craighead,
Lord Scott of Foscote,
Lord Walker of Gestingthorpe and
Lord Brown of Eaton-under-Heywood

Arbitration — Charterparty providing that "Any dispute arising under this charter" should be referred to London arbitration — Shipowners bringing court proceedings claiming rescission of charterparties for bribery and fraud — Whether arbitration clause covered dispute — Whether charterers entitled to stay of proceedings under Arbitration Act 1996, section 9.

Disputes arose between the parties to eight charterparties on the Shelltime 4 form. The owners asserted that the charterparties were procured by bribery, and they brought proceedings in England claiming damages for the tort of conspiracy, restitution, and an account of profits. The owners also claimed that the charterparties had been validly rescinded for bribery.

The charterparties all contained an English jurisdiction clause, and conferred a right on either party to elect to refer disputes "arising under this charter" and "out of this charter" to London arbitration.

On 25 April 2006 the charterers commenced London arbitration proceedings. They asked the arbitrator *inter alia* to determine the effectiveness of the owners' rescission of the charters.

On 12 June 2006 the owners applied to the court under section 72 of the Arbitration Act 1996 to restrain the arbitration proceedings, on the basis that there was no valid arbitration agreement since the charterparties, and therefore the arbitration agreements, had been rescinded for bribery.

On 12 July 2006 the charterers applied under section 9 of the Act for a stay of the owners' rescission claims and any further time charter claims.

At first instance, Morison J declined to stay the owners' rescission claims. He held that the bribery arguments, if sustainable, impeached the whole contract and did not arise "out of" or "under" the contract. He granted interim injunctions to restrain the arbitration proceedings pending the trial of the action.

The Court of Appeal (Tuckey, Arden and Longmore LJJ) allowed the charterers' appeal, holding that a dispute whether the contract could be set aside or rescinded for bribery fell within the arbitration clause, that an arbitration clause was a separate contract which survived the destruction of the main contract, and that the assertion of invalidity did not go to the validity of the arbitration clause as opposed to the validity of the charterparties as a whole. The Court of Appeal ordered that the owners' claims for rescission should be stayed.

The owners appealed to the House of Lords.

————*Held* by HL (Lord Hoffmann, Lord Hope of Craighead, Lord Scott of Foscote, Lord Walker of Gestingthorpe and Lord Brown of Eaton-under-Heywood) that the appeal would be dismissed.

(1) An arbitration clause should be construed in accordance with the presumption that the parties intended any dispute arising out of the relationship into which they had entered or purported to enter to be decided by the same tribunal, unless the language made it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction. The language of the arbitration clause in the Shelltime 4 charterparty contained nothing to exclude disputes about the validity of the contract, whether on the grounds that it was procured by fraud, bribery, misrepresentation or anything else. It therefore applied to the present dispute (*see* paras 13 and 15).

(2) The principle of separability enacted in section 7 of the Arbitration Act 1996 meant that the invalidity or rescission of the main contract did not necessarily entail the invalidity or rescission of the arbitration agreement. The arbitration agreement had to be treated as a distinct agreement and could be void or voidable only on a ground which related directly to the arbitration agreement and was not merely a consequence of the main agreement. The allegations in the present case did not involve an attack on the arbitration agreement (*see* paras 17 to 19).

———

The following cases were referred to in the judgment:

*Ashville Investments Ltd v Elmer Contractors Ltd* (CA) [1988] 2 Lloyd's Rep 73; [1989] QB 488;

*AT&T Technologies Inc v Communications Workers of America*, 475 US 643 (1986);

*Comandate Marine Corporation v Pan Australia Shipping Pty Ltd* [2007] 1 Lloyd's Rep 119; [2006] FCAFC 192;

*Fillite (Runcorn) Ltd v Aqua-Lift* (CA) (1989) 45 BLR 27; (1989) 26 Con LR 66;

*Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* (CA) [1993] 1 Lloyd's Rep 455;

*Heyman v Darwins Ltd* (HL) (1942) 72 Ll L Rep 65; [1942] AC 356;

*Mackender, Hill and White v Feldia AG* (CA) [1966] 2 Lloyd's Rep 449; [1967] 2 QB 590;

*Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep 63;

*Prima Paint Corporation v Flood & Conklin Manufacturing Co*, 388 US 395 (1967);
*Threlkeld & Co Inc v Metallgesellschaft Ltd (London)*, 923 F. 2d 245 (2d Cir 1991);
*Union of India v E B Aaby's Rederi AS (The Evje)* (HL) [1974] 2 Lloyd's Rep 57; [1975] AC 797.

---

This was an appeal by claimant owners from the decision of the Court of Appeal (Tuckey, Arden and Longmore LJJ [2007] 2 Lloyd's Rep 267) allowing an appeal by charterers against the refusal of Morison J to stay the owners' claims for rescission of the charterparties on the ground of bribery.

Christopher Butcher QC and Philip Jones QC, instructed by Ince & Co, for the owners; Nicholas Hamblen QC and Vernon Flynn, instructed by Lax & Co, for the charterers.

The further facts are stated in the opinion of Lord Hoffmann.

Judgment was reserved.

Wednesday, 17 October 2007

---

## JUDGMENT

**Lord HOFFMANN:**

My Lords,

1. This appeal concerns the scope and effect of arbitration clauses in eight charterparties in Shelltime 4 form made between eight companies forming part of the Sovcomflot group of companies (which is owned by the Russian state) and eight charterers. It is alleged by the owners that the charters were procured by the bribery of senior officers of the Sovcomflot group by a Mr Nikitin, who controlled or was associated with the charterer companies. It is unnecessary to set out the details of these allegations because it is not disputed that the owners have an arguable case. They have purported to rescind the charters on this ground and the question is whether the issue of whether they were entitled to do so should be determined by arbitration or by a court. The owners have commenced court proceedings for a declaration that the charters have been validly rescinded and the charterers have applied for a stay under section 9 of the Arbitration Act 1996. Morison J [2007] 1 All ER (Comm) 81 refused a stay but the Court of Appeal (Tuckey, Arden and Longmore LJJ) [2007] 2 Lloyd's Rep 267; [2007] Bus LR 686 allowed the appeal and granted it.

2. The case has been argued on the basis that there are two issues: first, whether, as a matter of construction, the arbitration clause is apt to cover the question of whether the contract was procured by bribery and, secondly, whether it is possible for a party to be bound by submission to arbitration when he alleges that, but for the bribery, he would never have entered into the contract containing the arbitration clause. It seems to me, however, that for the reasons I shall explain, these questions are very closely connected.

3. I start by setting out the arbitration clause in the Shelltime 4 form:

    41. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.

    (b) Any dispute arising under this charter shall be decided by the English courts to whose jurisdiction the parties hereby agree.

    (c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred ... to arbitration in London, one arbitrator to be nominated by Owners and the other by Charterers, and in case the arbitrators shall not agree to the decision of an umpire, whose decision shall be final and binding upon both parties. Arbitration shall take place in London in accordance with the London Maritime Association of Arbitrators, in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.

        (i) A party shall lose its right to make such an election only if:

    (a) it receives from the other party a written notice of dispute which

        (1) states expressly that a dispute has arisen out of this charter;

        (2) specifies the nature of the dispute; and

        (3) refers expressly to this clause 41(c)

    and

    (b) it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute ...

4. It will be observed that clause 41(b) is a jurisdiction clause in respect of "any dispute arising under this charter" which is then incorporated by reference (by the words "any such dispute") in the arbitration clause in 41(c). So the first question is whether clause 41(b) refers the question of whether the charters were procured by bribery to the jurisdiction of the English court. If it does, then a party

may elect under clause 41(c) to have that question referred to arbitration. But I shall for the sake of convenience discuss the clause as if it was a simple arbitration clause. The owners say that for two reasons it does not apply. The first is that, as a matter of construction, the question is not a dispute arising under the charter. The second is that the jurisdiction and arbitration clause is liable to be rescinded and therefore not binding upon them.

5. Both of these defences raise the same fundamental question about the attitude of the courts to arbitration. Arbitration is consensual. It depends upon the intention of the parties as expressed in their agreement. Only the agreement can tell you what kind of disputes they intended to submit to arbitration. But the meaning which parties intended to express by the words which they used will be affected by the commercial background and the reader's understanding of the purpose for which the agreement was made. Businessmen in particular are assumed to have entered into agreements to achieve some rational commercial purpose and an understanding of this purpose will influence the way in which one interprets their language.

6. In approaching the question of construction, it is therefore necessary to inquire into the purpose of the arbitration clause. As to this, I think there can be no doubt. The parties have entered into a relationship, an agreement or what is alleged to be an agreement or what appears on its face to be an agreement, which may give rise to disputes. They want those disputes decided by a tribunal which they have chosen, commonly on the grounds of such matters as its neutrality, expertise and privacy, the availability of legal services at the seat of the arbitration and the unobtrusive efficiency of its supervisory law. Particularly in the case of international contracts, they want a quick and efficient adjudication and do not want to take the risks of delay and, in too many cases, partiality, in proceedings before a national jurisdiction.

7. If one accepts that this is the purpose of an arbitration clause, its construction must be influenced by whether the parties, as rational businessmen, were likely to have intended that only some of the questions arising out of their relationship were to be submitted to arbitration and others were to be decided by national courts. Could they have intended that the question of whether the contract was repudiated should be decided by arbitration but the question of whether it was induced by misrepresentation should be decided by a court? If, as appears to be generally accepted, there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another, one would need to find very clear language before deciding that they must have had such an intention.

8. A proper approach to construction therefore requires the court to give effect, so far as the language used by the parties will permit, to the commercial purpose of the arbitration clause. But the same policy of giving effect to the commercial purpose also drives the approach of the courts (and the legislature) to the second question raised in this appeal, namely, whether there is any conceptual reason why parties who have agreed to submit the question of the validity of the contract to arbitration should not be allowed to do so.

9. There was for some time a view that arbitrators could never have jurisdiction to decide whether a contract was valid. If the contract was invalid, so was the arbitration clause. In *Overseas Union Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep 63 at page 66 Evans J said that this rule "owes as much to logic as it does to authority". But the logic of the proposition was denied by the Court of Appeal in *Harbour Assurance Co (UK) Ltd v Kansa General International Insurance Co Ltd* [1993] 1 Lloyd's Rep 455 and the question was put beyond doubt by section 7 of the Arbitration Act 1996:

> Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement.

10. This section shows a recognition by Parliament that, for the reasons I have given in discussing the approach to construction, businessmen frequently do want the question of whether their contract was valid, or came into existence, or has become ineffective, submitted to arbitration and that the law should not place conceptual obstacles in their way.

11. With that background, I turn to the question of construction. Your Lordships were referred to a number of cases in which various forms of words in arbitration clauses have been considered. Some of them draw a distinction between disputes "arising under" and "arising out of" the agreement. In *Heyman v Darwins Ltd* (1942) 72 Ll L Rep 65; [1942] AC 356 at page 399 Lord Porter said that the former had a narrower meaning than the latter but in *Union of India v E B Aaby's Rederi AS (The Evje)* [1974] 2 Lloyd's Rep 57; [1975] AC 797 Viscount Dilhorne, at page 814, and Lord Salmon, at page 817, said that they could not see the difference between them. Nevertheless, in *Overseas Union*

*Insurance Ltd v AA Mutual International Insurance Co Ltd* [1988] 2 Lloyd's Rep 63 at page 67, Evans J said that there was a broad distinction between clauses which referred "only those disputes which may arise regarding the rights and obligations which are created by the contract itself" and those which "show an intention to refer some wider class or classes of disputes". The former may be said to arise "under" the contract while the latter would arise "in relation to" or "in connection with" the contract. In *Fillite (Runcorn) Ltd v Aqua-Lift* (1989) 45 BLR 27; (1989) 26 Con LR 66, at page 76, Slade LJ said that the phrase "under a contract" was not wide enough to include disputes which did not concern obligations created by or incorporated in the contract. Nourse LJ gave a judgment to the same effect. The court does not seem to have been referred to *Mackender, Hill and White v Feldia AG* [1966] 2 Lloyd's Rep 449; [1967] 2 QB 590, in which a court which included Lord Denning MR and Diplock LJ decided that a clause in an insurance policy submitting disputes "arising thereunder" to a foreign jurisdiction was wide enough to cover the question of whether the contract could be avoided for non-disclosure.

12. I do not propose to analyse these and other such cases any further because in my opinion the distinctions which they make reflect no credit upon English commercial law. It may be a great disappointment to the judges who explained so carefully the effects of the various linguistic nuances if they could learn that the draftsman of so widely used a standard form as Shelltime 4 obviously regarded the expressions "arising under this charter" in clause 41(b) and "arisen out of this charter" in clause 41(c)(1)(a)(i) as mutually interchangeable. So I applaud the opinion expressed by Longmore LJ in the Court of Appeal (at para 17) that the time has come to draw a line under the authorities to date and make a fresh start. I think that a fresh start is justified by the developments which have occurred in this branch of the law in recent years and in particular by the adoption of the principle of separability by Parliament in section 7 of the 1996 Act. That section was obviously intended to enable the courts to give effect to the reasonable commercial expectations of the parties about the questions which they intended to be decided by arbitration. But section 7 will not achieve its purpose if the courts adopt an approach to construction which is likely in many cases to defeat those expectations. The approach to construction therefore needs to be re-examined.

13. In my opinion the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction. As Longmore LJ remarked, at para 17: "if any businessman did want to exclude disputes about the validity of a contract, it would be comparatively easy to say so."

14. This appears to be the approach adopted in Germany: see the Bundesgerichtshof's decision of 27 February 1970 (1990) Arbitration International, vol 6, no 1, page 79:

> There is every reason to presume that reasonable parties will wish to have the relationships created by their contract and the claims arising therefrom, irrespective of whether their contract is effective or not, decided by the same tribunal and not by two different tribunals.

15. If one adopts this approach, the language of clause 41 of Shelltime 4 contains nothing to exclude disputes about the validity of the contract, whether on the grounds that it was procured by fraud, bribery, misrepresentation or anything else. In my opinion it therefore applies to the present dispute.

16. The next question is whether, in view of the allegation of bribery, the clause is binding upon the owners. They say that if they are right about the bribery, they were entitled to rescind the whole contract, including the arbitration clause. The arbitrator therefore has no jurisdiction and the dispute should be decided by the court.

17. The principle of separability enacted in section 7 means that the invalidity or rescission of the main contract does not necessarily entail the invalidity or rescission of the arbitration agreement. The arbitration agreement must be treated as a "distinct agreement" and can be void or voidable only on grounds which relate directly to the arbitration agreement. Of course there may be cases in which the ground upon which the main agreement is invalid is identical with the ground upon which the arbitration agreement is invalid. For example, if the main agreement and the arbitration agreement are contained in the same document and one of the parties claims that he never agreed to anything in the document and that his signature was forged, that will be an attack on the validity of the arbitration agreement. But the ground of attack is not that the main agreement was invalid. It is that the signature to the arbitration agreement, as a "distinct agreement", was forged. Similarly, if a party alleges that someone who purported to sign as agent on his behalf had no authority whatever to conclude any agreement on his behalf, that is an attack on both the main agreement and the arbitration agreement.

18. On the other hand, if (as in this case) the allegation is that the agent exceeded his authority by entering into a main agreement in terms which were not authorised or for improper reasons, that is not necessarily an attack on the arbitration agreement. It would have to be shown that whatever the terms of the main agreement or the reasons for which the agent concluded it, he would have had no authority to enter into an arbitration agreement. Even if the allegation is that there was no concluded agreement (for example, that terms of the main agreement remained to be agreed) that is not necessarily an attack on the arbitration agreement. If the arbitration clause has been agreed, the parties will be presumed to have intended the question of whether there was a concluded main agreement to be decided by arbitration.

19. In the present case, it is alleged that the main agreement was in uncommercial terms which, together with other surrounding circumstances, give rise to the inference that an agent acting for the owners was bribed to consent to it. But that does not show that he was bribed to enter into the arbitration agreement. It would have been remarkable for him to enter into any charter without an arbitration agreement, whatever its other terms had been. Mr Butcher QC, who appeared for the owners, said that but for the bribery, the owners would not have entered into any charter with the charterers and therefore would not have entered into an arbitration agreement. But that is in my opinion exactly the kind of argument which section 7 was intended to prevent. It amounts to saying that because the main agreement and the arbitration agreement were bound up with each other, the invalidity of the main agreement should result in the invalidity of the arbitration agreement. The one should fall with the other because they would never have been separately concluded. But section 7 in my opinion means that they must be treated as having been separately concluded and the arbitration agreement can be invalidated only on a ground which relates to the arbitration agreement and is not merely a consequence of the invalidity of the main agreement.

20. Mr Butcher submitted that the approach to construction and separability adopted by the Court of Appeal infringed the owners' right of access to a court for the resolution of their civil disputes, contrary to article 6 of the European Convention on Human Rights. I do not think there is anything in this point. The European Convention was not intended to destroy arbitration. Arbitration is based upon agreement and the parties can by agreement waive the right to a court. If it appears upon a fair construction of the charter that they have agreed to the arbitration of a particular dispute, there is no infringement of their Convention right.

21. For these reasons, which are substantially the same as those given by Longmore LJ in the Court of Appeal, I would hold that the charterers are entitled to a stay of the proceedings to rescind the charters and dismiss the appeal.

**Lord HOPE of CRAIGHEAD:**

My Lords,

22. I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hoffmann. I entirely agree with it, and for the reasons he gives I too would dismiss the appeal. I wish to add only a few brief comments.

23. There are, as my noble and learned friend has said, two issues in this appeal. The first is an issue of construction: whether the appellants' claims that the charterparties have been validly rescinded are disputes which arise under, or out of, the charterparties within the meaning of clause 41. The second is an issue of separability: whether, assuming that the appellants have an arguable case that the charterparties have been validly rescinded, they also have an arguable case that the arbitration agreements in clause 41 have been rescinded as well. The appellants submit that they were entitled to rescind the charterparties, including the arbitration agreements, because the charterparties were induced by bribery. The allegations of bribery are directed to the terms on which the charters were entered into by the Sovcomflot group of companies as owners with Mr Nikitin's chartering companies. They are said to have been uncommercial and unbelievably generous. The bribes are said to impeach not only the charters themselves but also the arbitration clause. The argument is essentially one of causation. It is that the charters would not have been entered into in the absence of these bribes or other benefits, and that but for the agreement to enter into them there would have been no agreement to go to arbitration. Had it not been for the bribes provided by Mr Nikitin to their director-general, Mr Skarga, Sovcomflot would not have done business with Mr Nikitin's companies at all.

24. On the first issue, the appellants say that it is highly unlikely that the parties, in agreeing to an arbitration provision, intended it to cover disputes as to whether the contract itself was induced by bribery, as to which it must be assumed one party would be entirely ignorant. The clear trend of recent authorities, they say, is to give a narrow meaning to the words used in the arbitration agreement to identify the disputes that are referred by it. They must be taken to have informed any decision to use the clause which is set out in the Shelltime 4 standard forms. I think that there are two answers to this argument. One is to be found in the wording of clause 41 itself. The other is to be found by considering whether its consequences make sense

in the international commercial context within which these standard forms are designed to operate.

25. As for the wording, contracts negotiated between parties in the international market are commonly based upon standard forms the terms of which are well known. Because they have a well-understood meaning, they enable contracts to be entered into quickly and efficiently. The Shelltime 4 standard form is a good example of this practice. It has been in frequent use since at least 1984, and it is still in use. But it must be appreciated that the various clauses in these forms serve various functions. In some a high degree of precision is necessary. Terms which define the parties' mutual obligations in relation to price and performance lie at the heart of every business transaction. They fall into that category. In others, where the overall purpose is clear, the parties are unlikely to linger over the words which are used to express it.

26. Clause 41 falls into the latter category. No contract of this kind is complete without a clause which identifies the law to be applied and the methods to be used for the determination of disputes. Its purpose is to avoid the expense and delay of having to argue about these matters later. It is the kind of clause to which ordinary businessmen readily give their agreement so long as its general meaning is clear. They are unlikely to trouble themselves too much about its precise language or to wish to explore the way it has been interpreted in the numerous authorities, not all of which speak with one voice. Of course, the court must do what it can to provide charterers and shipowners with legal certainty at the negotiation stage as to what they are agreeing to. But there is no conflict between that proposition and the guidance which Longmore LJ gave in paras 17 to 19 of the Court of Appeal's judgment about the interpretation of jurisdiction and arbitration clauses in international commercial contracts. The proposition that any jurisdiction or arbitration clause in an international commercial contract should be liberally construed promotes legal certainty. It serves to underline the golden rule that if the parties wish to have issues as to the validity of their contract decided by one tribunal and issues as to its meaning or performance decided by another, they must say so expressly. Otherwise they will be taken to have agreed on a single tribunal for the resolution of all such disputes.

27. The overall purpose of clause 41 is identified in the two opening paragraphs. These are the choice of law and jurisdiction clauses. There is no sign here — leaving aside the question of arbitration for a moment — that the parties intended that the disputes which were to be determined in accordance with the laws of England and be decided by the English courts were not to include disputes about the charter's validity. The simplicity of the wording is a plain indication to the contrary. The arbitration clause which follows is to be read in that context. It indicates to the reader that he need not trouble himself with fussy distinctions as to what the words "arising under" and "arising out of" may mean. Taken overall, the wording indicates that arbitration may be chosen as a one-stop method of adjudication for the determination of all disputes. Disputes about validity, after all, are no less appropriate for determination by an arbitrator than any other kind of dispute that may arise. So I do not think that there is anything in the appellants' point that it must be assumed that when the charters were entered into one party was entirely ignorant that they were induced by bribery. The purpose of the clause is to provide for the determination of disputes of all kinds, whether or not they were foreseen at the time when the contract was entered into.

28. Then there are consequences that would follow if the appellants are right. It is not just that the parties would be deprived of the benefit of having all their disputes decided in one forum. The jurisdiction clause does not say where disputes about the validity of the contract are to be determined, if this is not to be in the forum which is expressly mentioned. The default position is that such claims would have to be brought in the jurisdiction where their opponents were incorporated, wherever and however unreliable that might be, while claims for breach of contract have to be brought in England. But why, it may be asked, would any sensible businessmen have wished to agree to this? As Bingham LJ said in *Ashville Investments Ltd v Elmer Contractors Ltd* [1988] 2 Lloyd's Rep 73; [1989] QB 488 at page 517, one should be slow to attribute to reasonable parties an intention that there should in any foreseeable eventuality be two sets of proceedings. If the parties have confidence in their chosen jurisdiction for one purpose, why should they not have confidence in it for the other? Why, having chosen their jurisdiction for one purpose, should they leave the question which court is to have jurisdiction for the other purpose unspoken, with all the risks that this may give rise to? For them, everything is to be gained by avoiding litigation in two different jurisdictions. The same approach applies to the arbitration clause

29. The Court of Appeal said that the time had come for a fresh start to be made, at any rate for cases arising in an international commercial context. It has indeed been clear for many years that the trend of recent authority has risked isolating the approach that English law takes to the wording of

such clauses from that which is taken internationally. It makes sense in the context of international commerce for decisions about their effect to be informed by what has been decided elsewhere.

30. The Bundesgerichtshof's decision of 27 February 1970 to which Lord Hoffmann has referred makes two points that are relevant to this issue. The first is that haphazard interpretations should be avoided and a rule of construction established which presumes, in cases of doubt, that reasonable parties will wish to have the claims arising from their contract decided by the same tribunal irrespective of whether their contract is effective or not. The second is that experience shows that as soon as a dispute of any kind arises from a contract, objections are very often also raised against its validity. As the Bundesgerichtshof said, entrusting the assessment of the facts of the case to different tribunals according to the approach that is taken to the issues between them is unlikely to occur to the contracting parties.

31. In *AT&T Technologies Inc v Communications Workers of America*, 475 US 643 (1986) at page 650, the United States Supreme Court said that, in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration could prevail. In *Threlkeld & Co Inc v Metallgesellschaft Ltd (London)*, 923 F 2d 245 (2d Cir 1991), the court observed that federal arbitration policy required that any doubts concerning the scope of arbitral issues should be resolved in favour of arbitration and that arbitration clauses should be construed as broadly as possible. In *Comandate Marine Corporation v Pan Australia Shipping Pty Ltd* [2007] 1 Lloyd's Rep 119; [2006] FCAFC 192, para 165 the Federal Court of Australia said that a liberal approach to the words chosen by the parties was underpinned by the sensible commercial presumption that the parties did not intend the inconvenience of having possible disputes from their transaction being heard in two places, particularly when they were operating in a truly international market. This approach to the issue of construction is now firmly embedded as part of the law of international commerce. I agree with the Court of Appeal that it must now be accepted as part of our law too.

32. It is in the light of these observations that the issue of severability should be viewed also. Section 7 of the Arbitration Act 1996 reproduces in English law the principle that was laid down by section 4 of the United States Arbitration Act 1925. That section provides that, on being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration. Section 7 uses slightly different language, but it is to the same effect. The validity, existence or effectiveness of the arbitration agreement is not dependent upon the effectiveness, existence or validity of the underlying substantive contract unless the parties have agreed to this. The purpose of these provisions, as the United States Supreme Court observed in *Prima Paint Corporation v Flood & Conklin Manufacturing Co*, 388 US 395 (1967), at page 404, is that the arbitration procedure, when selected by the parties to a contract, should be speedy and not subject to delay and obstruction in the courts. The statutory language, it said, did not permit the court to consider claims of fraud in the inducement of the contract generally. It could consider only issues relating to the making and performance of the agreement to arbitrate. *Dicey, Morris and Collins on the Conflict of Laws*, 14th Edition, 2006, vol 1, para 12-099, acknowledge that there are excellent reasons of policy to support this approach.

33. The appellants' case is that, as there was no real consent to the charterparties because they were induced by bribery, there was no real consent to the arbitration clauses. They submit that a line does not have to be drawn between matters which might impeach the arbitration clause and those which affect the main contract. What is needed is an analysis of whether the matters that affect the main contract are also matters which affect the validity of the arbitration clause. As the respondents point out, this is a causation argument. The appellants say that no substantive distinction can be drawn between various situations where the complaint is made that there was no real consent to the transaction. It would be contrary to the policy of the law, which is to deter bribery, that acts of the person who is alleged to have been bribed should deprive the innocent party of access to a court for determination of the issue whether the contract was induced by bribery.

34. But, as Longmore LJ said in para 21 of the Court of Appeal's judgment, this case is different from a dispute as to whether there was ever a contract at all. As everyone knows, an arbitral award possesses no binding force except that which is derived from the joint mandate of the contracting parties. Everything depends on their contract, and if there was no contract to go to arbitration at all an arbitrator's award can have no validity. So, where the arbitration agreement is set out in the same document as the main contract, the issue whether there was an agreement at all may indeed affect all parts of it. Issues as to whether the entire agreement was procured by impersonation or by forgery, for example, are unlikely to be severable from the arbitration clause.

35. That is not this case, however. The appellants' argument was not that there was no contract

at all, but that they were entitled to rescind the contract including the arbitration agreement because the contract was induced by bribery. Allegations of that kind, if sound, may affect the validity of the main agreement. But they do not undermine the validity of the arbitration agreement as a distinct agreement. The doctrine of separability requires direct impeachment of the arbitration agreement before it can be set aside. This is an exacting test. The argument must be based on facts which are specific to the arbitration agreement. Allegations that are parasitical to a challenge to the validity to the main agreement will not do. That being the situation in this case, the agreement to go to arbitration must be given effect.

**Lord SCOTT of FOSCOTE:**

My Lords,

36. I have had the advantage of reading in advance the opinion of my noble and learned friend Lord Hoffmann and find myself in complete agreement with the conclusion he has reached and his reasons for that conclusion. I cannot improve upon those reasons and shall not try to do so. I, too, would dismiss this appeal.

**Lord WALKER of GESTINGTHORPE:**

My Lords,

37. I have had the privilege of reading in draft the opinion of my noble and learned friend Lord Hoffmann. I am in full agreement with it. It gives full effect to the legislative purpose of section 7 of the Arbitration Act 1996. It marks a fresh start, leaving behind some fine verbal distinctions (on the language of particular arbitration clauses) which few commercial men would regard as significant. For these reasons I too would dismiss this appeal.

**Lord BROWN of EATON-UNDER-HEYWOOD:**

My Lords,

38. For the reasons given in the speeches prepared by my noble and learned friends, Lord Hoffmann and Lord Hope of Craighead, with which I am in full agreement, I too would dismiss this appeal.