IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN LMAA ARBITRATION

BETWEEN:

**PSARA ENERGY LIMITED**

Claimant

**and**

**(1) ADVANTAGE ARROW SHIPPING LLC**
**(2) ADVANTAGE START SHIPPING LLC**
**(3) ADVANTAGE TANKERS LLC**
**(4) ADVANTAGE HOLDINGS LLC**
**(5) FORWARD HOLDINGS LLC**

Respondents

---

# CLAIM SUBMISSIONS

---

Exhibited to these Claim Submissions is a true copy bundle of documents. References to the documents in that bundle take the form [X].

## A. Introduction

1. The Claimant ("**Owners**") serve these Claim Submissions against the Respondents ("**the Advantage Respondents**") pursuant to the Order of District Judge Marcia A. Crone of the United States District Court for the Eastern District of Texas ("**the ED Texas Court**") dated 24 January 2019 ("**the Crone Order**").

2. By the Crone Order, District Judge Crone ordered that the Rule B attachment proceedings then pending in the ED Texas Court (Civil Action No 1:18-cv-00178) ("**the ED Texas Rule B Proceedings**") be referred to arbitration in accordance with the arbitration agreement set out in the Charterparty as further defined below.

3. The ED Texas Rule B Proceedings subsumed within them proceedings that had been commenced by Owners in the United States District Court for the Eastern District of Louisiana ("**the ED Louisiana Rule B Proceedings**") (Civil Action No 2:18:cv-4111), which had been transferred to the ED Texas Court and consolidated with the ED Texas Rule B Proceedings (jointly, "**the Rule B Proceedings**") by Order of Senior District Judge Ivan Lemelle of the Eastern District of Louisiana dated 18 May 2018.

4. In the Rule B Proceedings, Owners had attached two vessels owned by the First and Second Respondents, MT "*ADVANTAGE ARROW*" and MT "*ADVANTAGE START*", respectively ("**the Rule B Vessels**"). The Rule B Vessels were in due course released against the payment of security into Court in the sums of US$4,000,000 and US$800,000 ("**the Rule B Sums**").

5. These Claim Submissions are served without prejudice to Owners' appeal against the Crone Order pending in the United States Court of Appeals for the Fifth Circuit (Case





No 19-40071), Owners' contention that the Rule B Proceedings should be determined by the ED Texas Court, and its contention that this Tribunal accordingly has no jurisdiction to determine these claims.

## B. The Charterparty and the Guarantee

6. By a charterparty dated 23 February 2010 on an amended Barecon 2001 form ("**the Charterparty**") Owners chartered MT "*CV STEALTH*" ("**the Vessel**") to Geden Holdings Limited ("**Geden Holdings**") or its guaranteed nominee. A copy of the Charterparty is exhibited at [1-24].

7. On 2 June 2010 Geden Holdings nominated Space Shipping Limited ("**Charterers**") as charterers. An irrevocable performance guarantee ("**the Guarantee**") was provided by Geden Holdings on 4 March 2010 [25-27] unconditionally and irrevocably guaranteeing Charterers' performance under the Charterparty.

## C. Summary of Owners' case

8. In summary, it is Owners' case that:

(i) For the reasons set out in Section D below, Charterers are liable to Owners under the Charterparty and Geden Holdings under the Guarantee.

(ii) As against the Advantage Respondents, between around January and May 2015 Geden Holdings and/or its ultimate beneficial owner Mehmet Emin Karamehmet ("**Mr Karamehmet**") caused Geden Holdings and various of its subsidiaries to transfer 11 crude oil tankers, including those vessels the subject of the US Rule B proceedings to the Advantage Respondents and their associates ("**the Advantage Group**").

(iii) The Advantage Group is and has at all material times been nominally owned and controlled by Mr Karamehmet's daughter Gulsun Nazli Karamehmet Williams ("**Ms Karamehmet-Williams**"), and Ali Tugrul Tokgöz ("**Mr Tokgöz**"), who was also a director of Geden Holdings.

(iv) Contrary to the case advanced by the Advantage Respondents in the Rule B Proceedings and elsewhere, those transfers were not *bona fide* arms' length dispositions, but were instead a vehicle by which Mr Karamehmet could retain effective control over those vessels, albeit now in a new wrapper designed to evade Geden Holdings' creditors.

(v) Owners will also rely upon the fact that similar transfers had taken place in or around mid-2013, when 7 product tankers owned by other of Geden Holdings' subsidiaries were transferred to SPVs owned by Geden Holdings' financiers, and then bareboat chartered pursuant to "sale and leaseback" arrangements to subsidiaries of Future Holdings Ltd ("**the Future Group**"). Just as with the Advantage Group, the Future Group is nominally owned and controlled by Ms Karahmehmet-Williams and Mr Tokgöz.

(vi) In truth, however, both the Future Group and the Advantage Group are owned and controlled by Mr Karamehmet through Ms Karamehmet-Williams and Mr Tokgöz as his nominees.

(vii) Both the transfers to the Future Group and to the Advantage Group were made pursuant to a plan devised in March 2013 by AlixPartners LLP codenamed "Project Hermitage", which had as one of its express intentions the "*[r]ing-*

*fence [of] potential sources of disruption, holdout or nuisance (such as arrests or sister ship arrests)"*, against the background of aggressive actions by Geden Holdings' creditors (such as Icon). In other words, Mr Karamehmet sought to immunise the fleet that he (through Geden Holdings) owned against attachment by transferring them into other corporate entities still under his effective control but in different nominal ownership.

(viii) Geden Holdings cannot however so easily evade its legal obligations. As a matter of US law (which Owners say is the proper law governing this dispute), the Advantage Respondents are liable for Geden Holdings' obligations on the basis of "successor liability" and/or as a "fraudulent transferee". Further or in the alternative, as a matter of English law, Owners are entitled to pierce the corporate veil so as to make the Advantage Respondents similarly liable.

(ix) Owners accordingly seek the relief set out in the prayer as against the Advantage Respondents.

## D. The claims under the Charterparty and the Guarantee

The terms of the Charterparty

9. The Charterparty provided *inter alia* as follows:

*Box 21: Charter period*
*5 years straight period firm +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterer 5 months prior end of firm period.*

*Box 22: Charter hire*
*US$10,750 gross pdpr for 5th charter year*

*Part II*

*7. Surveys on Delivery and Redelivery*

*...Charterers shall bear all expenses of the Off-hire Survey including loss of time, if any, at the daily equivalent to the rate of hire or pro rata thereof*

*10. Maintenance and Operation*

*a. Maintenance and Repairs...The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice...shall at all times keep the Vessel's Class fully up to date with the Classification society...and maintain al other necessary certificates in full force at all times*

*11. Hire*

*a. The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence.*

*b. Payment of hire shall be made as per daily hire in Box 22 basis per calendar month in advance...*

*f. Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 24. If Box 24 has not been filled in, the three months Interbank offered rate in London (LIBOR or its successor) for the currency stated in*

*Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent, shall apply.*

*g. Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date.*

*15. Redelivery*

*...The Charterers shall give the Owners not less than thirty (30) running days' preliminary notice of expected date, range of ports of redelivery or port or place of redelivery and not less than 5/3/2/1 running days' definite notice of expected date and port or place of redelivery...*

*Subject to the provisions of Clause 10, the Vessel shall be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted.*

*The Vessel upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 17.*

*17. Indemnity*

*(a) The Charterers shall indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the Vessel by the Charterers...*

*Rider Clauses*

*CLAUSE 7. INTEREST*

*The Charterers shall pay on demand by the Owners interest on any sum due under this Charter and unpaid from and including the date which it feel due for payment (subject as provided below) until the date of actual payment (as well after as before judgement) at the rate per annum determined by the Owners and certified by them to the Charterers to be equal to one-month London Interbank Offer Rate (LIBOR) plus 2 percent (2%) per annum provided always that where the Owners pay or incur any such costs, charges, expenses, claims, liabilities, losses, penalties, fines, duty, fee tax or other moneys as are stated in the Charter to be payable by the Charterers to the Owners or recoverable by the Owners from the Charterers or in respect of which the Charterers may be liable to indemnify Owners, interest shall accrue thereon at the rate specified above from and including the date on which such cost, charge, expenses, claim, liability, loss, penalty, fine, duty, fee tax of or other money is paid or incurred by the Owners. Any such interest which is not paid when due shall be compounded at the end of such periods as the Owners may determine for so long as it remains unpaid. All payments of interest to be made under the Charter shall accrue from day to day and be calculated on the basis of the actual number of days elapsed and a three hundred and sixty five (365) day year.*

*Clause 9 INDEMNITY*

*The Charterers shall pay to the Owners on demand, and indemnity (sic) and keep the Owners indemnified against, all costs charges, expenses, claims proceedings (whether civil or criminal) ~ liabilities, losses ~ penalties, duties and fees...and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering...use,*

*operation, return, redelivery...of the Vessel...and regardless of when the same shall arise...*

<u>*Clause 15*</u>

*...Charterers to give 30/15/10 days approximate, then 5/3/2/1 days firm notice of redelivery.*

10. Pursuant to clause 7 of a Settlement Agreement dated 8 December 2016 and entered into between Owners [28-32], Charterers and Geden Holdings, hire payable under the Charterparty was amended to US$9,875 per day from 1 January 2017 onwards.

<u>The Vessel's detention in Venezuela and subsequent events</u>

11. On 4 September 2014, the Vessel was ordered by Charterers' sub-charterers ST Shipping and Transport Pte Ltd ("**ST Shipping**") to proceed to Puerto La Cruz, Venezuela, to load a cargo of Mesa crude oil. She arrived on 6 September 2014 but on 13 September 2014 was boarded by representatives of the Venezuelan authorities who were investigating possible unauthorised export of crude oil. In due course, a Mr Asuncion Rafael Barbosa was arrested and charged in connection with the same. The Vessel herself was detained.

12. The Vessel was eventually released some three years later, on or around 3 October 2017. Charterers arranged for her to be towed to the Port of Spain, Trinidad. She was finally redelivered to Owners at 16:00 on 24 March 2018.

<u>Unpaid Hire</u>

13. In accordance with Box 22 (as varied by clause 7 of the Settlement Agreement) and clause 11 of Part II of the Charterparty, Charterers are required to pay hire monthly in advance.

14. Owners have, in separate arbitral proceedings commenced against Charterers under the Charterparty ("**the Space Shipping Reference**"), obtained awards for hire payable up to and including the end of February 2018. Charterers have however failed to pay hire due and owing for March 2018.

15. Owners are accordingly entitled to hire payable up to and including 16:00 on 24 March 2018 when the Vessel was redelivered. Owners exhibit a copy of the Vessel's redelivery certificate at [33].

16. The amount of hire due and unpaid is US$233,708.33. A copy of Owners' hire invoices are exhibited at [34-35]. Owners are also entitled to interest pursuant to Rider Clause 7 at the rate of 2% above one month LIBOR.

17. Owners understand (from Charterers' case in the Space Shipping Reference) that the Advantage Respondents will say that the Vessel was in fact redelivered, or should have been redelivered, on 24 February 2018. This is denied:

    (i) Redelivery did not in fact take place until 24 March 2018, which was when Charterers' crew effected physical handover of the Vessel. Redelivery cannot have taken place on 24 February 2018 as no handing over of physical possession of the Vessel took place at that time. Hire is due and payable until redelivery in fact took place on 24 March 2018. Charterers would have to advance some form of damages claim if they consider that Owners breached the Charterparty by failing to take redelivery earlier.

(ii) In that regard, Owners will say that Charterers were not entitled to oblige Owners to take redelivery before 11 March 2018, being not less than 30 days after Charterers gave their 30 days' notice of redelivery on 9 February 2018.

(iii) In any event Owners required at least until 11 March 2018 to make the necessary arrangements for redelivery.

(iv) Furthermore, redelivery could not take place until 24 March 2018 in any event because Charterers were making arrangements to fit a second anchor (which Charterers were obliged to replace under the Charterparty) which was necessary before the Vessel could be considered to be at a safe place and before Owners could obtain insurance cover, which were prerequisites to Owners taking redelivery.

(v) Furthermore and in any event, pursuant to Clause 7 the Charterers must bear all expenses of the "Off-hire Survey" including loss of time at the CP hire rate. The redelivery survey (which could not be completed) took place from 2-8 March 2018 inclusive, so the Charterers would be liable for hire (or to pay for that time at the hire rate) in any event.

18. Alternatively, if (which is denied) the Vessel was considered to be redelivered earlier than 24 March 2018 notwithstanding the matters set out above, then Owners would be entitled to damages for Charterers' breaches of their obligations concerning the notices of redelivery and the Vessel's condition on redelivery in Clause 15 of Part II and/or Rider Clause 15 of the Charterparty, in a sum equivalent to the amount of the hire otherwise payable in this period.

Breach of Charterers' maintenance/redelivery obligations

19. Pursuant to Clause 10(a) of Part II the Charterparty, Charterers were under an obligation to keep the Vessel well maintained and in a good state of repair throughout the duration of the Charterparty. Charterers were also under an absolute and unqualified obligation to keep the Vessel's Class fully up to date and to maintain all other necessary certificates in full force at all times.

20. Further, pursuant to Clause 15 of Part II of the Charterparty, Charterers were obliged to redeliver the Vessel to Owners "*in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted*" and that the Vessel upon redelivery would have her survey cycles up to date and trading and class certificates valid. Box 17 required the Vessel to have passed her Special Survey dry docking without extensions.

21. In breach of Clauses 10(a) and/or 15 of Part II and/or Box 17 of the Charterparty, Charterers did not undertake any (or any non-negligible) maintenance on the Vessel since September 2014, failed to pass her Special Survey dry docking, and instead redelivered the Vessel in a severely damaged condition on 24 March 2018 with all Class and statutory certificates expired.

22. Pending expert evidence, the best particulars Owners can currently give as to the work required to the Vessel to bring her back to the required redelivery condition, to pass Special Survey, and to have all Class and statutory certificated reinstated, include the following non-exhaustive list of works:

(i) complete overhauling and/or repair and/or replacement of all machinery and equipment and extensive renewals of major and miscellaneous spares;

(ii) extensive piping system renewals, overhauling of valves, sensors and gauges;

(iii) full hull and deck blasting and extensive steel renewals and recoating;

(iv) extensive renewal of outfitting, supports, ladders;

(v) extensive steel renewals in cargo and ballast tanks;

(vi) re-tubing and/or replacement of auxiliary boilers and exhaust gas boilers;

(vii) overhauling and renewal of cargo system, cargo piping, cargo monitoring and cargo equipment and machinery;

(viii) steam lines and heating coils renewals;

(ix) deck machinery overhauling and renewal including cranes and their hydraulic systems;

(x) electrical, electronics and automation system service, repair and renewal;

(xi) extensive rewiring;

(xii) bridge navigation and communication equipment service and renewals;

(xiii) overhauling, repairs and renewal of steering and shafting system;

(xiv) overhauling, service, repair and renewals of all safety equipment, firefighting systems and appliances including lifesaving equipment; and

(xv) fitting of ballast water treatment system.

23. Owners reserve the right to amend their claim to provide further information and particulars in due course.

24. The Vessel is in such a bad condition that in Owners' view it would cost more to tow her and repair her than her (repaired) market value. Owners therefore claim as damages an amount equivalent to the (repaired) market value of the Vessel, which is USD 18 million. Owners will give credit for the net proceeds received from scrapping the Vessel after towage and other expenses in the approximate sum of USD 3.5 million.

25. Further or in the alternative, the matters set out above constitute a "*loss...arising out of or in relation to the operation of the Vessel by the Charterers*" and/or one "*...arising directly or indirectly in any manner out of the possession, management control, chartering, sub-chartering...use, operation, return, redelivery...of the Vessel*" and Owners are accordingly entitled to an indemnity pursuant to Clause 15 and/or Rider Clause 9 of the Charterparty as calculated above.

26. Alternatively, if contrary to the above the cost of towage and repairs is less than the Vessel's (repaired) market value, Owners claim damages and/or an indemnity in the following sums:

(i) the cost of repairs to put the Vessel into the same good order and condition as that in which she was on delivery; alternatively diminution in the value of the Vessel in the same sum;

(ii) loss of hire during the period of any repairs, at the prevailing market rate;

(iii) any costs incidental to the repair, including but not limited to classification and superintendency costs.

<u>Geden Holdings' liability under the Guarantee</u>

27. By the terms of the Guarantee, Geden Holdings agreed:

    (i) To "...*unconditionally and irrevocably guarantee as primary obligor on first demand the full and timely performance by the Charterer of all its obligations under the [Charterparty]*"; and

    (ii) To pay upon Owners' first written demand "...*stating (i) that the claimed amount is due to you and remains unpaid for a period of seven (7) calendar days form the due date and (ii) copies of the hire statement for the relevant period, we especially undertake to make any payment which was due to you under the above-mentioned Contract but has not been paid on the due date by the Charterers...*".

28. The Guarantee further provided that in the event of any dispute between Owners and Charterers as to sums payable under the Charterparty which had been referred to arbitration within seven days of receipt of the payment for demand, Geden Holdings shall be "...*entitled to withhold and defer payment until the awards is published*".

29. However, on the proper construction of the Guarantee, the effect of a dispute would be to <u>suspend</u> Geden Holdings' liability to make payment (i.e. payment is "withheld and deferred") pending the publication of an award. The existence of a dispute referred to arbitration would not prevent Geden Holdings' liability from crystallising; nor would it prevent Owners from taking steps to secure those crystallised claims.

30. Geden Holdings is accordingly liable under the Guarantee as and to the same extent that Charterers are liable under the Charterparty, albeit that its obligation to discharge that liability is held in suspense pending resolution of the Charterparty claims.

## E. The factual basis for the claims against the Advantage Respondents

<u>The relevant parties</u>

31. The ultimate holding company within the Advantage Group is Forward Holdings LLC, which is (nominally) 85% owned by Ms Karamehmet-Williams and 15% owned Mr Tokgöz.

32. Forward Holdings LLC owns 100% of Advantage Holdings LLC, which owns 100% of Advantage Tankers LLC. Advantage Tankers LLC owns 100% of (now) 9 single vessel owning companies. Those SPV companies include Advantage Arrow Shipping LLC and Advantage Start Shipping LLC, which respectively own MT "*ADVANTAGE ARROW*" and MT "*ADVANTAGE START*", the vessels which are the subject of the Rule B proceedings.

33. An organisational chart is exhibited to these Claim Submissions at [36].

34. Ms Karamehmet-Williams is the only child of Mr Karamehmet. Prior to mid-2013, she had no experience or involvement in the shipping industry. She had, instead, been an active director at another of Mr Karamehmet's companies, Turkcell Iletisim Hizmetleri AS ("**Turkcell**"), a telecommunications company.

35. Mr Karamehmet is and was at all material times the directing mind and will of Geden Holdings. 77,099,999 of the shares in Geden Holdings are and were at all material

times owned by Buselten Finance SA, a company 100% owned by Mr Karamehmet. The only other share in Geden Holdings was held by Mr Tokgöz. Geden Holdings was the sole shareholder in a number of SPV single vessel owning companies.

36. Mr Karamehmet also owned and controlled a related company, Genel Denizcilik Nakliyati AS ("**Geden Lines**"), through his company Cukurova Holdings. Geden Holdings, Geden Lines and their subsidiaries are referred to as "**the Geden Group**".

37. Mr Tokgöz is and was at all material times the Vice Chairman and CEO of Geden Holdings. He is also a minority shareholder in and CEO of both Future Holdings Ltd and Forward Holdings LLC.

38. Mehmet Mat ("**Mr Mat**") is and was at all material times the CFO of Geden Holdings, and also of both Future Holdings Ltd and Forward Holdings LLC.

39. Save for the apparent substitution of Mr Karamehmet for his only daughter Ms Karamehmet-Williams, Geden Holdings (on the one hand) and Future Holdings Ltd and Forward Holdings LLC (on the other) therefore have the same senior management.

Project Hermitage

40. As the Tribunal will be aware, the shipping industry suffered a substantial downturn following the global financial crisis in late 2008 and a sustained bear market thereafter. A number of shipping interests became insolvent or otherwise suffered heavy losses in the years that followed.

41. Against that background, it is appears that in or around November 2012, the Geden Group engaged AlixPartners LLP ("**AlixPartners**"), a consultancy particularly known for corporate restructuring, to advise on how it might restructure its business. That proposed restructuring was codenamed "Project Hermitage".

42. On or around 6 March 2013, AlixPartners presented a 52-page report to Geden Lines ("**the Project Hermitage Report**") [37-88]. The Project Hermitage Report provided, *inter alia*, as follows:

    (i) The "key objectives" of Project Hermitage as recorded in the "Executive Summary" on page 7 of the Project Hermitage Report. Those included to "*[c]ompensate stakeholders adequately for their risk-weighted capital exposure and concessions*", and to "*[r]ing-fence potential sources of disruption, holdout or nuisance (such as arrests or sister-ship arrests)*".

    (ii) The "Executive Summary" went on to state that Project Hermitage would involve "*...grouping and ringfencing assets...*", and that this would be achieved by arranging for sales of the SPV subsidiaries "*into appropriate newcos*", codenamed "*Newco Alpha*", "*Newco Beta*", "*Group C*" and "*Group D*".

    (iii) Part III of the Project Hermitage Report then set out details of the restructuring proposal. Those included:

        (a) That there would need to be "*some change in the ownership...in order to protect relevant lenders from sister ship arrests in South Africa – type jurisdictions...*";

        (b) By the organogram on page 16, that Mr Karamehmet would still hold the majority of the shares in "Newco Alpha", and Geden Lines would continue to manage the vessels in "Newco Alpha";

(c) That 21 vessels would be transferred into "Newco Alpha". Those included all 11 of the crude oil tankers subsequently transferred to the Advantage Group, and the 7 product tankers subsequently bareboat chartered to SPVs within the Future Group.

(iv) In the "Conclusions", on page 40, that it met the "key objectives" outlined in the "Executive Summary" by, *inter alia*, providing for "*recategorization of exposure from "Geden Holdings Ltd" to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support*", creating a "*[c]ommon set of incentives and exposure to recovery protects lenders from disruptive behaviour onset by other stakeholders with a markedly different position*" and minimising the risk for sister ship arrest "*...given shareholding structure in Newco*". The reference to "disruptive behaviour by other stakeholders" was to the fact that other of the Geden Group's counter-parties, such as Icon, were enforcing their contractual rights by taking steps as exercising liens over sub-hire (see page 10).

43. The Project Hermitage Report was addressed to Geden Lines but could be made available to the Geden Group's lenders, including DVB SE.

The Future Group transfers

44. Between June and August 2013, so between three and five months after the Project Hermitage Report, the Geden Group divested itself of the 7 product tankers, which were transferred to newly incorporated SPV companies and renamed, as follows:

| **Vessel former name** | **Former owner** | **Vessel new name** | **New owner** |
|---|---|---|---|
| Rock | Rock Shipping Ltd | Stone I | Stone Shipping LLC |
| Rocket | Rocket Shipping Ltd | Steel | Steel Shipping LLC |
| Cargo | Cargo Shipping Ltd | Style | Style Shipping LLC |
| Cotton | Cotton Shipping Ltd | Sky | Sky Shipping LLC |
| Acor | Acor Shipping Ltd | Star I | Star Transportation LLC |
| Carry | Carry Shipping Ltd | Silent | Silent Shipping LLC |
| Rova | Rova Shipping Ltd | Single | Single Shipping LLC |

45. Silent Shipping LLC, Single Shipping LLC and Star Transportation LLC are wholly owned subsidiaries of an intermediate holding company, Hudson Shipping Holdco LLC. Hudson Shipping Hudson LLC is managed by DVB Investment Management NV. DVB SE is and was one of Geden Group's financiers. Copies of the incorporation documents bearing out the foregoing are exhibited at [89-140].

46. It is to be inferred from the above and the further matters set out below that the other four new SPVs (Stone Shipping LLC, Steel Shipping LLC, Style Shipping LLC and Sky Shipping LLC) were also owned and/or controlled by the Geden Group's financiers.

47. Each of the 7 product tankers was then bareboat chartered to newly incorporated SPVs owned by Future Holdings Ltd (itself incorporated on 11 July 2013), as follows:

| **Vessel new name** | **New owner** | **Bareboat charterer** |
|---|---|---|
| Stone I | Stone Shipping LLC | Boston Maritime Ltd |
| Steel | Steel Shipping LLC | Milan Maritime Ltd |

| Style | Style Shipping LLC | Paris Maritime Ltd |
|---|---|---|
| Sky | Sky Shipping LLC | London Maritime Ltd |
| Star I | Star Transportation LLC | Amsterdam Maritime Ltd |
| Silent | Silent Shipping LLC | Barcelona Maritime Ltd |
| Single | Single Shipping LLC | Istanbul Maritime Ltd |

48. Future Holdings Ltd's ownership of each of the bareboat charterers for the 7 product tankers is confirmed in its letter dated 29 February 2016 [141].

49. Each of the Amsterdam Maritime Ltd, Barcelona Maritime Ltd and Boston Maritime Ltd has as its business address Buyukdere Cad. Yapi Kredi Plaza Blok K. 12 34430, Istanbul, Turkey – the same business address as Geden Holdings. Further, each of the 7 product tankers continues to be managed by Geden Lines (again, consistent with the proposals set out in the Project Hermitage Report).

50. Silent, Single and Star I were time chartered to STI Chartering and Trading Ltd by time charters dated 29 February 2016 [142-338]. Those time charters provide for hire to be paid to Future Holdings Ltd. Each of them also contained, at rider clause 88, consent for the bareboat charterers to sell the vessels to Advantage Product Tankers LLC, a company within the Advantage Group and hence also within the ultimate nominal ownership of Ms Karamehmet-Williams and Mr Tokgöz.

51. Future Holdings Ltd is 75% owned by Ms Karamehmet-Williams and 25% owned by Mr Tokgöz. Mr Tokgöz is also the sole director, president and secretary of Amsterdam Maritime Ltd, Barcelona Maritime Ltd and Boston Maritime Ltd. It is to be inferred that he holds similar positions with the other four bareboat charterers. At around the same time, Ms Karamehmet-Williams, who previously had no experience in or involvement in the shipping industry, left her father's company Turkcell.

52. A sample bareboat charter between the owning SPVs and the bareboat chartering SPVs isexhibited at [339-361] (the other bareboat charters are materially identical). Those are not conventional bareboat charters (such as the Charterparty) but structured as "sale and leaseback" charters more characteristic of an arrangement between an owner and its financier. The charters are executed on behalf of the owning SPVs by George Macheras, a ship finance partner at Watson Farley Williams law firm, who includes in his experience advising "*Geden Lines on the fleet-wide global restructuring of its vessel financings and charter arrangements*".

53. It is therefore apparent from the foregoing that the apparent dispositions of the 7 product tankers was, in substance, a restructuring of the Geden Group's assets into a new wrapper nominally controlled by Ms Karamehmet-Williams and Mr Tokgöz but in fact controlled by Mr Karamehmet. That is consistent with the fact that the 7 product tankers were identified in the Project Hermitage Report as vessels to be transferred into "Newco Alpha", the proposed new corporate entity in which Mr Karamehmet was to have a majority share. The vessels are still managed by Geden Lines, and the bareboat chartering SPVs operate from Geden Holdings' address.

<u>The Advantage Group transfers</u>

54. Between around January and May 2015, a further 11 crude oil tankers (including the Rule B Vessels, which appear in the **bold** in the table below) were divested from the Geden Group, to the Advantage Group, and again renamed. Those were as follows:

| Vessel former name | Former owner | Vessel new name | New owner |
|---|---|---|---|
| Profit | Profit Shipping Ltd | Advantage Solar | Advantage Solar Shipping LLC |
| **Target** | **Target Shipping Ltd** | **Advantage Arrow** | **Advantage Arrow Shipping LLC** |
| True | True Shipping Ltd | Advantage Avenue | Advantage Avenue Shipping LLC |
| Blue | Blue Shipping Ltd | Advantage Sky | Advantage Sky Shipping LLC |
| Pink | Pink Shipping Ltd | Advantage Summer | Advantage Summer Shipping LLC |
| **Blank** | **Blank Shipping Ltd** | **Advantage Start** | **Advantage Start Shipping LLC** |
| Reef | Reef Shipping Ltd | Advantage Spring | Advantage Spring Shipping LLC |
| Bravo | Bravo Shipping Ltd | Advantage Atom | Advantage Atom Shipping LLC |
| Power | Barbados Maritime Ltd | Advantage Anthem | Advantage Anthem Shipping Ltd |
| Value | Value Shipping Ltd | Advantage Award | Advantage Award Shipping LLC |
| Royal | Prima Shipping Ltd | Advantage Sun | Advantage Sun Shipping Ltd |

55. The said 11 crude oil tankers were identified in the Project Hermitage Report as assets to be transferred from the Geden Group into "Newco Alpha", the new corporate entity majority owned by Mr Karamehmet.

56. Further, the Advantage Group shares common officers and directors with the Geden Group and operates from the same business premises (Buyukdere Cad. Yapi Kredi Plaza Blok K. 12 34430, Istanbul, Turkey) as the Geden Group. Each of the 11 crude oil tankers continues to be managed by Geden Lines.

57. As with the 7 product tankers, each of the 11 crude oil tankers was re-flagged from the Maltese Registry to the Marshall Islands Registry.

58. As set out above at paragraphs 31 to 39 above, the Advantage Group is nominally owned and controlled by Ms Karamehmet-Williams and Mr Tokgöz but should be regarded as being in the ultimate control of Mr Karamehmet.

59. In a deposition dated 14 January 2016 given in connection with another related matter (*Eclipse Liquidity Inc et al v Avor Navigation Ltd et al*) [362-364] ("**the Eclipse Litigation**"), Ms Karamehmet-Williams deposed that she paid c. US$200 million of her own money to purchase the 11 crude oil tankers, with the balance of the money being advanced by lenders.

60. Ms Karamehmet-Williams was however unable to give any further details of the source of that US$200 million other than that she was "born wealthy". It is to be inferred that that money was indeed invested by the wealthy Karamehmet family, at the direction of Mr Karamehmet.

<u>The further transfers to Fleetscape</u>

61. Yet further, in or around early 2019, certain of the vessels owned by the Advantage Group were transferred into companies within the Fleetscape group ("the Fleetscape

Group") as part of a further restructuring and/or refinancing, as follows (again, with the Rule B Vessels appearing in bold typeface):

| **Vessel former name** | **Former owner** | **Vessel new name** | **New owner** |
|---|---|---|---|
| Advantage Solar | Advantage Solar Shipping LLC | Fleetscape Solar | Fleetscape Solar LLC |
| **Advantage Arrow** | **Advantage Arrow Shipping LLC** | **Fleetscape Arrow** | **Fleetscape Arrow LLC** |
| Advantage Avenue | Advantage Avenue Shipping LLC | Fleetscape Avenue | Fleetscape Avenue LLC |
| Advantage Sky | Advantage Sky Shipping LLC | Fleetscape Sky | Fleetscape Sky LLC |
| Advantage Summer | Advantage Summer Shipping LLC | Fleetscape Summer | Fleetscape Summer LLC |
| **Advantage Start** | **Advantage Start Shipping LLC** | **Fleetscape Start** | **Fleetscape Start LLC** |
| Advantage Spring | Advantage Spring Shipping LLC | Fleetscape Spring | Fleetscape Spring LLC |
| Advantage Atom | Advantage Atom Shipping LLC | Fleetscape Atom | Fleetscape Atom LLC |
| Advantage Anthem | Advantage Anthem Shipping Ltd | Fleetscape Anthem | Fleetscape Anthem Ltd |
| Advantage Award | Advantage Award Shipping LLC | Fleetscape Award | Fleetscape Award LLC |
| Advantage Sun | Advantage Sun Shipping Ltd | Fleetscape Sun | Fleetscape Sun LLC |

62. The holding company within the Fleetscape group is Fleetscape Capital LLC, which is understood to be a joint venture between (on the one hand) the Advantage Group and/or the Karamehmet family and (on the other) Oaktree Capital Management LP. That restructuring was again carried out by Watson Farley Williams.

63. The restructuring was carried out against the background of the two sets of Rule B Proceedings against companies in the Advantage Group, and further proceedings in South Africa brought against Advantage Sky and Advantage Sky LLC by companies within the Icon group. It is to be inferred that this was therefore yet another attempt by the Karamehmet family to evade the creditors of Geden Holdings which were now seeking to attach Advantage Group assets.

<u>The inferences to be drawn</u>

64. In the circumstances set out above, it is to be inferred that:

(i) The apparent divestment of the 7 product tankers and the 11 crude oil tankers by the Geden Group was in fact a restructuring of its assets in a manner calculated to evade its creditors, consistent with the scheme devised by Project Hermitage;

(ii) The Advantage Group and the Future Group remain in the ultimate control of Mr Karamehmet, with Ms Karamehmet-Williams and Mr Tokgöz acting as his nominees;

65. Without prejudice to Owners' case as will be developed at the trial of this reference, and pending full and proper disclosure from the Advantage Respondents, Owners will rely upon *inter alia* the following facts and matters in support of that inference:

(i) The familial relationship between Mr Karamehmet and Ms Karamehmet-Williams, the majority owner of the Future Group and the Advantage Group;

(ii) The common directors and officers for each of the Geden Group, the Future Group and the Advantage Group, in particular in the forms of Mr Tokgöz (who is also a minority shareholder in each of the Geden Group, the Future Group and the Advantage Group) and Mr Mat;

(iii) The fact of Project Hermitage, and the facts and matters set out in the Project Hermitage Report, including but not limited that the 7 product tankers and the 11 crude oil tankers were to be transferred to "Newco Alpha" which was to be majority owned by Mr Karamehmet, in order to "ring fence" assets from creditors;

(iv) The inherent unlikelihood that Ms Karamehmet-Williams, who had no experience or involvement in the shipping industry, should coincidentally at a time when the shipping industry was in a bear market but a short time after Project Hermitage, decide to resign from Turkcell and incorporate the Future Group and acquire 7 product tankers on "sale and leaseback" bareboat charters;

(v) The inherent unlikelihood that Ms Karamehmet-Williams should coincidentally invest US$200 million of her own money into buying vessels from the Geden Group;

(vi) The fact that Ms Karamehmet-Williams' only explanation for the source of the said US$200 million was that she was "born wealthy", a clear reference to the Karamehmet family wealth;

(vii) The inherent unlikelihood, contrary to the evidence given by Ms Karamehmet-Williams in her deposition of 14 January 2016 (page 12), that she should invest US$200 million of (on her case) her inheritance into buying vessels from her father's fleet without discussing the matter with him first;

(viii) The fact that Ms Karamehmet-Williams untruthfully deposed in her deposition of 14 January 2016 (page 41) that Future Holdings Ltd in October 2014 had no assets and was non-operative, when in fact (as she must have known) it was the holding company for seven bareboat chartering SPVs;

(ix) The fact that Mr Tokgöz untruthfully deposed in a deposition he gave on 13 January 2016 in the Eclipse Litigation that Future Holdings Ltd was nothing to do with restructuring (page 67) when in fact it (as he must have known) was the holding company for seven bareboat chartering SPVs in respect of the 7 product tankers;

(x) The fact that Mr Mat untruthfully deposed in a deposition he gave on 15 January 2016 in the Eclipse Litigation that Future Holdings Ltd had no assets or money when in fact (as he must have known) it was the holding company for seven bareboat chartering SPVs in respect of the 7 product tankers;

(xi) The fact that Mr Karamehmet has been convicted of dishonesty offences in Turkey, in respect of which he was sentenced to a term of seven years' imprisonment;

(xii) The common business address of each of the Geden Group, the Future Group and the Advantage Group;

(xiii) The fact that Geden Lines manages each of the vessels bareboat chartered to the Future Group and owned by the Advantage Group, consistent with the plan for "Newco Alpha" in the Project Hermitage Report;

(xiv) The fact that, in a letter from Geden Holdings to Shell Western and Supply and Trading Limited dated 6 February 2015 and signed by Mr Tokgöz [365-397], the transfer of the 11 crude oil tankers to the Advantage Group was described as "*...part of certain reorganisation efforts being conducted by the existing shareholders of each Existing Owner...*" and that the new owners would be "*...each wholly owned by the Shareholder* [i.e., Geden Holdings]";

(xv) The fact that, following earlier Rule B proceedings brought in Pennsylvania, Texas and Louisiana in September 2016 to secure Owners' claims against Charterers and Geden Holdings against certain defendants including members of the Advantage Group, Geden Lines, Mr Karamehmet and Ms Karamehmet-Williams, those defendants initially sought to resist discovery, and when Owners pressed their discovery requests, Charterers and Geden Holdings subsequently agreed to enter into a settlement with Owners of their outstanding liabilities on 8 December 2016;

(xvi) The fact that the dispositions of the 7 product tankers and 11 crude oil tankers by the Geden Group were part of a wider restructuring arrangement, pursuant to which by the end of 2016 the Geden Group had disposed of between 50 and 60 vessels, leaving it with a single ship and no other substantial assets;

(xvii) The fact that the Geden Group and the Advantage Respondents have the same English solicitors (Lax & Co LLP) and US attorneys (Watson Farley Williams), in circumstances where (had they been separate entities, and given that the Advantage Respondents' interests and the Geden Group's interests are adverse) those lawyers would have necessarily faced a conflict of interest;

(xviii) The fact that at the end of 2016 the Geden Group paid Owners US$ 4,765,192.15 pursuant to the Settlement Agreement of 8 December 2016. In circumstances where the Geden Group had no substantial assets, the inference is that Geden must have been placed in funds by the Advantage Group. To the extent that the contrary is averred, Owners will seek disclosure as to the source of those funds;

(xix) The further apparent transfers to the Fleetscape Group in early 2019, which has every appearance of being yet another attempt by those ultimately controlling the Geden and Advantage Groups to evade their creditors.

## F. The US law claims against the Advantage Respondents

66. The Rule B proceedings are ancillary to a contractual claim and are accordingly governed by the law of the US 5th Circuit (which includes both the states of Texas and Louisiana), as appropriate, applying US federal maritime conflicts of law principles: see *Blue Whale Corp v Grand China Shipping Dev Co* 722 F 3d 488 (2nd Cir 2013).

67. Further or in the alternative, as a matter of English conflicts of law, the Rule B proceedings (and/or any issue concerning what in English law would be characterised as piercing the corporate veil) are matters of remedy and/or enforcement are thus to be governed by the *lex fori* rather than the *lex contractus*: *Akhmedova v Akhmedova* [2018] EWFC 23 (Fam) at [58-61], *per* Haddon-Cave J (as he then was). In

circumstances where the Rule B proceedings were commenced in Texas and Louisiana, the *lex fori* is the law of the US 5th Circuit. The fact that those proceedings were stayed for arbitration cannot retrospectively change the governing *lex fori*.

68. As a matter of the law of US 5th Circuit, the Advantage Respondents are liable for the liabilities of Geden Holdings under principles of "successor liability" and/or as a "fraudulent transferee".

69. Pursuant to US 5th Circuit law, a company will attract "successor liability" where "*(1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability*": *In re Louisiana Crawfish Producers* 772 F 3d 1026, 1030 (5th Cir. 2014), incorporating into admiralty jurisprudence the principles stated in *Golden State Bottling Co v NLRB* 414 US 168, 182 (S Ct. 1973).

70. Here, for the reasons set out in Section E above, it is to be inferred that the Advantage Respondents were "merely a continuation" of the Geden Group so far as the 11 crude oil tankers (including the Rule B Vessels) were concerned, and moreover that the transfers of those vessels were "entered into to escape liability". Accordingly, "successor liability" attaches to the Advantage Respondents.

71. Further or in the alternative, the Advantage Respondents are liable as "fraudulent transferees". The assets of a transferee may be attached in Rule B proceedings where the jurisdiction of the admiralty court would otherwise be "*thwarted by a fraudulent transfer*": see *Swift & Co Packers v Compania Colombiana Del Caribe SA* 339 US 684, 867-868 (S Ct. 1950).

72. Owners aver that in circumstances where the transfer of the Advantage Respondents was and was known to be a mechanism for evading the Geden Group's creditors whilst allowing Mr Karamehmet to continue ultimate ownership of the Geden Group's assets, that was inherently dishonest so as to attract fraudulent transferee liability.

73. Owners will further rely upon the facts that each of Ms Karamehmet-Williams, Mr Tokgöz and Mr Mat gave untruthful evidence in relation to Future Holdings Ltd when deposed in January 2016, and that Mr Karamehmet has been found to have been criminally dishonest by the Turkish courts.

74. Mr Karamehmet has also defaulted on a personal guarantee the subject of separate English High Court proceedings brought by Samsung Heavy Industries Co Ltd (Claim No CL-2015-000622) against Mr Karamehmet and certain of his companies. Judgment in default was entered against him by Leggatt J on 3 February 2016 in the sum of US$44,332,413 excluding interest and costs [398-400], but he has failed to pay any or all of that judgment sum. Judgment in default in the sum of US$67,899,877.59, excluding interest and costs, was also entered against Geden Lines, the Seventh Defendant in that action, by Popplewell J on 14 June 2016 [401-403]. Again that judgment debt remains wholly unsatisfied.

75. The Advantage Respondents are accordingly liable under both theories of US 5th Circuit law, and Owners are accordingly entitled to enforce their claims under the Guarantee against the Rule B Sums.

## G. The English law claims against the Advantage Respondents

76. Further or in the alternative, if and to the extent that any piercing of the corporate veil is governed by English law, then Owners are entitled to rely upon the "evasion" principle as explained by Lord Sumption in the decision of the (UK) Supreme Court in *Prest v Petrodel Resources Ltd* [2013] 2 AC 415. The interposition of the Advantage

Group was plainly intended by the Geden Group to "*...defeat the right or frustrate...enforcement*" of Owners' rights by placing assets held by the Geden Group into a different wrapper. On this basis too, Owners are entitled to enforce their claims under the Guarantee against the Rule B Sums.

77. Yet further or in the further alternative, in circumstances where Owners are entitled to pierce the corporate veil as a matter of English law, they are entitled to hold the Advantage Respondents directly liable for Owners' claims under the Guarantee, as to do so would allow Owners to enforce against the dissipated assets and so "*depriv[e] the company or its controller of the advantage that they would otherwise have obtained by the company's separate legal personality*" (*Prest*, at [35]).

## H. Relief sought

78. By reasons of the facts and matters above, Owners are entitled to and do claim the following relief.

Declaratory relief

79. Owners are entitled to and do claim the following declarations.

(i) Declarations that as a matter of US 5th Circuit law:

(a) The Advantage Respondents are successors to Geden Holdings for the purposes of successor liability, and fraudulent transferees of Geden Holdings' assets; and

(b) Owners are accordingly entitled to enforce their claims under the Guarantee against the Rule B Sums;

(ii) A declaration that as a matter of English law, Owners are entitled to pierce the corporate veil so as to enforce as against the Advantage Respondents claims arising against Geden Holdings under the Guarantee;

Monetary claims

80. In light of the fact that Owners are entitled to pierce the corporate veil as against the Advantage Respondents as a matter of English law, Owners are further entitled to and do claim the following monetary relief:

(i) US$233,708.33 in unpaid hire as a debt and/or damages for breach of the Charterparty; and

(ii) US$18 million for breach of the maintenance obligations and/or by way of indemnification, less the net proceeds of scrappage;

alternatively such other sums as the Tribunal may assess.

Interest and costs

81. Owners are further entitled to and do claim:

(i) Interest on such sums as are adjudged due to them, at such rate over such period and compounded with such rests as the Tribunal sees fit, pursuant to section 49 of the Arbitration Act 1996;

(ii) The costs of the reference, pursuant to section 61 of the Arbitration Act 1996.

AND OWNERS CLAIM:

(1) The declaratory relief set out at paragraph 79 above;

(2) The monetary claims set out at paragraph 80 in the sums of US$233,708.33 or US$18 million or such other sums as the Tribunal may assess, less the net proceeds of scrappage;

(3) Further or other relief;

(4) Interest;

(5) Costs.

**ALEXANDER WRIGHT**

Served this 18th of June 2019 by Gaitas & Chalos, P.C., on behalf of the Claimant.